UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| CONSERVATION LAW FOUNDATION, INC., | ) | Case No. 1:16-cv-11950-MLW |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| EXXONMOBIL CORPORATION, | ) |  |
| EXXONMOBIL OIL CORPORATION, AND | ) |  |
| EXXONMOBIL PIPELINE COMPANY, | ) |  |
|  | ) |  |
| Defendants. | ) |  |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF AUTHORITIES

**Cases**

*Adams v. Watson,*
 10 F.3d 915 (1st Cir. 1993) .................................................................... 5

*Amigos Bravos v. U.S. Bureau of Land Mgmt.,*
 816 F. Supp.2d 1118 (D.N.M. 2011) ..................................................... 11

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009) ............................................................................... 3

*Atl. States Legal Found, v. Eastman Kodak Co.,*
 933 F.2d 124 (2d Cir. 1991) ................................................................... 20

*Babbitt v. Farm Workers,*
 442 U.S. 289 (1979) ............................................................................... 9

*Bell Atl. Corp. v. Twombly,*
 550 U.S. 544 ........................................................................................... 3

*Center for Biological Diversity v. U.S. Dep't of Interior,*
 563 F.3d 466 (D.C. Cir. 2009) ............................................................... 11

*Clapper v. Amnesty Intern. USA,*
 133 S. Ct. 1138 (2013) ........................................................................... 4

*Conservation Law Found., Inc. v. U.S. Envtl. Prot. Agency,*
 964 F. Supp.2d 175 (D. Mass. 2013) .................................................... 13

*Covington v. Jefferson Cnty.,*
 358 F.3d 626 (9th Cir. 2004) ............................................................. 5, 13

*Cty. of Los Angeles,*
 725 F.3d 1194 (9th Cir. 2013) ............................................................... 17

*Dague v. Cty. of Burlington,*
 935 F.2d 1343 (2d Cir. 1991) ........................................................... 14, 15

*Davis v. Fed. Election Comm'n,*
 554 U.S. 724 (2008) ............................................................................... 9

*U.S. Envtl. Prot. Agency v. California,*
 426 U.S. 200 (1976) ......................................................................... 18, 23

*Gonzalez v. United States,*
 284 F.3d 281 (1st Cir. 2002) .................................................................. 3

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,*
 484 U.S. 49 (1987) ........................................................................ passim

*Hudson Riverkeeper Fund, Inc. v. Orange & Rockland Utilities, Inc.,*
 835 F.Supp. 160 (S.D.N.Y. 1993) ......................................................... 19

*Katz v. Pershing, LLC,*
 672 F. 3d 64 (1st Cir. 2012) ................................................................... 3

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
 528 U.S. 167 (2000) ........................................................................... 4, 5

*Los Angeles v. Lyons,*
 461 U.S. 95 (1983) ................................................................................. 9

*Defs. of Wildlife v. Lujan,*
 504 U.S. 555 (1992) ..................................................................... 4, 11, 12

*Me. People's Alliance v. Mallinckrodt, Inc.,*
  471 F.3d 277 (1st Cir. 2006) ........................................................................ 5, 14, 15
*Massachusetts v. U.S. Envtl. Prot. Agency*
  549 U.S. 497 (2007) .......................................................................................... 12
*Meghrig v. KFC W., Inc.,*
  516 U.S. 479 (1996) ............................................................................................ 2
*Nat. Res. Def. Council v. Kempthorne,*
  506 F.Supp.2d 322 (2007) ................................................................................. 21
*Ocasio–Hernandez v. Fortuno–Burset,*
  640 F.3d 1 (1st Cir. 2011) ................................................................................... 3
*O'Shea v. Littleton,*
  414 U.S. 488 (1974) .......................................................................................... 10
*Palumbo v. Waste Techs. Indus.,*
  989 F.2d 156 (4th Cir. 1993) ............................................................................. 18
*Parker v. Scrap Metal Processors, Inc.,*
  386 F.3d 993 (11th Cir. 2004) ..................................................................... 14, 15
*Pennsylvania v. West Virginia,*
  262 U.S. 553 (1923) ............................................................................................ 9
*Pettengill v. Curtis,*
  584 F. Supp. 2d 348 (D. Mass. 2008) ................................................................. 3
*Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals Inc.,*
  913 F.2d 64 (3d Cir. 1990) ....................................................................... 5, 12, 13
*P.R. Campers' Ass'n. v. P.R. Aqueduct & Sewer Auth.,*
  219 F. Supp. 2d 201 (D.P.R. 2002) .................................................................... 25
*Rodriguez–Ortiz v. Margo Caribe, Inc.,*
  490 F.3d 92 (1st Cir. 2007) ................................................................................. 3
*S.P.I.R.G. v. Anchor Thread Co.,*
  1984 U.S. Dist. LEXIS 23153 (D.N.J. Oct. 1, 1984) ........................................ 25
*San Luis & Delta-Mendota Water Auth. v. Salazar,*
  666 F.Supp.2d 1137 (E.D. Ca 2009) ................................................................. 21
*Sierra Club v. Morton,*
  405 U.S. 727 (1972) ............................................................................................ 5
*Spokeo, Inc. v. Robins,*
  136 S. Ct. 1540 (2016) ........................................................................................ 4
*Student Pub. Interest Research Grp. of N.J., Inc. v. Georgia-Pac. Corp.,*
  615 F. Supp. 1419 (D.N.J. 1985) ............................................................... 5, 6, 12
*Student Pub. Interest Research Grp. of N.J., Inc. v. Tenneco Polymers, Inc.,*
  602 F. Supp. 1394 (D.N.J. 1985) ....................................................................... 12
*SURCCO v. PRASA,*
  157 F. Supp. 2d 160 (D.P.R. 2001) .................................................................... 25
*Texaco Ref. & Mktg., Inc.,*
  2 F.3d 493 (3d Cir. 1993) ............................................................................. 25, 26
*Texport Oil Co. v. United States,*
  185 F.3d 1291 (Fed. Cir. 1999) ......................................................................... 21
*Defs. of Conewango Creek v. Echo Developers, LLC.,*
  No. CIV.A. 06-242 E, 2007 WL 3023927 (W.D. Pa. Oct. 12, 2007) ................. 18

*United States v. AVX Corp.*,
    962 F.2d 108 (1st Cir. 1992) ............................................................... 6
*United States v. Union Corp.*,
    259 F. Supp. 2d 356 (E.D. Pa. 2003) ................................................... 15
*Village of Oconomowoc Lake v. Dayton Hudson Corp.*,
    24 F.3d 962 (1994) .............................................................................. 27
*Warth v. Seldin*,
    422 U.S. 490 (1975) .......................................................................... 4, 5
*Wisc. Res. Prot. Council v. Flambeau Min. Co.*,
    727 F.3d 700 (7th Cir. 2013) .......................................................... 21, 22

**Statutes**

33 U.S.C. § 1311(a) ............................................................................... 27
33 U.S.C. § 1342(p)(1) ......................................................................... 23
33 U.S.C. § 1362(7) ............................................................................... 27
33 U.S.C. § 1365(a) ............................................................................... 25
33 U.S.C. § 1365(a)(1) ......................................................................... 18
33 U.S.C. § 1365(a), (b)(2) ................................................................. 20
33 U.S.C. § 1365(f)(6) ......................................................................... 18
33 U.S.C. §§ 1251–1387 ........................................................................ 1
42 U.S.C. §§ 6901 .................................................................................. 1

**Regulations**

40 C.F.R. § 122.2 ................................................................................... 27
40 C.F.R. § 122.44(k) ........................................................................... 24

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 2

LEGAL STANDARD .......................................................................................................... 4

ARGUMENT ...................................................................................................................... 5

I.    CLF has Standing to Bring Its Claims. ................................................................ 5

    a.    CLF and its Members have Sufficiently Alleged Injury in Fact. ............... 6

    b.    The Injuries Suffered by CLF and Its Members are Caused by Exxon. ................. 13

    c.    The Injuries Suffered by CLF and Its Members are Redressable. ........................ 14

II.    CLF has Properly Alleged Imminent and Substantial Endangerment under RCRA. ................................................................................................................ 15

III.    CLF's Claims are not Barred by the Permit Shield Defense. ................................ 17

IV.    CLF's Climate Change Claims are Timely. ........................................................ 19

V.    EPA has not Taken the Position that the CWA does not Require Consideration of Climate Change Impacts, and even if it had, it would not be Entitled to Deference. ........................................................................................................ 19

VI.    CLF has Sufficiently Alleged that Exxon Violated its Duty to Consider and Disclose Relevant Information to EPA. .................................................................... 24

VII.    The Terminal's Spill Prevention, Control and Countermeasures Plan is an Enforceable Best Management Practice and Permit Condition. ............................ 24

VIII.    CLF has Sufficiently Alleged Ongoing Violations of the CWA. ............................ 26

IX.    CLF has Properly Alleged Unpermitted Discharges to the Half-Moon Shaped Pond. ................................................................................................................ 28

CONCLUSION.................................................................................................................. 28

Plaintiff Conservation Law Foundation ("CLF") respectfully requests that this Court deny Exxon's[1] Motion to Dismiss in its entirety for the reasons that follow.

