# Tab A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, Inc., | |
| Plaintiff, | |
| v. | Case 1:16-cv-11950 (MLW) |
| EXXON MOBIL CORPORATION, EXXONMOBIL OIL CORPORATION, and EXXONMOBIL PIPELINE COMPANY, | |
| Defendants. | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .......... 1

ARGUMENT .......... 1

I. CLF's Opposition Does Not Cure the Complaint's Standing Defects .......... 1

II. CLF's Solitary RCRA Claim Is Not Cognizable .......... 4

III. CLF's Opposition Cannot Salvage the Complaint's Defective CWA Climate Change Claims .......... 5

IV. CLF's Non–Climate Change CWA Claims Remain Barred .......... 8

A. The Permit Shield Precludes Claims 2–4 .......... 8

B. CLF Does Not Plausibly Allege Ongoing CWA Violations .......... 9

C. Terminal Discharge Is Not Released Into the Half-Moon Shaped Pond, Which Is Not a Navigable Water of the United States .......... 10

CONCLUSION .......... 10

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*United States* v. *AVX Corp.*,
962 F.2d 108 (1st Cir. 1992)....................1

*Brod* v. *Omya, Inc.*,
653 F.3d 156 (2d Cir. 2011)....................5

*Catskill Mountains Chapter of Trout Unlimited, Inc.* v. *City of N.Y.*,
451 F.3d 77 (2d Cir. 2006)....................2

*Clorox Co. P.R.* v. *Proctor & Gamble Commercial Co.*,
228 F.3d 24 (1st Cir. 2000)....................4

*Covington* v. *Jefferson Cty.*,
358 F.3d 626 (9th Cir. 2004)....................3

*Dague* v. *City of Burlington*,
935 F.2d 1343 (2d Cir. 1991), *rev'd in part*, 505 U.S. 557 (1992)....................5

*Defs. of Conewango Creek* v. *Echo Developers, LLC*,
No. 06-242 E, 2007 WL 3023927 (W.D. Pa. Oct. 12, 2007)....................7

*FCC* v. *Fox Television Stations, Inc.*,
132 S. Ct. 2307 (2012)....................6

*Gwaltney of Smithfield, Ltd.* v. *Chesapeake Bay Found., Inc.*,
484 U.S. 49 (1987)....................8

*Hamker* v. *Diamond Shamrock Chem. Co.*,
756 F.2d 392 (5th Cir. 1985)....................10

*Holmes Grp., Inc.* v. *RPS Prods., Inc.*,
No. 03-40146-FDS, 2010 WL 7867756 (D. Mass. June 25, 2010)....................4

*Hudson Riverkeeper Fund, Inc.* v. *Orange & Rockland Utils., Inc.*,
835 F. Supp. 160 (S.D.N.Y. 1993)....................6

*In re Initial Pub. Offering Sec. Litig.*,
174 F. Supp. 2d 61 (S.D.N.Y. 2001)....................4

*Karr* v. *Hefner*,
475 F.3d 1192 (10th Cir. 2007)....................8

*Katz* v. *Pershing, LLC*,
672 F.3d 64 (1st Cir. 2012)....................5

*Massachusetts* v. *EPA*,
549 U.S. 497 (2007)....................2

*Me. People's All. & NRDC* v. *Mallinckrodt, Inc.*,
471 F.3d 277 (1st Cir. 2006)....................3, 4

*O'Shea* v. *Littleton*,
414 U.S. 488 (1974)....................2, 3

*Palumbo* v. *Waste Techs. Indus.*,
989 F.2d 156 (4th Cir. 1993)....................7

*Parker* v. *Scrap Metal Processors, Inc.*,
386 F.3d 993 (11th Cir. 2004)....................5

*Pawtuxet Cove Marina, Inc.* v. *Ciba-Geigy Corp.*,
807 F.3d 1089 (1st Cir. 1986)....................9

*United States* v. *Perea-Rey*,
680 F.3d 1179 (9th Cir. 2012)....................10