## INTRODUCTION

Exxon grossly mischaracterizes CLF's allegations. This is not a challenge to Exxon's NPDES Permit[2] conditions, nor a challenge to U.S. Environmental Protection Agency ("EPA") regulations, nor a case against EPA challenging its actions or inactions. This is a citizen suit brought under the Clean Water Act, 33 U.S.C. §§ 1251–1387 ("CWA"), and the Resources Conservation and Recovery Act, 42 U.S.C. §§ 6901, *et seq.* ("RCRA"). CLF's claims fall into two categories: (1) Exxon's discharges into the Island End and Mystic Rivers ("the Rivers") in violation of the Permit ("Effluent Limit Claims"),[3] and (2) Exxon's failure to manage risks of discharges at the Terminal in violation of RCRA and the Permit ("Risk Management Claims").[4]

The Permit sets numeric effluent limits for discharges into the Rivers. Exxon's own monitoring and reporting establish ongoing violations of these limits and the Permit's operational requirements. A CWA citizen suit is proper to enforce the Permit where EPA has not commenced enforcement.[5] The Permit requires Exxon to consider and protect against discharges resulting from climate change such as increased frequency and severity of weather events. Exxon admits that it has not considered climate change in developing or implementing the

---

[1] As used herein, "Defendants" or "Exxon" refers to Exxon Mobil Corporation, ExxonMobil Oil Corporation, and ExxonMobil Pipeline Company, collectively.

[2] NPDES Permit No. MA0000833 (as modified on Oct. 12, 2011) Doc. 18-1. (hereinafter the "Permit"), located at Doc. 18-2.

[3] The Effluent Limit Claims include counts 2, 3, 4, 13 and 14.

[4] The Risk Management Claims include 1, 5, 6, 7, 8, 9, 10, 11, and 12.

[5] Contrary to Exxon's assertion that CLF's "Complaint acknowledges that neither [PAHs or TSS] have caused the Mystic or Island End Rivers to be designated as 'impaired' water bodies since 2010," Doc. 17 at 5, CLF's Complaint clearly alleges that in 2010 and again in 2014, the relevant segment of the Mystic River—which includes the Island End River—was listed as impaired for "Petroleum Hydrocarbons." Doc. 1 at ¶¶ 52–53. The term "Petroleum Hydrocarbons" includes PAHs. *See Toxicological Profile for Total Petroleum Hydrocarbons (TPH)*, U.S. Department of Health and Human Services, Public Health Service, Agency for Toxic Substances and Disease Registry at Appendix D, Table D-1 (Sept. 1999), *available at* https://www.atsdr.cdc.gov/toxprofiles/tp123.pdf (containing a list of hundreds of petroleum hydrocarbons, including the PAHs associated with the Everett Terminal).

Terminal's Stormwater Pollution Prevention Plan ("SWPPP") and Spill Prevention, Control and Countermeasures plan ("SPCC").  Doc. 17. at 7.

The Permit states that "[t]he permittee shall comply with the terms of its SWPPP."  Doc. 18-1 at 13.  The SPCC is incorporated by reference into the SWPPP as an enforceable best management practice to meet the Permit requirement to include "spill prevention and response procedures."  *Id.* at ¶ I.B.4.e; Doc. 1 at ¶¶ 61–9; 250–273.  It is Exxon's obligation to comply with the SWPPP and SPCC for the Everett Terminal by considering climate change in managing and preventing potential discharges of hazardous substances.

RCRA prohibits management of hazardous substances in a manner that presents an "imminent and substantial endangerment" to human health or the environment. "RCRA's primary purpose . . . is to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, *'so as to minimize the present and future threat to human health and the environment.'" Meghrig v. KFC W., Inc.,* 516 U.S. 479, 483 (1996) (emphasis added); *see also* Doc. 1 at ¶ 20. The Terminal is heavily contaminated and, due to its location, a release from the Terminal will have catastrophic effects on human life and the environment.  Exxon's failure to properly manage the risks of a discharge from the Terminal violates RCRA.

CLF's Complaint sufficiently alleges that it and its members have suffered a cognizable injury that was caused by Exxon's violations and is redressable by this Court. As to the Effluent Limit Claims, Exxon's discharges in violation of the Permit have injured CLF members by lessening the aesthetic and recreational values of the Rivers which CLF members regularly use.

Exxon's failure to properly disclose and manage risks of discharges resulting from climate change has lessened the aesthetic and recreational values of the Rivers, which CLF

3

members regularly use, and puts CLF members in harm's way. These risks and injuries are real and imminent, not exaggerated or uncertain. Throughout its motion, Exxon incorrectly adopts the position that the only impact from climate change is sea level rise. This is not the truth, nor what CLF has alleged in its Complaint. Good engineering practices, as required by the Permit, guard against such impacts.

This Court should cure Exxon's violations of federal law by granting the relief requested by CLF and denying Exxon's Motion to Dismiss.

## LEGAL STANDARD

Under the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. Rule 8(a)(2). "When considering a motion to dismiss pursuant to [Rule 12(b)(6)], a court must take all factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *Pettengill v. Curtis,* 584 F. Supp. 2d 348, 362 (D. Mass. 2008) (quoting *Rodriguez–Ortiz v. Margo Caribe, Inc.,* 490 F.3d 92, 96 (1st Cir. 2007)); *see also Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555–58 (2007); *Ashcroft v. Iqbal,* 556 U.S. 662, 677–78 (2009); *Ocasio–Hernandez v. Fortuno–Burset*, 640 F.3d 1, 10–11 (1st Cir. 2011).

In considering a motion to dismiss for lack of standing under Rule 12(b)(1), the Court "accept[s] as true all well-pleaded factual averments in the plaintiff's complaint and indulge[s] all reasonable inferences therefrom in his favor." *Katz v. Pershing, LLC*, 672 F. 3d 64, 70 (1st Cir. 2012) (internal quotations omitted). "The Court may also consider material outside the pleadings, such as affidavits, to aid in its determination." *Gonzalez v. United States*, 284 F.3d 281, 287–88 (1st Cir. 2002). "[A] suit will not be dismissed for lack of standing if there are sufficient allegations of fact . . . in the complaint or supporting affidavits." *Gwaltney of*

4

*Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 65 (1987) (internal quotations omitted).

## ARGUMENT

### I.   CLF has Standing to Bring Its Claims.

Exxon incorrectly asserts, under Rule 12(b)(1), that CLF lacks Article III standing to bring its claims. But CLF's well-pled complaint, supplemented by the declarations attached hereto, meets the Article III requirements and this Court has subject matter jurisdiction over CLF's claims.

To satisfy the requirements of Article III standing, a plaintiff must show that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).[6] "Where . . . a case is in the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).[7]

---

[6] An organization has standing to sue on behalf of its members when: (1) at least one of its members would otherwise have standing; (2) the interests at stake in the litigation are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires an individual member's participation in the lawsuit. *Laidlaw*, 528 U.S. at 181. Exxon does not challenge the second or third prong of the test. Thus, the only issue to be decided is whether any member of CLF would have standing to bring the claims asserted in the Complaint. In any case, CLF is "dedicated to protecting New England's environment" and "has long worked to protect the health of New England's waterways, including addressing the significant water quality impacts of industrial and stormwater pollution." Doc. 1 at ¶ 8.