*PIRG of N.J., Inc.* v. *Powell Duffryn Terminals Inc.*,
913 F.2d 64 (3d Cir. 1990)....................3, 4

*N.H.* v. *Ramsey*,
366 F.3d 1 (1st Cir. 2004)....................6

*Saco* v. *Tug Tucana Corp.*,
483 F. Supp. 2d 88 (D. Mass. 2007)....................10

*SPIRG of N.J., Inc.* v. *Georgia-Pacific Corp.*,
615 F. Supp. 1419 (D.N.J. 1985)....................3

*Spokeo, Inc.* v. *Robins*,
136 S. Ct. 1540 (2016)....................1

*Texport Oil Co.* v. *United States*,
185 F.3d 1291 (Fed. Cir. 1999)....................6

*United States* v. *Union Corp.*,
259 F. Supp. 2d 356 (E.D. Pa. 2003)....................5

*Upper Blackstone Water Pollution Abatement Dist.* v. *EPA*,
690 F.3d 9 (1st Cir. 2012)....................8

*USPIRG* v. *Atl. Salmon of Me., LLC*,
339 F.3d 23 (1st Cir. 2003) .......... 9

**STATUTES AND REGULATIONS**

33 U.S.C. § 1342(k) .......... 7

40 C.F.R. § 122.44(d) .......... 9

314 C.M.R. 4.05(e) .......... 9

**OTHER AUTHORITIES**

EPA, *Developing Your SWPPP* (Feb. 2009),
https://www3.epa.gov/npdes/pubs/sw_swppp_guide.pdf .......... 6, 7

EPA, *NPDES MSGP*,
https://www.epa.gov/sites/production/files/2015-10/documents/msgp2015_finalpermit.pdf .......... 6

Google Maps, https://maps.google.com .......... 10

MassDEP, Massachusetts Year 2010 Integrated List of Waters (Nov. 2011),
http://www.mass.gov/eea/docs/dep/water/resources/07v5/10list6.pdf .......... 9

MassDEP, Massachusetts Year 2014 Integrated List of Waters (Dec. 2015),
http://www.mass.gov/eea/docs/dep/water/resources/07v5/14list2.pdf .......... 9

Defendants (collectively "ExxonMobil") respectfully submit this reply memorandum of law in support of their motion to dismiss.

## PRELIMINARY STATEMENT

In an effort to distract from the defects in its complaint, CLF[1] improperly seeks to inject *eight* factual declarations into its Opposition, but none does anything to address the complaint's fatal deficiencies. CLF still fails to adequately plead standing, and the defects inherent in its CWA and RCRA claims persist. The reality remains that NPDES permits issued by the EPA do not require permitees to imagine and address every distant and speculative risk that CLF alleges might be posed by climate change. CLF's Opposition does nothing to change this fact. Nor does it validate CLF's impermissible collateral attack on the Terminal's Permit. The Opposition thus fails to salvage the defective complaint, which should be dismissed in its entirety and with prejudice.

## ARGUMENT

### I. CLF's Opposition Does Not Cure the Complaint's Standing Defects

CLF has not plausibly alleged (1) that it suffered a particularized and concrete injury, (2) that is fairly traceable to ExxonMobil's conduct, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc.* v. *Robins*, 136 S. Ct. 1540, 1547–48 (2016).

*First*, CLF still has not sufficiently alleged a particularized injury. The complaint itself alleges none. And not one declarant alleges use of "the relevant geographic area"—*i.e.*, the *immediate* vicinity surrounding the Terminal. *United States* v. *AVX Corp*., 962 F.2d 108, 116–17 (1st Cir. 1992). Rather, CLF's declarations reflect, at most, the use of *other* portions of the Mystic River and a vague aspiration to use the River's watershed at some unspecified point in

[1] Defined terms retain their meaning from ExxonMobil's Memorandum of Law in Support of Its Motion to Dismiss ("Mot.").

the future.[2] But unlike a state's sovereign interest in *all* of its territory, *see Massachusetts* v. *EPA*, 549 U.S. 497, 518–19 (2007), CLF cannot premise its standing on a general interest in "New England's waterways,"[3] or its members' interests in sections of the Mystic River that are remote from the Terminal.