[7] The standard for a motion to dismiss is different than the heightened standard applied when deciding whether summary judgment is appropriate. *See, e.g., Clapper v. Amnesty Intern. USA*, 133 S. Ct. 1138, 1148-49 (2013) ("[A]t the summary judgment stage, a party *'can no longer rest on . . . "mere allegations,"* but must "set forth" by affidavit or other evidence "specific facts."'") (quoting *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 561 (1992)) (emphasis added). Here, although Plaintiff satisfies even this heightened standard, it is not required to do so in order to defeat a motion to dismiss.

The Complaint satisfies the pleading requirements necessary to defeat Exxon's motion. However, CLF also hereby submits the declarations of five members, describing their personal use of the Rivers and how Exxon's unlawful discharges and failure to implement risk management measures injures them.[8] CLF has standing to bring its claims because its members have suffered an injury in fact that is fairly traceable to Exxon and will be redressed by the relief sought in the Complaint.

### a. CLF and its Members have Sufficiently Alleged Injury in Fact.

CLF has alleged injuries in fact that are concrete and particularized and that are actual and imminent. *Laidlaw*, 528 U.S. at 180–81, 183; *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972) (holding that harm to aesthetic and recreational interests is sufficient to confer standing). The scale of injury need not be significant and is not germane for purposes of standing; "an identifiable trifle will suffice." *Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 71, 72, n. 8 (3d Cir. 1990). se *also Student Pub. Interest Research Grp. of N.J., Inc. v. Georgia-Pac. Corp.*, 615 F. Supp. 1419, 1424 (D.N.J. 1985).

In the RCRA context, "probabilistic harms are legally cognizable." *Me. People's Alliance v. Mallinckrodt, Inc.*, 471 F.3d 277, 283–84 (1st Cir. 2006). "To establish an injury in fact based on a probabilistic harm, a plaintiff must show that there is a substantial probability that harm will occur." *Id.* at 284 (citing *Warth*, 422 U.S. at 504; *Adams v. Watson*, 10 F.3d 915, 923 (1st Cir. 1993)); *see also Covington v. Jefferson Cty.*, 358 F.3d 626, 639 (9th Cir. 2004). Plaintiff can show a substantial probability of harm by demonstrating proximity to the source of the risks RCRA seeks to minimize. *Mallinckrodt*, 471 F. 3d at 283 -84.

### i. CLF members' injuries are concrete and particularized.

---

[8] Declarations of Damali Vidot, Dake Henderson, Roseann Bongiovanni, Ken Krause, and Dr. Ellin Reisner, attached hereto as Exhibits A–E, respectively.

Exxon contends that "CLF does not plead that it uses 'the area affected by the challenged activity.'" Doc. 17 at 12. Exxon's statement blatantly overlooks the Complaint, which states: "CLF members use and enjoy New England's waterways for recreation and aesthetic purposes, including but not limited to boating, swimming, fishing, hunting, and sightseeing. *These waters of the United States include the waterways harmed and threatened by Exxon's violations of federal environmental laws and regulations,"* *i.e.*, the Island End and Mystic Rivers. Doc. 1 at ¶ 8 (emphasis added). The Complaint further states:  "CLF and its members are concerned that these toxic pollutant discharges, which frequently exceed the limits in ExxonMobil's NPDES permit, harm the ecosystems and human use and enjoyment of the Island End and Mystic Rivers." *Id.* at ¶ 9. Maps included in the Complaint depict the precise area of concern surrounding the Terminal. *Id.* at ¶¶ 10, 80, 81. CLF members "are placed directly in harm's way and have no reasonable assurance that they will be protected from pollutants released and discharged from the Everett Terminal." *Id.* at ¶ 11.[9] The attached declarations detail how individual CLF members use the Rivers and have been harmed by Exxon's actions and inactions.[10] *Georgia-Pac. Corp.*, 615 F. Supp. at 1423.

Damali Vidot, a resident of Chelsea, Massachusetts, is a community activist, parent, and Chelsea City Councilmember. Ex. A at ¶¶ 2, 4–5. Growing up in Chelsea, she always felt that the

---

[9] Exxon cites to a Fifth Circuit opinion to support its contention that "New England's waterways" are "too large" an area to confer standing to CLF. Doc. 17 at 12, n. 28. That case, *Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp.*, 95 F.3d 358, 361 (5th Cir. 1996), is easily distinguishable from the present circumstances. That case was decided at the summary judgment stage, and the court declined to infer causation because the organization's members used a lake that was not the point of discharge and was eighteen miles and three tributaries from the source of unlawful water pollution. Here, by contrast, CLF has clearly alleged that the waterways at issue are the portions of the Island End and Mystic Rivers near the Everett Terminal, in and around which its members live and recreate.

[10] Exxon's reliance on *United States v. AVX Corp.*, 962 F.2d 108 (1st Cir. 1992) is misplaced. In *AVX*, the National Wildlife Federation ("NWF") was an intervenor and had "piggy-backed" upon the standing of the government plaintiff, filing a motion for intervention that contained only the vaguest and most conclusory allegations in connection with standing. *Id.* at 120. Although questions regarding NWF's standing were raised, NWF never supplemented the record or otherwise addressed those questions. *Id.* Here, by contrast, CLF properly alleged its members' use of the receiving waters in the Complaint. *See* Doc. 1 at ¶¶ 8–11. Moreover, unlike NWF, CLF has properly, and promptly, supplemented the record with sworn declarations from five of its affected members in response to Exxon's assertion that CLF lacks standing. *See* Exhibits A–E, attached hereto.

local waters, including the Rivers, were unsafe because of pollution, and avoided any contact with them. *Id.* at ¶ 7. She does not take her daughter near the Rivers, because she believes it is still unsafe to do so and the smell is horrible. *Id.* She believes that the local rivers and streams could be an invaluable educational, cultural, and recreational resource for her community if they were clean and safe, and would like to be able spend time near the water with her family if she was confident that it was healthy to do so. *Id.*

Dake Henderson lives in Everett, Massachusetts, and enjoys walking along the Mystic River. Ex. B at ¶¶ 2, 4. He also enjoys fishing and swimming, and would like to fish and swim in the Mystic River near Everett, but does not because he is concerned about the poor water quality. *Id.* at ¶ 5. As he walks along the river or crosses the river on the Alford Street Bridge, he observes that the shoreline does not look healthy, and that there is little to no natural vegetation. *Id.* at ¶ 7. He notices outfall pipes along the river and is acutely aware of the smells emanating from the pipes when he is walking. *Id.*

Roseann Bongiovanni, a resident of Chelsea, Massachusetts, has dedicated her life for the past 21 years to engaging residents—particularly those who feel their voices go unheard—in creating a movement of empowered residents who are achieving a cleaner environment and healthier place to live, work and play. Ex. C at ¶¶ 2, 4. It is "important to [her] that the scenic, cultural, and recreational qualities of the Island End and Mystic Rivers are protected and enhanced both for [her] own use and enjoyment and for current and future generations to enjoy." *Id.* at ¶ 16.

Ken Krause, a resident of Medford, Massachusetts and active member of Friends of the Mystic River, participates in two to four river clean-ups a year, two invasive species removal projects, and the annual Mystic River Winter Bird Walk. Ex. D at ¶¶ 2, 4. He lives about two

blocks from the Mystic River and relies on it for recreation—he occasionally canoes on the river, walks or bikes along it at least a few times a week, and attends festivals and concerts at the Medford riverfront park. *Id.* at ¶ 5. When he must come into contact with the water, such as when he is working to remove invasive plants, he cleans himself immediately afterward because he is worried about the safety of the water. *Id.* at ¶ 10. He is also very concerned about the impact of pollution in the Mystic River on river herring and American Eel. *Id.* at ¶ 14.

Dr. Ellin Reisner lives in Somerville, Massachusetts, and for her, the Mystic Riverfront is a beautiful and peaceful place to relax, observe wildlife and sea birds, and exercise. Ex. E at ¶¶ 2, 4. She walks and bikes on the paths that run along the river in Somerville and enjoys observing wildlife and birds along the river. *Id.* These CLF members are concerned that discharges from the Terminal contain pollutants in levels that exceed the Permit limits. Ex. A at ¶¶ 9–11; Ex. B at ¶¶ 9–11; Ex. C at ¶¶ 9–11; Ex. D ¶¶ 7–9; Ex. E at ¶¶ 6–8. They are also afraid that pollutants from the Terminal will wash into the Rivers and nearby communities when the Terminal is flooded by a severe storm and/or sea level rise. Ex. A at ¶ 13; Ex. B at ¶ 12; Ex. C at ¶ 13; Ex. D at ¶ 13; Ex. E at ¶ 10. Due to the risk of contamination from the Terminal flowing into the Rivers and surrounding communities when a severe storm hits, they fear for their safety and worry about the possibility of that happening as they go about their daily activities in their neighborhoods. *See, e.g.,* Ex. A at ¶ 14; Ex. C at ¶ 14. Knowing that these risks exist decreases their aesthetic appreciation of the Rivers. *See, e.g.,* Ex. A at ¶ 14; Ex. B at ¶ 13; Ex. C at ¶ 14; Ex. D at ¶ 16; Ex. E at ¶ 10.