*Second*, CLF still does not plausibly allege any concrete injury. The complaint is devoid of any plausible factual allegations of any such injury. Nor does any declarant claim injury beyond an amorphous and subjective "concern" or "worry" of wholly conjectural climate change harms which, if they occur at all, may occur only decades or centuries from now.[4] CLF attempts to argue that the following qualify as concrete injuries: (i) alleged violations of the Permit's effluent limit for PAHs, and (ii) a purported increase in the probability of adverse weather events that could affect the Terminal. But CLF erroneously interprets the Permit's applicable effluent PAH limits, none of which has been violated.[5] And contrary to CLF's position, *O'Shea* v. *Littleton*, 414 U.S. 488 (1974), does not support its claim that standing can be premised on a past single rainfall event that affected the Terminal in July 2010—a time period that falls outside any applicable statute of limitations.[6] Indeed, in *O'Shea*, which is neither a CWA nor a RCRA case, the court found that allegations of "past wrongs" *failed* to establish standing because, as is the case with the claimed injuries here, "attempting to anticipate whether and when these respondents [will suffer the claimed harm] takes us into the area of speculation and conjecture."

---

[2] Opp. Exs. A ¶¶ 7–8, B ¶¶ 4-8, C ¶¶ 7-8, D ¶¶ 5-6, E ¶¶ 4-5. "Opp. Ex. __" are references to exhibits in the Declaration of Elizabeth B. Peterson in Support of Plaintiff's Opposition to Defendants' Motion to Dismiss. "Opp. at __" are references to Plaintiff's Opposition to Defendants' Motion to Dismiss. "Toal Ex. __" are references to exhibits to the Declaration of Daniel J. Toal in Support of Defendants' Motion to Dismiss.

[3] Compl. ¶ 8.

[4] Opp. Exs. A ¶¶ 12-14, B ¶¶ 12-13, C ¶¶ 12-14, D ¶¶ 11, 13-14, E ¶¶ 9-10.

[5] Mot. at 29–30.

[6] A five-year statute of limitations applies to CWA claims. *See, e.g.*, *Catskill Mountains Chapter of Trout Unlimited, Inc.* v. *City of N.Y.*, 451 F.3d 77, 88 n.14 (2d Cir. 2006) (citing 28 U.S.C. § 2462).

*Id.* at 497.[7]

*Third*, CLF fails to show a causal link between its purported injuries and ExxonMobil's supposed actions or inactions. CLF concedes that its standing depends on the ability to allege facts that plausibly suggest that ExxonMobil has engaged in ongoing violations of the effluent limits set by the Permit.[8] But despite having equal access to the publicly available information cited by CLF regarding ExxonMobil's activities at the Terminal, not a single declarant links his or her purported "injuries" to any specific and allegedly improper discharge of pollutants by ExxonMobil. And unlike the defendant in *SPIRG of N.J., Inc.* v. *Georgia-Pacific Corp.*, 615 F. Supp. 1419 (D.N.J. 1985), ExxonMobil has not conceded that any allegedly improper discharges at the Terminal have injured CLF's members. Moreover, CLF's allegation that climate change could, at some unspecified point in the future, damage the Terminal and cause it to release pollutants into the Mystic or Island End Rivers is not only conclusory and speculative, but also predicated on highly uncertain projections about prospective weather events which, if they occur at all, are likely only to occur well beyond the term of the Permit.[9]

*Fourth*, CLF admits that it must connect the relief it seeks to "a distinct and palpable