### ii.   CLF's members' injuries are actual and imminent.

CLF has alleged that its members' injuries resulting from Exxon's violations at the Terminal are actual and imminent. "One does not have to await the consummation of threatened

injury to obtain preventative relief. If the injury is certainly impending, that is enough." *Pennsylvania v. West Virginia,* 262 U.S. 553 (1923) (quoted in *Babbitt v. Farm Workers,* 442 U.S. 289, 298 (1979)).[11] Exxon's violations of the effluent limits in its Permit are ongoing. Exxon continually exceeded the relevant PAH limits in its Permit prior to the time the Complaint was filed, and these violations have continued subsequent to the filing of the Complaint.[12] As discussed above, CLF's members suffer injuries as a result of these ongoing violations.

In its Motion, Exxon generically denies climate change-related impacts as speculative and uncertain. Compounding its attempt at climate change denial, Exxon solely dwells on the risk of sea level rise, completely omitting the impacts of storm surges, severe weather events, and increased precipitation. Doc. 17 at 13–14. Exxon's attempts to recast CLF's Complaint to avoid liability are particularly puzzling because Exxon has acknowledged the risks associated with climate change and has taken actions to guard against them at facilities other than the Terminal. Doc. 1 at ¶¶ 143–46, 148–52, 154–56, 158–60.[13] Exxon employs approximately 16,000 engineers and, at other facilities and installations, "engineers its facilities and operations robustly with extreme weather considerations in mind," including addressing "[f]ortification to existing facilities and operations . . . where warranted due to climate or weather events[.]" *Id.* at ¶¶ 99, 155. Regardless of Exxon's shifting position, climate change impacts including severe weather events, storm surge, increased precipitation, and sea level rise are serious and well recognized generally and as related to the Boston area. *Id. at* ¶¶ 89–94. The Terminal, because of

---

[11] *See also Davis v. Fed. Election Comm'n,* 554 U.S. 724, 734 (2008) ("[T]he injury required for standing need not be actualized. A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct.") (citing *Los Angeles v. Lyons,* 461 U.S. 95, 102 (1983)).

[12] For the reporting period beginning October 1, 2016 and ending December 31, 2016, Exxon reported the following exceedances of the effluent limits in its NPDES Permit for Outfall 01A (the applicable effluent limit for each parameter is 0.031 μg/L): Chrysene (0.172 μg/L); Fluoranthene (0.196 μg/L); Phenanthrene (0.0631 μg/L); Pyrene (0.269 μg/L).

[13] Exxon's failure to disclose and act on information in its possession with regard to climate change risks is a violation of the Permit as well and further injures CLF and its members. *See* § IV, infra.

its location, is at risk of discharging oil and other pollutants as a result. *Id.* at ¶¶ 82–87. The Complaint references a recent Sea, Lake, and Overland Surges from Hurricanes ("SLOSH") model map, which shows that the majority of the Everett Terminal and the surrounding area are within a Category 1 or greater "Hurricane Surge Inundation Zone," and thus face a real and imminent threat of inundation causing discharges. *Id.* at ¶ 80. Further, the Complaint contains a map showing that the Terminal will be inundated by a four-foot rise in sea level. *Id.* at ¶ 81. Contrary to Exxon's incorrect assertion that sea level rise is not an immediate threat, sea level rise is already underway and will continue to grow more severe. *Id.* at ¶ 93. Because Exxon has not prepared its Terminal for these impacts, the risk of catastrophic effects on human health and the environment is immediate. Doc. 1 at ¶¶ 70–77. Exxon admitted as much in a recent publicly available letter to the EPA regarding a FOIA request submitted by CLF. Ex. F at 4 ("**Given the Terminal's location**, a security incident leading to **a release at the Terminal would likely have catastrophic effects on both human life and the environment**.") (emphasis added).

CLF members' fears of discharges and endangerment from climate change impacts at the Terminal are much more than "sheer speculation." Doc. 17 at 13. "[P]ast wrongs are evidence bearing on whether there is real and immediate threat of repeated injury." *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974). The very incident CLF members' fear will occur has actually happened at the Terminal and Exxon has failed to take any steps to prevent it from happening again. In July 2010, a severe rainfall event at the Terminal "produced a failure of the Everett Terminal's treatment system that resulted in a discharge of untreated pollutants directly into the Island End River." Doc. 1 at ¶ 79. Communities similarly situated to Everett and Chelsea have experienced similar incidents. *Id.* at ¶ 95.

Exxon cites to *Amigos Bravos v. BLM*, 816 F. Supp.2d 1118 (D.N.M. 2011) and argues that climate change risks that will be realized in "years or decades" are too remote to qualify as imminent. *See* Doc. 17 at 14, n. 30. However, in that case, the court held that the plaintiffs lacked standing because the plaintiffs did not show that their members used the BLM land subject to the oil and gas leases at issue in a way that would be impacted by BLM's alleged failure to consider climate change impacts. Here, CLF does not merely allege that the general impacts of climate change will injure its members; CLF members have identified reasonable fears about impacts specific to the area in which they live, work, and recreate, thereby establishing a sufficient "factual showing of perceptible harm." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 566 (1992).

Exxon's citation to *Center for Biological Diversity v. Department of Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009) is similarly inapposite. There, plaintiff alleged that the Department of Interior failed to take climate change effects into consideration when making decisions about offshore oil and gas development in Alaska. The court held that the plaintiff lacked standing, finding that "climate change is a harm that is shared by humanity at large, and the redress that Petitioners seek—to prevent an increase in global temperatures—is not focused any more on these petitioners than it is on the remainder of the world's population." *Id.* at 478. CLF is not seeking relief from a global increase in temperature; CLF's harm is caused by Exxon's failure to prepare the Terminal for the impacts of climate change.

CLF alleges injury to a particular group of its members: those living near and using the Rivers, where pollutants would be—and have been—discharged from the Terminal. Thus, the present case is squarely addressed by *Massachusetts v. U.S. Environmental Protection Agency,* 549 U.S. 497 (2007), because like CLF, Massachusetts had shown a sufficiently particularized and imminent injury when it alleged that its particular shoreline had actually been diminished by

the effects of climate change, making a sufficient showing that it had been affected "in a personal and individual way." 549 U.S. at 541 (quoting *Lujan*, 504 U.S. at 560 n. 1).

### b.  The Injuries Suffered by CLF and Its Members are Caused by Exxon.

The injuries suffered by CLF's members are fairly traceable to Exxon's violations of the CWA and RCRA. It is not necessary for CLF, or CLF's members, to establish "to a scientific certainty that defendant's effluent, and defendant's effluent alone, caused the precise harm suffered by the plaintiffs." *Powell Duffryn*, 913 F.2d at 72. Nor is it relevant that there have historically been other sources of pollutants into the Rivers. *Student Pub. Interest Research Grp. of N.J., Inc. v. Tenneco Polymers, Inc.*, 602 F. Supp. 1394, 1397 (D.N.J. 1985); *Georgia-Pac. Corp.*, 615 F. Supp. at 1424.

With regard to ongoing discharges, a plaintiff may establish a substantial likelihood that defendant caused plaintiff's harm by showing that a defendant has 1) discharged some pollutant in concentrations greater than allowed by its permit, 2) into a waterway in which the plaintiff has an interest that is or may be adversely affected by the pollutant, and that 3) this pollutant causes or contributes to the kinds of injuries alleged by the plaintiff. *Powell Duffryn*, 913 F.2d at 72. CLF has sufficiently demonstrated that (1) Exxon discharges pollutants at levels higher than the numeric effluent limits in the Permit, (2) into the Rivers, which are used and enjoyed by CLF's members, and (3) that the pollutants discharged by Exxon cause injuries alleged by CLF. *See* Ex. A at ¶¶ 9–11; Ex. B at ¶¶ 9–11; Ex. C at ¶¶ 9–11; Ex. D at ¶¶ 7–9; Ex. E at ¶¶ 6–8.