---

7 Likewise, CLF's reliance on *Me. People's All. & NRDC* v. *Mallinckrodt, Inc.*, 471 F.3d 277 (1st Cir. 2006), is misplaced. Opp. at 6. There, the court noted that a "substantial probability of harm" existed because the waterway at issue had five times the recommended level of mercury, which had spread "throughout the food web" such that it posed a direct danger to the community. *Mallinckrodt*, 471 F.3d at 282, 285. Here, CLF has not plausibly alleged facts indicating that the probability of climate change–related events is so great as to constitute an immediate and imminent threat to the community. *Covington* v. *Jefferson Cty.*, 358 F.3d 626 (9th Cir. 2004), is similarly irrelevant. Opp. at 6. In *Covington*, the probability of harm constituting an imminent injury was already present because the plaintiffs *lived next-door* to the landfill in question and made factual showings of several fires at the landfill, animals attracted to the garbage, and prior groundwater contamination. *Id.* at 638. None of CLF's members has alleged either a similar and continuous proximity to the Terminal, or that the Terminal poses anywhere near the imminent risks described in *Covington*. Finally, CLF relies on *PIRG of N.J., Inc.* v. *Powell Duffryn Terminals Inc.*, 913 F.2d 64 (3d Cir. 1990), and *SPIRG of N.J., Inc.* v. *Georgia-Pacific Corp.*, 615 F. Supp. 1419 (D.N.J. 1985), for the proposition that "[t]he scale of injury need not be significant and is not germane for purposes of standing." However, these cases deal only with the scale of the injury, not whether it is concrete and particularized.

8 Opp. at 13.

9 Mot. at 6 (citing source materials referenced in Compl. ¶¶ 92–94); *see also* Mot. at 7 (discussing the EPA's decision not to address hypothetical effects attributed to climate change).

injury," but conspicuously fails to do so. *PIRG of N.J., Inc.* v. *Powell Duffryn Terminals Inc.*, 913 F.2d 64, 73 (3d Cir. 1990). Indeed, despite CLF's inappropriate attempt to introduce purported expert opinions that offer entirely conclusory views regarding the issue of redressability, CLF still fails to establish that any injuries allegedly suffered are redressable.[10] The allegations in this case are a far cry from those in *Powell*, on which CLF relies. There, the court determined that forcing the defendant to comply with oil and grease discharge limits would have the tangible effect of reducing the "oily or greasy sheen" that the affiants "found offensive" based on their *actual* use of the *particular* waterway at issue. *Powell*, 913 F.2d at 73. By contrast, no declarant here alleges concrete harm from any specific pollutants allegedly discharged by the Terminal, let alone any that were allegedly discharged in violation of the Permit.[11] Nor do CLF's purported experts analyze redressability based on such harm.[12]

CLF thus has not carried its burden to adequately plead Article III standing, mandating dismissal of the complaint in its entirety.

## II. CLF's Solitary RCRA Claim Is Not Cognizable

CLF fails to plausibly allege that ExxonMobil's handling, storage, treatment, or disposal of waste has created, or will create, "a reasonable prospect that a serious, near-term threat to human health or the environment exists." *Me. People's All. & NRDC* v. *Mallinckrodt, Inc.*,

---

10 Opp. Exs. I ¶ 10, J ¶¶ 10-14, 20, K ¶ 10. "[A]n expert may not testify as to legal conclusions." *Holmes Grp., Inc.* v. *RPS Prods., Inc.*, No. 03-40146-FDS, 2010 WL 7867756, at *6 (D. Mass. June 25, 2010); *see also In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 69–70 (S.D.N.Y. 2001) (denying motion to admit law professors' declarations as expert opinions on legal issues). Moreover, these inappropriate declarations contain information and opinions that extend beyond the narrow question of redressability. Opp. Exs. I ¶¶ 11-15, J ¶¶ 15-19, K ¶¶ 8-9, 11-18. CLF cannot rely on the declarations of alleged experts to rebut legal arguments made pursuant to Rule 12(b)(6). The Court therefore should disregard these declarations and apply the Rule 12(b)(6) standard. Courts generally "guard against allowing" a party to convert a motion to dismiss into one for summary judgment "where it would come as a 'surprise' or be 'unfair' to the party against whom judgment is rendered." *Clorox Co. P.R.* v. *Proctor & Gamble Commercial Co.*, 228 F.3d 24, 31 (1st Cir. 2000) (quoting *Chaparro-Febus* v. *Int'l Longshoremen Ass'n, Local 1575*, 983 F.2d 325, 332 (1st Cir. 1992)).