The causal link between Exxon's violations of the CWA and RCRA and CLF members' injuries is direct and immediate, and not remote or dependent upon the action or inaction of third parties. Exxon has endangered CLF's members by failing to take steps to protect against storm

13

surges and other climate change impacts that threaten "catastrophic effects on both human life and the environment."[14] Ex. A at ¶ 13; Ex. B at ¶ 12; Ex. C at ¶ 13; Ex. D at ¶ 13; Ex. E at ¶ 10.

CLF's members are put in harm's way and endangered by Exxon's failure to manage the risks of extreme runoff, flooding and inundation of the Terminal. Doc. 1 at ¶ 11 ("CLF and its members are placed directly in harm's way and have no reasonable assurance that they will be protected from pollutants released and discharged from the Everett Terminal."), ¶ 70 ("The Everett Terminal is vulnerable to sea level rise, increased participation, increased magnitude and frequency of storm events, and increased magnitude and frequency of storm surges due to its location, elevation, and lack of preventative infrastructure."), ¶ 71 ("Exxon has not implemented needed actions to address and eliminate these vulnerabilities at the Everett Terminal."). These injuries do not hinge on the intervention of any actors other than Exxon, and require no independent decisions made by any other party.

### c. The Injuries Suffered by CLF and Its Members are Redressable.

The injuries suffered by CLF and its members are redressable by this Court. The injunctive relief and civil penalties sought by CLF in this action provide redress for CLF's injuries through (1) requiring Exxon to come into compliance with RCRA and the CWA, and (2) requiring Exxon to pay appropriate civil penalties,[15] thereby deterring Exxon and other industrial facility owners and operators from continuing to violate the CWA and RCRA.

---

[14] Ex. F at 4.

[15] *Powell Duffryn*, 913 F.2d at 73 (acknowledging the connection between civil penalties and the injuries to plaintiff's members where the general public interest in clean waterways would be served by the deterrent effect of an award of civil penalties on both the defendant specifically and other NPDES permit holders generally); *Covington*, 358 F.3d at 638–39 ("[Appellees] operate[] the landfill, thus any violation of RCRA is directly caused by [appellees], and any violation can be redressed by requiring . . . compliance with RCRA or by creating a credible deterrent against future violations via the imposition of fines.").

Exxon's attempt to wield this Court's decision in *Conservation Law Foundation, Inc. v. U.S. Environmental Protection Agency*, 964 F. Supp. 2d 175 (D. Mass. 2013) ("*CLF v. EPA*") against CLF must fail.

The present case is distinguishable from *CLF v. EPA*. First, the motion pending before the Court is a motion to dismiss, not a motion for summary judgment. Second, CLF is not suing a government agency for alleged failures to act, CLF is suing Exxon, the owner and operator of an industrial facility in Everett that discharges pollutants through a pipe into public waters that are used and enjoyed by CLF's members. While the instant case is in a different procedural posture than in *CLF v. EPA*, with a different—and lower—burden on CLF at this stage of the proceeding, CLF has, in an abundance of caution, submitted three declarations containing admissible expert opinions on the issue of redressability, attached hereto as Exhibits I, J, and K.

## II.    CLF has Properly Alleged Imminent and Substantial Endangerment under RCRA.

Exxon argues that CLF "fails to allege an 'imminent and substantial endangerment to health or the environment' as required to plead RCRA liability." Doc. 17 at 16. However, as described above, the risks to CLF members of exposure to discharges from the Terminal resulting from Exxon's failure to protect against impacts of climate change are imminent and substantial.

The RCRA citizen suit provision "allows citizen suits when there is a reasonable prospect that a serious, near-term threat to human health or the environment exists." *Me. People's Alliance v. Mallinckrodt, Inc.,* 471 F. 3d, 277, 279 (1st Cir. 2006). "This is expansive language, which is intended to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate *any risk* posed by toxic wastes." *Dague v. City of Burlington*, 935 F.2d 1343, 1355 (2d Cir. 1991), *rev'd in part on other grounds*, 505 U.S. 557 (1992)

(internal citations and quotation omitted); *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1015 (11th Cir. 2004) ("[T]he plaintiffs need only demonstrate that the waste disposed of 'may present' an imminent and substantial threat.").

"Imminence generally has been read to require only that the harm is of a kind that poses a near-term threat; there is no corollary requirement that the harm necessarily will occur or that the actual damage will manifest itself immediately."[16] *Mallinckrodt*, 471 F.3d at 288. The requirement that an endangerment be substantial "does not require quantification of the endangerment (e.g., proof that a certain number of persons will be exposed, that excess deaths will occur, or that a water supply will be contaminated to a specific degree) . . . [r]ather, an endangerment is substantial if there is some reasonable cause for concern that someone or something may be exposed to a risk of harm . . . if remedial action is not taken." *United States v. Union Corp.*, 259 F. Supp. 2d 356, 400 (E.D. Pa. 2003) (internal citations and quotations omitted).

"[T]he term endangerment means a threatened or potential harm, and does not require proof of actual harm." *Parker*, 386 F.3d at 1015. As summarized by the First Circuit, "the combination of the word 'may' with the word 'endanger,' both of which are probabilistic, leads us to conclude that a reasonable prospect of future harm is adequate to engage the gears of RCRA § 7002(a)(1)(B) so long as the threat is near-term and involves potentially serious harm." *Mallinckrodt*, 471 F.3d at 296.

Exxon's effort to cast the impacts of climate change as "remote" or "speculative" is belied by established science. While the actual timing and frequency of impacts may be

---

[16] *See also Dague*, 935 F.2d at 1356 ("A finding of imminency does not require a showing that actual harm will occur immediately so long as the risk of threatened harm is present: An imminent hazard may be declared at any point in a chain of events which may ultimately result in harm to the public.") (internal quotations and citations omitted).

uncertain, the *fact* of increased frequency and variability has been known for decades, and to Exxon since as early as the 1970s. *See* Doc. 1 at ¶¶ 97-170 (detailing Exxon's study of and contribution to climate change research). Indeed, Exxon recently stated to EPA that "[g]iven the Terminal's location, […] a release at the Terminal would likely have catastrophic effects on both human life and the environment." Ex. F at 4. Exxon's failure to take action to prepare the Terminal for the impacts of climate change creates an imminent and substantial endangerment to CLF's members.

**III.    CLF's Claims are not Barred by the Permit Shield Defense.**

As Exxon acknowledges, a citizen suit may properly target "a permittee that discharges pollutants in excess of the levels specified in the permit, or otherwise fails to comply with the permit's conditions." Doc. 17 at 19 (internal quotation omitted). That is precisely what this lawsuit is about. CLF is not "attempting to impose an obligation on Exxon to do more than the Permit requires," *id.* at 19–20; rather, each relevant Count specifies the exact Permit conditions CLF is seeking to enforce and alleges violations of those conditions.

Exxon's Permit and the CWA regulations require that Exxon develop, implement, and update its facility plans to account for identified potential pollution sources and associated risks. These requirements obligate Exxon to consider and address climate change impacts. CLF properly alleges that by failing to comply with those requirements, Exxon has and is violating its Permit.

Exxon asserts that Counts 2–4 are also barred by the permit shield defense. Doc. 17 at 26–29. With respect to enforcement of the Permit's wastewater treatment system operating conditions, Exxon argues that CLF's claims are based on a misinterpretation of the Permit. *Id.* at 26–28. However, in Count 2, CLF has clearly set forth the relevant Permit conditions and alleged

that Exxon is operating its system in a manner that violates those conditions. Doc. 1 at ¶¶ 187-97.

With respect to the effluent limit violations, Exxon admits that its discharges of PAHs "exceed the Permit's daily maximum limits," but asserts that its discharges "comply with the Permit's PAH compliance limits" and that CLF "could have challenged EPA's decision to enforce the compliance limits over the daily maximum limits during the public comment process." *Id.* at 27. However, Exxon's argument misses the point. CLF is not challenging EPA's inclusion of a compliance threshold that specifies when EPA will take enforcement action; instead, CLF is seeking to enforce the Permit's actual effluent limits.[17] Doc. 1 at ¶¶ 198-205. The fact that EPA has established a compliance threshold for its own purposes does not in any way bar CLF's citizen suit enforcing the Permit's effluent limits.