11 *See* Toal Ex. A.

12 Opp. Exs. I ¶ 9 (reviewed only Compl. and Mot.), J ¶ 9 (same), K ¶ 7 (same).

471 F.3d 277, 279 (1st Cir. 2006).[13] CLF points to no imminent and substantial endangerment from climate change that even closely resembles the harms identified in the cases on which it relies.[14] Instead, the wholly subjective fear of hypothetical climate change impacts at the Terminal, as alleged in the complaint and referenced in CLF's declarations, is a "purely theoretical possibility." *Katz* v. *Pershing, LLC*, 672 F.3d 64, 79 (1st Cir. 2012). Likewise, the "established science" on which CLF relies indicates that there will ***not*** be a substantial increase in the risk of climate change–related events for decades, at a minimum.[15] CLF's RCRA claim thus fails and requires dismissal.

## III. CLF's Opposition Cannot Salvage the Complaint's Defective CWA Climate Change Claims

The EPA has never so much as suggested that ExxonMobil should, or must, address any of the innumerable, speculative climate change hypotheticals that CLF attempts to graft onto the Permit in Claims 5–12. CLF thus does not—and cannot—contest that the Permit issued to the Terminal makes ***no*** reference to climate change.

Relying instead on the existence of the phrase "good engineering practices" in the Permit's SWPPP, CLF argues that the climate change causes of action "fall squarely within the scope of enforceable conditions in the Permit."[16] But there can be no dispute that the phrase "good engineering practices" does not on its face refer to "climate change." Moreover, although

---

[13] The Second Circuit's opinion in *Brod* v. *Omya, Inc*., 653 F.3d 156 (2d Cir. 2011), renders CLF's reliance on *Dague* v. *City of Burlington*, 935 F.2d 1343 (2d Cir. 1991), *rev'd in part*, 505 U.S. 557 (1992), irrelevant. *Id.* at 163. The broader "any risk" standard once applied to establish a RCRA claim is no longer good law.

[14] *See Parker* v. *Scrap Metal Processors, Inc.*, 386 F.3d 993, 1015 (11th Cir. 2004) (reports of "explosive" leaking waste materials that could potentially "affect the central nervous system"); *United States* v. *Union Corp.*, 259 F. Supp. 2d 356, 400 (E.D. Pa. 2003) ("consumption of contaminated fish and clams" may endanger human health, and "contaminants . . . *are presently having* a harmful effect on aquatic and plant life in the area" (emphasis added)).

[15] *See, e.g.*, Compl. ¶ 93(f).

[16] Opp. at 19.

the NPDES Multi-Sector General Permit for Stormwater Discharges guide ("MSGP"), which addresses SWPPPs, mentions "good engineering practices" five times, it never once mentions climate change.[17] In fact, the MSGP suggests that the term is altogether unrelated to climate change, and is simply intended to ensure that a "qualified person"—defined as someone who is "knowledgeable in the principles and practices of ***industrial stormwater controls and pollution prevention***, and possesses the education and ability to assess . . . the effectiveness of [a SWPPP permit's] stormwater controls"—is involved in the SWPPP process.[18] Nor can there be any dispute that, in determining the meaning of the language in a NPDES permit, it is the EPA's interpretation, rather than CLF's subjective view, that controls.[19] It thus strains credulity for CLF to argue that the phrase "good engineering practices" provides "fair warning" to ExxonMobil (not to mention every other permitee across the country) that a SWPPP must consider the potential and uncertain effects of climate change in the distant future. Such a suggestion defies the plain reading of the term as set forth in the Permit, as well as the EPA's extensive guidance on what the term means.[20]