Exxon also argues that CLF has misapplied the State Water Quality Standards ("WQS"). Doc. 17 at 28. The Permit requires Exxon to ensure that its discharges do not cause violations of State WQS, that pollutants are not discharged in concentrations or combinations that would be hazardous or toxic to human or aquatic life, and that its discharges do not impair the uses designated for the Island End and Mystic Rivers. Doc. 1 at ¶¶ 206-210. Despite these clear restrictions, as detailed in Count 4, many of Exxon's discharges violate applicable State WQS, and as such, constitute violations of the Permit.[18] *Id.*

---

[17] Exxon's argument that "the daily maximum limits are expressly modified in the Permit by the compliance limits," Doc. 17 at 27, would require the Court to improperly read the numeric effluent limits out of the Permit. *See Nat. Res. Def. Council, Inc. v. Cty. of Los Angeles*, 725 F.3d 1194, 1206 (9th Cir. 2013) ("[A] court must give effect to every word or term in an NPDES permit and reject none as meaningless or surplusage.") (internal citations and quotations omitted). The reading of the Permit that gives effect to both the numeric effluent limits and footnote 10, is that Exxon must comply with the numeric effluent limits, but EPA, in exercising its enforcement discretion, will deem Exxon to be out of compliance for enforcement purposes if it exceeds the 10 µg/L threshold.

[18] As previously discussed, Exxon's assertion that the Island End and Mystic Rivers are not impaired for PAHs, *see* Doc. 17 at 29, is incorrect. Exxon's argument that "the Terminal need only comply with the PAH numeric compliance limits established *by the Permit* because the Permit's limits already factor in the WQS of the receiving water," Doc. 17 at 28, is similarly unavailing, as Exxon's is continually violating those numeric effluent limits.

**IV.   CLF's Climate Change Claims are Timely.**

Contrary to Exxon's assertion that "CLF's claims are in reality an objection to the Permit's failure to mandate consideration of speculative climate change risks," Doc. 17 at 21, as discussed above, CLF brought this suit to remedy ongoing violations of the CWA and RCRA. CLF is not challenging the terms of Exxon's Permit, it is seeking to enforce those terms. Thus, Exxon's argument that CLF's claims are untimely is inapposite.[19]

**V.   EPA has not Taken the Position that the CWA does not Require Consideration of Climate Change Impacts, and even if it had, it would not be Entitled to Deference.**

Exxon devotes significant effort to set up the straw proposition that EPA's failure to expressly mention climate change in the conditions in the Permit or various guidance documents constitutes an affirmative determination that climate change-related impacts cannot be considered in determining compliance with the Permit. Doc. 17 at 22-24. Exxon further states, without any support, that this lack of any affirmative statement by EPA is entitled to deference by the Court. On the contrary, CLF's climate change-based claims fall squarely within the scope of enforceable conditions in the Permit and should not be dismissed.

Exxon first argues that CLF's climate change-related claims rely on "isolated phrases" and "baseless interpretation" of the Permit's conditions, essentially asking the Court to ignore those conditions. *Id.* at 22. The CWA citizen suit provision allows "any citizen" to sue "any person . . . who is alleged to be in violation of . . . an *effluent standard or limitation under this chapter,*" 33 U.S.C. § 1365(a)(1) (emphasis added), and confers jurisdiction in the district courts. "Effluent standard or limitation under this chapter" is defined as "a permit or condition thereof

---

[19] The rulings in *Defs. of Conewango Creek* v. *Echo Developers, LLC.*, No. CIV.A. 06-242 E, 2007 WL 3023927 (W.D. Pa. Oct. 12, 2007) and *Palumbo* v. *Waste Techs. Indus.*, 989 F.2d 156 (4th Cir. 1993), addressed facial challenges to valid permits issued under CWA and RCRA respectively. The allegations asserted by CLF are distinguishable as they do not challenge the issuance of the Terminal's Permit but rather Exxon's compliance with its terms.

issued under section 1342 of this title." 33 U.S.C. § 1365(f)(6). *See also EPA v. Cal.,* 426 U.S.

200, 223–24 (1976) (confirming plain language interpretation); *Gwaltney,* 484 U.S. at 64 (same).

Exxon takes particular issue with CLF's reference to reliance on "phrases such as 'good

engineering practices' and 'identify sources of pollutants'" as they relate to the Permit's required

SWPPP. Ironically, in accusing CLF of a collateral attack on the Permit, Exxon urges the Court

to not give force to the plain language of the Permit conditions. PART II. A. of the Permit

entitled "GENERAL REQUIREMENTS" states:

> 1. <u>Duty to Comply</u>
>
> The permittee must comply with all conditions of this permit. Any permit noncompliance
> constitutes a violation of the Clean Water Act (CWA) and is grounds for enforcement
> action; for permit termination, revocation and reissuance, or modification; or for denial of
> a permit renewal application.

The Permit also provides that "[t]he permittee shall comply with the terms of the SWPPP." Doc.

18-1 at 13, Part I.B.1. Exxon cannot choose to dismiss "isolated phrases" of specific Permit

conditions as "general obligations" without force and effect.[20]

Indeed, in publicly available documents directly relating to the Terminal, Exxon

acknowledged in 2012 that "good engineering practices" must include consideration of "severe

flooding" and "severe precipitation events." Ex. H.  Yet Exxon failed to act on that knowledge at

the Terminal, in violation of numerous Permit conditions, including but not limited to its duty to

apply good engineering practices, the obligation to amend and update its SWPPP, and its duty to

report information in its possession to EPA.

---

[20] CLF does not agree with Exxon's dismissive characterization of its legal obligations. But, in any case, a similar
argument regarding the citizen suit enforceability of the term "Best Technology Available" in a Permit condition
was rejected in *Hudson Riverkeeper Fund, Inc. v. Orange & Rockland Utilities, Inc.* 835 F.Supp. 160 (S.D.N.Y.
1993). *Id.* at 164-165. There, (Defendant argued that plaintiff's attempt to enforce an allegedly vague permit
condition was "actually a collateral attack on the terms of the permit, not an enforcement claim" but "[t]his Court
concludes as a matter of law that Condition 9 is not so vague or ambiguous as to be useless, lacking in meaning, or
unenforceable. Best Technology Available, under the statute, is something which exists, and can be ascertained as
fact.")

Exxon argues that EPA's alleged failure to include express references to climate change in various manuals and guidance documents in some way governs interpretation of its Permit conditions. This argument fails for several reasons.

First, EPA has not commenced any enforcement action that would preclude CLF's suit. Inaction by government authorities in the face of violations is the *sine qua non* of CWA and RCRA citizen suits. Under the CWA, a citizen may commence suit only when enforcement agencies fail to commence and diligently prosecute enforcement prior to the filing of a duly noticed citizen suit complaint in a federal district court. 33 U.S.C. § 1365(a), (b)(2); *see, e.g., Atl. States Legal Found. v. Eastman Kodak Co.*, 933 F.2d 124, 127 (2d Cir. 1991) ("The purpose of the citizen suit is to stop violations of the Clean Water Act that are not challenged by appropriate state and federal authorities."). Citizen plaintiffs cannot be estopped from maintaining a suit because of an alleged waiver or inaction by government officials. *S.P.I.R.G. v. Anchor Thread Co.,* 1984 U.S. Dist. LEXIS 23153, at *12–14 (D.N.J. Oct. 1, 1984).

Second, as mentioned by Exxon, EPA's Permit Writers' Manual, adopted in 2010 before the Permit was issued, expressly "mandates consideration of climate change." Doc.17 at 7. While Exxon seeks to limit the scope of the Manual to "thermal effluent variances and patterning upstream flow of a discharge," *id.,* the Manual's mandate to consider climate change in characterizing receiving water upstream flow is directly applicable to the Terminal. In seeking to avoid the Permit's condition requiring compliance with water quality standards, Exxon argues that compliance only need be determined for the "discharges, once released and diluted by the receiving water." Doc. 17 at 28. But climate change must be considered, consistent with the Manual, to understand the flow conditions in the Island End River. Exxon misses the point of the climate change reference in the Manual. The reference to

21

"receiving water upstream flow" in the Manual is *an example* of a "receiving water critical condition" where climate change must be taken into account. Other such conditions include "tidal flux and temperature" which are just as affected by climate change. Doc.17 at 7, n. 11.