---

[17] EPA, *NPDES MSGP* 14, 30, 72, 89, 104, https://www.epa.gov/sites/production/files/2015-10/documents/msgp2015_finalpermit.pdf ("MSGP"). CLF does not dispute that the EPA has developed hundreds of pages of interpretation and guidance regarding the requirements of SWPPPs in the MSGP and the SWPPP Manual, neither of which requires consideration of climate change. *Id.*; EPA, *Developing Your SWPPP* (Feb. 2009), https://www3.epa.gov/npdes/pubs/sw_swppp_guide.pdf ("SWPPP Manual"). Attempting to argue that this silence is not owed any deference, CLF cites *Texport Oil Co.* v. *United States*, 185 F.3d 1291 (Fed. Cir. 1999). But in that case the agency was a party to the litigation and did not request deference. *Id*. at 1294. Moreover, the case turned on the interpretation of a clearly identified statutory provision. *Id.* Here, the EPA is not a party to the case, and the Court can consider relevant evidence pertaining to whether the EPA considers speculative climate change impacts in the issuance of NPDES permits. *See N.H.* v. *Ramsey*, 366 F.3d 1, 26 (1st Cir. 2004).

[18] MSGP, *supra* n. 17, at 30 (emphasis added); *see also* SWPPP Manual, *supra* n. 17 (no reference to term "engineering practices").

[19] For this reason, CLF's reference to *Hudson Riverkeeper Fund, Inc.* v. *Orange & Rockland Utils., Inc*., 835 F. Supp. 160 (S.D.N.Y. 1993), is inapt. The condition at issue there concerned a statutorily defined term, which is not the case here. *See id.* at 163–65.

[20] CLF does not even attempt to argue that such a phrase would satisfy the standard articulated in *FCC* v. *Fox Television Stations, Inc.*, 132 S. Ct. 2307 (2012), that "regulated parties should know what is required of them." *Id.* at 2317. Similarly, CLF refers to ExxonMobil's duty to submit "relevant facts" to the EPA, but provides no basis for its claim that "such facts or information" are somehow related to alleged climate change impacts. Opp. at 24.

The textual acrobatics engaged in by CLF only accentuate its real grievance, which is not with ExxonMobil's adherence to the terms of the Permit, but rather with the content of the Permit itself. But having failed to timely object to the contents of the Permit, CLF now resorts to improperly cloaking its time-barred objection to the Permit as an enforcement action. And because it cannot, CLF does not distinguish its suit from those courts have rightly rejected as collateral attacks on validly issued NPDES or other pollution-related permits. *See Defs. of Conewango Creek* v. *Echo Developers, LLC*, No. 06-242 E, 2007 WL 3023927, at *8–9 (W.D. Pa. Oct. 12, 2007) (NPDES permit); *Palumbo* v. *Waste Techs. Indus.*, 989 F.2d 156, 160 (4th Cir. 1993) (hazardous waste incinerator permit).

In a similarly misguided attempt to shoehorn its SPCC allegations into this citizen suit, CLF argues that ExxonMobil "itself has elected to incorporate its SPCC as a condition of its NPDES Permit."[21] SPCCs, however, are governed by a distinct set of regulations unrelated to SWPPPs.[22] CLF does not provide any authority to support its assertion that ExxonMobil's passing cross-reference in its SWPPP to its SPCC creates a Permit condition enforceable in a CWA citizen suit. Left unaddressed are the numerous cases and specific statutory regimes cited by ExxonMobil in its opening brief that (i) squarely establish that the SPCC falls outside the scope of any valid citizen suit brought pursuant to the CWA, and (ii) show that the permit shield[23] prevents CLF from imposing obligations on Defendants that require them to do more than the Permit requires.[24]

---

21 Opp. at 26.

22 *See* SWPPP Manual, *supra* n. 17, at 18 ("If your facility has more than 1,320 gallons of oil storage capacity in aboveground tanks you may also be required to develop a Spill Prevention, Control and Countermeasure (SPCC) plan consistent with 40 CFR 112.1.").

23 The permit shield insulates NPDES permit holders from liability when they comply with the terms of the permit. *See* 33 U.S.C. § 1342(k).