Lastly, the Court should reject Exxon's argument that EPA's failure to make statements about climate change in various documents is entitled to deference. Doc. 17 at 7, 23. EPA's failure to make a statement indicates only silence. *Texport Oil Co. v. U.S.*, 185 F.3d 1291, 1294 (Fed. Cir. 1999) ("In these circumstances, where Customs' conspicuous silence raises the question of whether there is an official 'agenc[y] construction' of the relevant statute, we decline to *sua sponte* extend *Chevron* deference.") (citations omitted); *San Luis & Delta-Mendota Water Authority v. Salazar*, 666 F. Supp. 2d 1137, 1156-7 (E.D. Ca. 2009) ("The agency's silence cannot be afforded deference.") (citing *Nat. Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322, 366 (2007)). Notably, even where an agency with express authority was a party in the litigation (which is not the case here), the Federal Circuit in *Texport* did not defer to the agency's silence but rather reached the merits of the disputed legal interpretation and ruled on the matter. *Texport* at 1294-95. The Court should do the same here. CLF's climate change-based causes of action fall squarely within the mandatory Permit conditions. They are subject to Court review through presentation of fact and opinion testimony. Exxon's motion to dismiss should be denied.

Exxon's argument that the Court should dismiss CLF's climate change claims based on "fair warning" limits should also be rejected. CLF's claims are entirely founded on the plain language of the Permit conditions, not new, retroactive interpretations of regulations as in the cases cited by Exxon.[21] Doc. 17 at 24. The Permit's mandate that Exxon must use "good

---

[21] Exxon's citation to *Wisconsin Res. Prot. Council v. Flambeau Min. Co.*, 727 F.3d 700 (7th Cir. 2013) ("*Flambeau Mining*") is a red herring. Plaintiffs in *Flambeau Mining* attacked the validity of the permit held by defendant, a permit with which defendant was in full and complete compliance. *Flambeau Mining* 727 F.3d at 705 ("All of Flambeau's [...] discharges complied with the mining permit"); id. at 711 ("Plaintiffs have not alleged or

engineering practices" established a duty of care based on information known to reasonable engineers during the applicable timeframe and requires annual certifications under penalty of perjury that this standard, among other Permit requirements, is being followed. Exxon itself acknowledged in 2012 that this standard required consideration of severe storm events and has acknowledged that the 2010 EPA Permit Writers' Manual expressly includes consideration of climate change for "receiving water critical conditions," including "patterning upstream flow." Ex. H; Doc. 17 at 7, n.11.

These conditions directly relate to compliance with Permit conditions governing the Terminal SWPPP. Doc. 18-1 at 13-14. Furthermore, regardless of EPA's statements and actions or CLF's arguments, Exxon has been well aware of climate change risks for decades, has acknowledged that action is required to address those risks on numerous occasions, and has engineered facilities other than the Terminal to address those risks. *See* Doc. 1 at ¶¶ 97-170 (detailing Exxon's study of and contribution to climate change research). Exxon is under an express duty to disclose this information to EPA, and to act on information in its possession to implement, amend and update its SWPPP. Ex. G at Part II.D.1.h ("Other information. Where the permittee becomes aware that it failed to submit any relevant facts in a permit application, or submitted incorrect information in a permit application or in any report to the Regional Administrator, it shall promptly submit such facts or information."); *id.* at Part II.B.3 ("The

---

demonstrated that Flambeau failed to comply with its mining permit"). The *Flambeau* court, noting that "if a [NPDES] permit holder discharges pollutants *precisely in accordance with the terms of its permit*, the permit will 'shield' its holder from CWA liability," *id.* at 706 (emphasis added), held that "[u]nder these circumstances, where the permitting authority issues a facially valid NPDES permit and the permit holder lacks notice of the permit's (potential) invalidity, we hold that the permit shield applies." The factual and legal analysis employed by the *Flambeau* court are inapplicable here. CLF is not attacking the validity of Exxon's Permit. CLF is enforcing the terms and conditions of the Permit, which Exxon has violated and continues to violate. Unlike Flambeau's "efforts to protect the environment [which] were exemplary and deserve commendation," *id.* at 705, Exxon has repeatedly and illegally discharged pollutants at levels above its Permit's numeric effluent limits and otherwise violated the CWA and RCRA at the Terminal, both during and after the filing of CLF's Complaint.

permittee shall take all reasonable steps to minimize or prevent any discharge or sludge use or disposal in violation of this permit which has a reasonable likelihood of adversely affecting human health or the environment."); Doc. 18-1 at 14 ¶ 6 ("The permittee shall amend and update the SWPPP within 30 days for any changes at the facility affecting the SWPPP."). Adjudication of each of the Permit condition violations in the Complaint falls squarely within the Court's citizen suit jurisdiction and can be readily determined through fact and opinion evidence. *EPA v. Cal.,* 426 U.S. at 223–24; *Gwaltney,* 484 U.S. at 64.

**VI.   CLF has Sufficiently Alleged that Exxon Violated its Duty to Consider and Disclose Relevant Information to EPA.**

The Permit and associated regulations are replete with the requirement that Exxon disclose and update information relevant to its facility plans. The Standard Conditions of the Terminal's NPDES Permit at II.D.1.h requires that:

> Where the permitee becomes aware that it failed to submit any relevant facts in a permit application, or submitted incorrect information in a permit application or in any report to the Regional Administrator, it shall promptly submit such facts or information.

Ex. G. This responsibility is also incorporated into the Permit as detailed in the Complaint at ¶¶ 222 – 229 (describing obligations of a permitee to disclose and update information relevant to its waste management and storm water discharge prevention plans for a facility).

As discussed throughout this brief, Exxon has known about the impacts of climate change for decades, yet failed to disclose this information to EPA, thereby violating the requirement to disclose and update relevant information.

**VII.   The Terminal's Spill Prevention, Control and Countermeasures Plan is an Enforceable Best Management Practice and Permit Condition.**

As detailed previously in Section V, the CWA citizen suit provision allows for enforcement of NPDES permits and conditions. The CWA regulations governing NPDES

permits provide, in relevant part, that "each NPDES permit shall include" "[b]est management practices (BMPs) to control or abate the discharge of pollutants" when, *inter alia*, "[a]uthorized under section 402(p)[22] of the CWA for the control of storm water discharges" and "[t]he practices are reasonably necessary to achieve effluent limitations and standards or to carry out the purposes and intent of the CWA." 40 C.F.R. § 122.44(k).

Accordingly, Exxon's Permit requires that "[t]he SWPPP shall include best management practices (BMPs) for on-site activities that will minimize the discharge of pollutants in storm water to waters of the United States." Permit at 13 ¶ 3. The Permit lists specific elements that the SWPPP must contain, including:

> A description of all storm water controls, both structural and non-structural. BMPs must include good housekeeping measures, preventative maintenance programs, **spill prevention and response procedures**, runoff management practices, and proper handling of deicing materials. The SWPPP shall describe how the BMPs are appropriate for the facility. All BMPs shall be properly maintained and be in effective operating conditions.

Doc. 18-1 at 13–14 ¶ 4 (emphasis added). Exxon's SWPPP contains a section describing spill prevention and response BMPs, which states that "[d]etails regarding spill prevention and response are provided in the Everett Terminal's Spill Prevention Control and Countermeasure (SPCC) Plan and Facility Response Plan (FRP)." Stormwater Pollution Prevention Plan for ExxonMobil Oil Corporation Everett Terminal at 21 (Oct. 2013), <u>available at</u> https://foiaonline.regulations.gov/foia/action/public/view/record?objectId=090004d280a51809&fromSearch=true.

---

[22] Section 402(p) exempts certain discharges comprised entirely of stormwater from the requirement to obtain an NPDES permit. *See* 33 U.S.C. § 1342(p)(1). However, the exemption does not apply to discharges associated with industrial activities, and the statute specifically requires that "[p]ermits for discharges associated with industrial activity shall meet all applicable provisions of this section and section 1311." *Id.* at § 1342(p)(2)-(3). Thus, discharges associated with industrial activities, including Exxon's discharges from the Everett Terminal, are subject to the regulation requiring NPDES permits to include BMPs to control or abate the discharge of pollutants. *See* 40 C.F.R. § 122.44(k).