24 Mot. at 24–25; *id.* at 19–20.

Claims 5–12 thus are untimely and improperly styled as an enforcement action. Each of these claims must be dismissed as a matter of law.

## IV. CLF's Non–Climate Change CWA Claims Remain Barred

### A. The Permit Shield Precludes Claims 2–4

CLF fails to plausibly allege that Claims 2–4 are exempt from the permit shield.

*First*, as to Claim 2, CLF does not respond to ExxonMobil's argument that the Terminal may discharge water through Outfall 01A whenever Outfall 01C encounters a flow rate higher than 280 gallons *per minute*.[25] CLF wrongly claims, without any supporting factual allegations, that "Exxon is operating its [water treatment] system in a manner that violates [its Permit] conditions."[26] The plain text of the Permit, however, belies CLF's theory that Outfall 01C must discharge 403,200 gallons of water each day before Outfall 01A discharges a single drop.[27] Claim 2 fails as a matter of law and should be dismissed.

*Second*, with respect to Claim 3, CLF asserts that it may use a citizen suit to ask this Court to enforce effluent limits that differ from those set by the EPA.[28] Such a claim is inaccurate and flies in the face of the Supreme Court's directive that citizen suits may not be used to supplant the role of the EPA. *Gwaltney of Smithfield, Ltd.* v. *Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60 (1987).[29] Claim 3 therefore requires dismissal as well.

*Third*, as to Claim 4, State Water Quality Standards do not trump effluent limits set by the EPA. *See Upper Blackstone Water Pollution Abatement Dist.* v. *EPA*, 690 F.3d 9, 14

---

25 *Id.* at 27.

26 Opp. at 17–18.

27 Mot. at 27.

28 Opp. at 18.

29 *See also Karr* v. *Hefner*, 475 F.3d 1192, 1197 (10th Cir. 2007) ("If a defendant is exposed to a citizen suit whenever the EPA grants it a concession, defendants will have little incentive to negotiate consent decrees.").

(1st Cir. 2012).[30] Unable to withstand the protection provided by the permit shield, Claim 4 also warrants dismissal.

**B. CLF Does Not Plausibly Allege Ongoing CWA Violations**

Both Claims 3 and 13 are based on wholly past purported violations and are thus barred.[31] Despite CLF's claims to the contrary, "wholly past" violations are not considered ongoing for the purposes of a CWA citizen suit. *See Pawtuxet Cove Marina, Inc.* v. *Ciba-Geigy Corp.*, 807 F.3d 1089, 1094 (1st Cir. 1986). As explained in Defendants' opening brief, the factual basis for Claim 3 is limited to a discrete alleged exceedance of a single discharge limit that occurred in 2010.[32] Claim 13 fares no better because the complaint identifies the Terminal as the source of only one wholly past discharge that reached the Mystic and/or Island End Rivers in 2011.[33] Even if the "unknown" source of the remaining incident identified in Claim 13 were attributed to ExxonMobil, these two incidents, one in 2011 and the other in 2015, would still not constitute an *ongoing* violation sufficient to invoke the CWA.[34] *See USPIRG* v. *Atl. Salmon of Me., LLC*, 339 F.3d 23, 33 (1st Cir. 2003). Having failed to articulate cognizable causes of

30 *See also* 40 C.F.R. § 122.44(d); 314 C.M.R. 4.05(e). Moreover, CLF inaccurately claims that—because some PAHs are also listed as "Petroleum Hydrocarbons" in an unrelated federal document—the Mystic and/or Island End Rivers were impaired by PAHs in 2010 and 2014. (Opp. at 2 n.5). CLF, however, ignores that the reports authored by the Massachusetts Department of Environmental Protection ("MassDEP"), on which its complaint relies, address PAHs and "Petroleum Hydrocarbons" separately. *See* MassDEP, Massachusetts Year 2010 Integrated List of Waters at 154 (Nov. 2011), http://www.mass.gov/eea/docs/dep/water/resources/07v5/10list6.pdf (listing "Millers River" as impaired by both "PAHs" and "Petroleum Hydrocarbons," while identifying the relevant portions of the Mystic and Island End Rivers as impaired only by "Petroleum Hydrocarbons"); MassDEP, Massachusetts Year 2014 Integrated List of Waters at 154 (Dec. 2015), http://www.mass.gov/eea/docs/dep/water/resources/07v5/14list2.pdf (same). Thus, these reports show that the relevant portions of the Mystic and Island End Rivers have not been impaired by PAHs since 2010. (Mot. at 5, 29.)