Contrary to Exxon's assertions that SPCCs "are not incorporated into or governed by NPDES Permits" and "bear no relation to NPDES permits," Doc. 17 at 25, Exxon itself has elected to incorporate its SPCC as a condition of its NPDES Permit and rely on its SPCC and Facility Response Plan as the spill prevention and response BMPs required by its NPDES Permit.   Exxon cannot both use its SPCC to attempt to meet the Permit requirement that it implement spill prevention and response procedures and claim that its SPCC bears no relation to the Permit. The SPCC is an enforceable condition of Exxon's NPDES Permit, and CLF's claims related to the SPCC are properly brought under the citizen suit provision of the CWA, 33 U.S.C. § 1365(a).

## VIII.   CLF has Sufficiently Alleged Ongoing Violations of the CWA.

According to the Supreme Court, "[t]he most natural reading of 'to be in violation' [under 33 U.S.C. § 1365(a)] is a requirement that citizen-plaintiffs allege a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Gwaltney*, 484 U.S. at 57.  "The statute does not require that a defendant 'be in violation' of the Act at the commencement of suit; rather, the statute requires that a defendant be '*alleged* to be in violation.'" *Id.* at 64 (emphasis in original).[23]

"[P]laintiffs can establish that violations are continuous or intermittent either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations." *Nat. Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc.*, 2 F.3d 493, 501 (3d Cir. 1993) (internal citations and quotations omitted).  "A continuing likelihood of intermittent or sporadic violations exists until there is no real likelihood of

---

[23] *See also SURCCO v. PRASA*, 157 F. Supp. 2d 160, 164–65 (D.P.R. 2001), *on reconsideration* (July 26, 2001) ("[M]ere allegations of violation are sufficient to establish an ongoing harm since the 'good faith' pleading requirements are sufficient to protect Defendants from frivolous allegations.") (citing *Gwaltney*, 484 U.S. 49).

repetition," and "a real likelihood of repetition remains so long as a discharger has failed to take remedial measures that clearly eliminate the causes of the violations." *Id.* (internal citations and quotations omitted).[24]

CLF has sufficiently alleged ongoing violations of the CWA at the Everett Terminal. With respect to Exxon's violations of the numeric effluent limits in its NPDES Permit, CLF's Complaint alleges that "[t]hese violations are ongoing and continuous, and barring a change at the Terminal and full compliance with the permitting requirements of the Clean Water Act, these violations will continue indefinitely." Doc. 1 at ¶ 205. As discussed herein, the alleged violations of the applicable PAH limits in the permit have continued after CLF's complaint was filed. *See Nat. Res. Def. Council, Inc.*, 2 F.3d at 501. Furthermore, there is no evidence that Exxon has taken any remedial measures that would clearly eliminate the causes of these violations, meaning that there is a continuing likelihood of intermittent or sporadic violations.

CLF has also sufficiently alleged ongoing violations with respect to Exxon's violation of the condition of its Permit prohibiting visible oil sheen, foam, or floating solids. Even assuming that three out of the four incidents are not attributable to Exxon[25] as Defendants claim, *see* Doc. 17 at 31, at least one incident *has* been specifically attributed to Exxon. That incident occurred in October 2015 and there is no evidence that Exxon has taken any remedial measures that would clearly eliminate the cause of this violation. Moreover, the soils and groundwater at the Terminal

---

[24] *see also P.R. Campers' Ass'n. v. P.R. Aqueduct & Sewer Auth.*, 219 F. Supp. 2d 201, 216–17 (D.P.R. 2002) (finding that plaintiff met both requirements for alleging an ongoing violation—although it only had to meet one—where plaintiff alleged that defendant exceeded numeric effluent limits of its NPDES permit after complaint was filed, and "recurrence of intermittent or sporadic violations" at defendant's plant was "not an impossibility").

[25] CLF does not concede that Exxon is not responsible for all four of the incidents referenced. The "Source" of the 2011 incident is listed as "Unknown," but the "Location" is listed as "52 Beacham St.," which is the address of Exxon's Everett Terminal. Furthermore, while Sprague Energy is a separate corporate entity, Exxon's NPDES Permit Fact Sheet confirms that "ExxonMobil is responsible for storm water and any other discharges from Sprague Energy into ExxonMobil's storm water collection system." *See* Permit at 24; Permit Fact Sheet at 8.

are heavily contaminated with oil and grease[26] and heavy precipitation events and storm surges will continue to mobilize these contaminants off-site and into the Island End River and Mystic River. Therefore, a continuing likelihood of intermittent or sporadic violations exists.[27]

## IX.   CLF has Properly Alleged Unpermitted Discharges to the Half-Moon Shaped Pond.

Exxon argues that the half-moon shaped pond that it has used as part of its wastewater treatment system since as early as the 1900s is not a navigable water and is therefore not governed by the Permit. Doc. 17 at 31. As alleged in the Complaint, the pond is "connected to the Island End River via surface water flows, subsurface hydrological connections and man made conduits" and was part of the traditionally navigable Island End River and associated tributaries. Doc. 1 at ¶¶ 289, 291. Under the regulations implementing the CWA, the definition of "discharge of a pollutant" includes "additions of pollutants into waters of the United States from: surface runoff which is collected or channelled by man[.]" 40 C.F.R. § 122.2. While Exxon and its predecessors may have altered the configuration of the pond over time, that does not change its status as a "water[] of the United States" as defined in 40 C.F.R. § 122.2, and 33 U.S.C. § 1362(7) (conferring jurisdiction over navigable waters).[28] Exxon's discharges of pollutants into the half-moon shaped pond are unpermitted, and thus violate the CWA. 33 U.S.C. § 1311(a).

## CONCLUSION

For all the foregoing reasons, Plaintiff CLF respectfully requests that Defendant Exxon's motion to dismiss be denied.

---

[26] *See* Permit Fact Sheet at 11–12 (stating that on-site groundwater is "generally contaminated" and that "Contaminated groundwater infiltration into the collection system contributes a constant flow of oil to the treatment works. . . . ExxonMobil has taken no action to date to mitigate the resulting infiltration of contaminated groundwater into the storm drains and ultimate discharge to Island End River.").

[27] Exxon argues that violations of its Permit prior to 2011 should not be considered by this Court. However, the Supreme Court has held that while no private action may lie where violations are wholly past, evidence of past violations, like those identified in the Complaint, can help prove a continuing violation as well as establish the likelihood of future violations. *Gwaltney*, 484 U.S. at 58-59.

[28] Exxon's reliance on *Village of Oconomowoc Lake v. Dayton Hudson Corp.*, 24 F.3d 962 (1994), does not change this result. Unlike the artificial retention pond constructed by that defendant in conjunction with its facility, the half-moon shaped pond at the Terminal has its genesis in the Island End and Mystic River tributaries. As the court confirmed in *Oconomowoc Lake*, the reach of the CWA is "broad . . . reaching waters and wetlands that are not navigable or even directly connected to navigable waters." *Id.* at 964 (citation omitted).

Dated: December 20, 2016

Respectfully submitted,
KANNER & WHITELEY, LLC


*/s/ Elizabeth B. Petersen*
Allan Kanner
Elizabeth B. Petersen
Allison S. Brouk
Kanner & Whiteley, LLC
701 Camp Street
New Orleans, LA 70130
Counsel for Plaintiff
Conservation Law Foundation, Inc.

CONSERVATION LAW
FOUNDATION, INC.
By its attorneys:
/s/ Zachary K. Griefen
Zachary K. Griefen, Esq., BBO# 665521
Conservation Law Foundation
15 East State Street, Suite 4
Montpelier, VT 05602
(802) 223-5992 x4011
zgriefen@clf.org

/s/ Christopher M. Kilian
Christopher M. Kilian, Esq.
Conservation Law Foundation
15 East State Street, Suite 4
Montpelier, VT 05602
(802) 223-5992 x4015
ckilian@clf.org


## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2016, I sent the foregoing via email, to counsel of

record for the Defendant.

*/s/ Elizabeth B. Petersen*
Allan Kanner
Elizabeth B. Petersen
Allison S. Brouk
Kanner & Whiteley, LLC
701 Camp Street
New Orleans, LA 70130
Counsel for Plaintiff
Conservation Law Foundation, Inc.