31 Mot. at 29–31.

32 *Id.* at 29–30.

33 Compl. ¶ 285.

34 CLF's statement in its Opposition, that "Exxon's NPDES Permit Fact Sheet confirms that 'ExxonMobil is responsible for storm water and any other discharges from Sprague Energy *into* ExxonMobil's storm water collection system,'" still fails to sufficiently allege that the discharge from Sprague was routed through ExxonMobil's water treatment system such that the "discharges" reported to the National Incident Command are plausibly attributable to ExxonMobil. *See* Opp. at 27 n.24 (emphasis added); Compl. ¶¶ 283–86.

action, Claims 3 and 13 should be dismissed.

### C. Terminal Discharge Is Not Released Into the Half-Moon Shaped Pond, Which Is Not a Navigable Water of the United States

The artificial half-moon shaped pond on the Terminal's north tank farm farthest from the Mystic River is not a "navigable water" of the United States.[35] But even if this Court were to reach a different conclusion, CLF fails to plausibly allege that any pollutants from the Terminal discharge into the pond from any cognizable point source, which is the only kind of discharge governed by the Permit. *See Hamker* v. *Diamond Shamrock Chem. Co.*, 756 F.2d 392, 398 (5th Cir. 1985). And no declarants have alleged use of the pond, which the EPA concedes "serves no purpose," because doing so would require them to trespass onto the Terminal's private property, where the pond is located.[36] Claim 14 must therefore be rejected.

## CONCLUSION

The CWA and RCRA were never intended to require the holders of EPA-issued NPDES permits, SWPPPs, and SPCCs to mitigate any and all hypothetical risks posed by climate change, no matter how distant or conjectural. Nor were they intended to provide citizens *carte blanche* to use the courts to end run the regulatory authority of the EPA. CLF's attempt to rewrite or overwrite the EPA's NPDES permitting regime should not be countenanced. Accordingly, for the reasons set forth above and in Defendants' opening brief, CLF's complaint should be dismissed in its entirety and with prejudice.

---

[35] Mot. at 31. A satellite image from Google Maps, https://maps.google.com, of "52 Beecham Street, Everett, MA 02149" shows that the half-moon shaped pond exists separate and apart from the Mystic and Island End Rivers. *See Saco* v. *Tug Tucana Corp.*, 483 F. Supp. 2d 88, 93 n.4 (D. Mass. 2007) (taking judicial notice of distances on MapQuest); *United States* v. *Perea-Rey*, 680 F.3d 1179, 1182 n.1 (9th Cir. 2012) (taking "judicial notice of a Google map").

[36] Toal Ex. C at 1, 12.

Dated: December 30, 2016

By: /s/ *Theodore V. Wells, Jr.*
Theodore V. Wells, Jr.
*pro hac vice*
twells@paulweiss.com
John F. Baughman
*pro hac vice*
jbaughman@paulweiss.com
Daniel J. Toal
*pro hac vice*
dtoal@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
Fax: (212) 757-3990

and

By: /s/ *Deborah E. Barnard*
Deborah E. Barnard (BBO #550654)
deborah.barnard@hklaw.com
Jessica R. Early (BBO# 672878)
jessica.early@hklaw.com
HOLLAND & KNIGHT LLP
10 St. James Avenue, 11th Floor
Boston, MA 02116
(617) 523-2700
Fax: (617) 523-6850

*Counsel for Exxon Mobil Corporation, ExxonMobil Oil Corporation, and ExxonMobil Pipeline Company*