**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, Inc., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case 1:16-cv-11950 (MLW) |
| | ) |
| EXXON MOBIL CORPORATION, | ) |
| EXXONMOBIL OIL CORPORATION, and | ) |
| EXXONMOBIL PIPELINE COMPANY, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF FACTS ..................................................................... 3

APPLICABLE LEGAL STANDARD ........................................................ 8

ARGUMENT ..................................................................................... 9

I.  CLF's Non-Climate Change Claims Fail as a Matter of Law (Counts 1–5) ..................... 9

    A.  The Permit Shield and Collateral Attack Doctrine Bar Counts 1–3 ........................ 9

        1.  Count 1 Mischaracterizes the Permit's Design Flow Conditions ............. 11

        2.  Count 2 Misinterprets the Permit's Numeric Effluent Limits .................. 12

        3.  Count 3 Misapplies the State Water Quality Standards ........................... 15

    B.  This Court Lacks Jurisdiction Over Wholly Past Violations ................................ 17

    C.  CLF Fails to Plausibly Allege Point Sources Discharges into the Half-Moon Shaped Pond (Count 5) ..................................................................... 19

II.  CLF Lacks Standing to Assert its Climate Change Claims (Counts 6–15) ..................... 21

III.  CLF's RCRA Claim Fails to Allege "Imminent and Substantial Endangerment" (Count 15) ....................................................................................... 24

IV.  CLF's CWA Climate Change Claims Must Be Dismissed (Counts 6–14) ..................... 25

    A.  The Permit Shield and Collateral Attack Doctrine Bar CLF's CWA Climate Change Claims ................................................................................... 26

    B.  The Court Should Defer to EPA's View that the CWA Does Not Require SWPPPs or SPCCs to Consider Speculative Climate Change Impacts ................ 29

    C.  CLF Has Not Alleged a Failure to Exercise "Good Engineering Practices" Based on Purported Violations of Actual Permit Conditions............................... 31

V.  This Court Lacks Subject Matter Jurisdiction Over CLF's SPCC Claim (Count 11) ............................................................................................ 32

VI.  The Amended Complaint Should Be Dismissed With Prejudice ..................... 33

CONCLUSION................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*26 Crown Assocs., LLC* v. *Greater New Haven Reg'l Water Pollution Control
Auth.*, No. 3:14-CV-1439, 2017 WL 2960506 (D. Conn. July 11, 2017) ...............................21

*Amigos Bravos* v. *U.S. Bureau of Land Mgmt.*,
816 F. Supp. 2d 1118 (D.N.M. 2011) ....................................................................................21

*Aponte-Torres* v. *Univ. of Puerto Rico*,
445 F.3d 50 (1st Cir. 2006) ...................................................................................................34

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009) .................................................................................................................8

*Askins* v. *Ohio Dep't of Agric.*,
809 F.3d 868 (6th Cir. 2016) .................................................................................................33

*Atchafalaya Basinkeeper* v. *Chustz*,
682 F.3d 356 (5th Cir. 2012) .................................................................................................33

*Bell Atl. Corp.* v. *Twombly*,
550 U.S. 544 (2007) ...............................................................................................................18

*Cardoso* v. *City of Brockton*,
No. 12–10892–DJC, 2015 WL 1539949 (D. Mass Jan. 14, 2015) ........................................22

*Catskill Mountains Chapter of Trout Unlimited, Inc.* v. *City of New York*,
451 F.3d 77 (2d Cir. 2006) ....................................................................................................18

*Chesapeake Bay Found., Inc.* v. *Severstal Sparrows Point, LLC*,
794 F. Supp. 2d 602 (D. Md. 2011) .......................................................................................33

*Chesapeake Bay Found.* v. *Bethlehem Steel Corp.*,
608 F. Supp. 440 (D. Md. 1985) ............................................................................................10

*Clapper* v. *Amnesty Int'l USA*,
568 U.S. 398 (2013) ...............................................................................................................24

*CLF* v. *Am. Recycled Materials, Inc.*,
No.16-12451-RGS, 2017 WL 2622737 (D. Mass. June 16, 2017) ....................................8, 32

*CLF* v. *EPA*,
No. 10–11455–MLW, 2012 WL 1207719 (D. Mass. Sept. 21, 2012) ...............................29, 30

*CLF* v. *EPA*,
No. 10–11455–MLW, 2012 WL 12077183 (D. Mass. Nov. 30, 2012)...................................15

*Coon* v. *Willet Dairy, LP*,
536 F. 3d 171 (2d Cir. 2008)...............................................................................................12

*Cordiano* v. *Metacon Gun Club, Inc.*,
575 F.3d 199 (2d Cir. 2009)................................................................................................21

*Ctr. for Biological Diversity* v. *U.S. Dep't of Interior*,
563 F.3d 466 (D.C. Cir. 2009)............................................................................................21

*Defs. of Conewango Creek* v. *Echo Developers, LLC*,
No. CIV.A. 06-242 E, 2007 WL 3023927 (W.D. Pa. Oct. 12, 2007)....................................11

*Divot Golf Corp.* v. *Citizens Bank of Mass.*,
No. Civ.A 02-CV-10654-PB, 2003 WL 61287 (D. Mass. Jan. 8, 2003)................................17

*Dumont* v. *Corr. Corp. of Am.*,
No. 2:14-CV-209-CR-JMC, 2016 WL 8193639 (D. Vt. Nov. 21, 2016)...............................22

*EPA* v. *California ex rel. State Water Res. Control Bd.*,
426 U.S. 200 (1976).......................................................................................................27, 33

*United States* v. *ExxonMobil Pipeline Co.*,
No. 1:08-cr-10404-PBS (D. Mass. May 1, 2012)..................................................................32

*FCC* v. *Fox Television Stations, Inc.*,
567 U.S. 239 (2012)............................................................................................................28

*In re Fruit Juice Prods. Mktg. & Sales Practices Litig.*,
831 F. Supp. 2d 507 (D. Mass. 2011)................................................................................6, 27

*Gwaltney of Smithfield, Ltd.* v. *Chesapeake Bay Found., Inc.*,
484 U.S. 49 (1987)...........................................................................................10, 14, 18, 31

*H & H Holding, L.P.* v. *Chi Choul Lee*,
No. 12–5433, 2014 WL 958878 (E.D. Pa. Mar. 6, 2014).....................................................24

*Haley* v. *City of Boston*,
657 F.3d 39 (1st Cir. 2011)...................................................................................................3

*Hamker* v. *Diamond Shamrock Chem. Co.*,
756 F.2d 392 (5th Cir. 1985) ........................................................................................19, 20

*United States* v. *Hoyts Cinemas Corp.*,
380 F.3d 558 (1st Cir. 2004)...............................................................................................28

*Karr* v. *Hefner,*
    475 F.3d 1192 (10th Cir. 2007) ........................................................................14

*Katz* v. *Pershing, LLC,*
    672 F.3d 64 (1st Cir. 2012)..............................................................................23

*A.G. ex rel. Maddox* v. *Elsevier, Inc.,*
    732 F.3d 77 (1st Cir. 2013)..............................................................................20

*EPA ex rel. McKeown* v. *Port Auth. of N.Y. & N.J.,*
    162 F. Supp. 2d 173 (S.D.N.Y. 2001)..............................................................33

*Me. People's All. & Nat. Res. Def. Council* v. *Mallinckrodt, Inc.,*
    471 F.3d 277 (1st Cir. 2006)......................................................................24, 25

*Meghrig* v. *KFC W., Inc.,*
    516 U.S. 479 (1996).........................................................................................24

*Molosky* v. *Wash. Mut., Inc.,*
    664 F.3d 109 (6th Cir. 2011) ...........................................................................30

*Muller* v. *Bedford VA Admin. Hosp.,*
    No. 11–10510–DJC, 2013 WL 702766 (D. Mass. Feb. 25, 2013) ...................... 8-9

*Nat. Res. Def. Council, Inc.* v. *Cty. of Los Angeles,*
    725 F.3d 1194 (9th Cir. 2013) ....................................................................10, 26

*Nat. Res. Def. Council* v. *McCarthy,*
    231 F. Supp. 3d 491 (N.D. Cal. 2017)..............................................................27

*New Comm Wireless* v. *Sprintcom, Inc.,*
    213 F. Supp. 2d 61 (D.P.R. 2002).......................................................................3

*Palumbo* v. *Waste Techs. Indus.,*
    989 F.2d 156, 159 (4th Cir. 1993) ....................................................................11

*Paolino* v. *JF Realty, LLC,*
    710 F.3d 31 (1st Cir. 2013)............................................................................9, 10

*Pawtuxet Cove Marina, Inc.* v. *Ciba-Geigy Corp.,*
    807 F.2d 1089 (1st Cir. 1986)..........................................................................18

*Piney Run Preservation Ass'n* v. *Cty. Comm'rs,*
    268 F.3d 255 (4th Cir. 2001) ...........................................................................20

*United States* v. *Plaza Health Labs., Inc.,*
    3 F.3d 643 (2d Cir. 1993) ................................................................................20

*Price* v. *U.S. Navy,*
   39 F.3d 1011 (9th Cir. 1994) ....................................................................25

*Puget Soundkeeper All.* v. *Rainier Petroleum Corp.,*
   138 F. Supp. 3d 1170 (W.D. Wash. 2015)................................................27

*Rife* v. *One W. Bank, F.S.B.,*
   873 F.3d 17 (1st Cir. 2017)........................................................................34

*S. Appalachian Mountain Stewards* v. *A & G Coal Corp.,*
   758 F.3d 560 (4th Cir. 2014) ...................................................9-10, 15, 26

*United States* v. *S. Union Co.,*
   630 F.3d 17, 27 (1st Cir. 2010)..................................................................11

*Sanchez* v. *Esso Standard Oil de Puerto Rico, Inc.,*
   No. 08-2151, 2010 WL 3809990 (D.P.R. Sept. 29, 2010)........................24

*Sanchez* v. *Esso Standard Oil de Puerto Rico, Inc.,*
   No. 08-2151 (JAF), 2010 WL 3087485 (D.P.R. Aug. 5, 2010) ...............35

*Shain* v. *Veneman,*
   376 F.3d 815 (8th Cir. 2004) .....................................................................23

*In re Stallworth,*
   No. 11-19919-WCH 2012 WL 404952 (D. Mass. Bankr. Feb. 8, 2012)...............35

*U.S. Pub. Interest Research Grp.* v. *Atl. Salmon of Me., LLC,*
   339 F.3d 23 (1st Cir. 2003) ..................................................................18, 20

*Upper Blackstone Water Pollution Abatement Dist.* v. *EPA,*
   690 F.3d 9 (1st Cir. 2012).....................................................................16, 30

*Vill. of Oconomowoc Lake* v. *Dayton Hudson Corp.,*
   24 F.3d 962 (7th Cir. 1994) .......................................................................21

*Watterson* v. *Page,*
   987 F.2d 1 (1st Cir. 1993)............................................................................6

*Wis. Res. Prot. Council* v. *Flambeau Mining Co.,*
   727 F.3d 700 (7th Cir. 2013) .....................................................................29

## STATUTES

33 U.S.C. § 1312.........................................................................................31

33 U.S.C. § 1319....................................................................................10, 31

33 U.S.C. § 1321.........................................................................................33

33 U.S.C. § 1342 ...............................................................................9, 13, 31

33 U.S.C. § 1362 ...................................................................................20, 21

33 U.S.C. § 1365 ...........................................................................................33

33 U.S.C. § 1369 ...........................................................................................10

42 U.S.C. 6972 ..............................................................................................24

42 U.S.C. 6976 ..............................................................................................11

## RULES AND REGULATIONS

40 C.F.R. § 112 .............................................................................................30

40 C.F.R. § 122.2 ..........................................................................................19

40 C.F.R. § 122.44 ...................................................................................16, 17

40 C.F.R. § 124.19 ........................................................................................10

314 C.M.R. § 4.03 .........................................................................................16

314 C.M.R. § 4.05 .........................................................................................17

Fed. R. Civ. P. 12(b)(1) ..................................................................................8

Fed. R. Civ. P. 12(b)(6) ...............................................................................6, 8

## OTHER AUTHORITIES

Atlantic Oceanographic & Meteorological Laboratory, NOAA, *Continental U.S. Hurricane Impacts/Landfalls: 1851-2016*,
    http://www.aoml.noaa.gov/hrd/hurdat/All_U.S._Hurricanes.html .........................23

Boston Water & Sewage Comm'n, *Daily Rainfall*,
    http://www.bwsc.org/COMMUNITY/rainfall/telog_rainfall/rf_daily.asp .........................6, 27

Emergency Mgmt., *SPCC Guidance for Regional Inspectors* (Dec. 16, 2013),
    https://www.epa.gov/sites/production/files/2014-04/documents/spcc_guidance_fulltext_2014.pdf ......................29

EPA, *Developing Your Stormwater Pollution Prevention Plan* (Feb. 2009),
    https://www3.epa.gov/npdes/pubs/sw_swppp_guide.pdf .........................30

EPA, *Multi-Sector General Permit for Stormwater Discharges* (June 4, 2015),
    https://www.epa.gov/sites/production/files/2015-0/documents/msgp2015_finalpermit.pdf ..................................30

EPA News Release, *ExxonMobil Addresses Stormwater at Everett Terminal –
Better Water Quality in Mystic and Island End Rivers Will Result* (Oct. 14,
2011), https://yosemite.epa.gov/opa/admpress.nsf
/0/7228CB43D6712FCA85257929005936EA ........................................................................32

Exxon Co. USA, *Closure of Effluent Holding Pond* (Oct. 1988),
http://eeaonline.eea.state.ma.us/EEA/FileViewer/Scanned.aspx?id=133192 ........................20

Mass. DEP, *Massachusetts Year 2010 Integrated List of Waters* 189 (Nov. 2011),
http://www.mass.gov/eea/docs/dep/water/resources/07v5/10list6.pdf......................................7

Mass. DEP, *Massachusetts Year 2014 Integrated List of Waters* 135 (Dec. 2015),
http://www.mass.gov/eea/docs/dep/water/resources/07v5/14list2.pdf......................................7

Mass. DEP, *Massachusetts Year 2016 Integrated List of Waters* 149–50 (June
2017),
http://www.mass.gov/eea/docs/dep/water/resources/07v5/16ilwplist.pdf.................................7

Mass. Office of Coastal Zone Mgmt., *Sea Level Rise: Understanding and
Applying Trends and Future Scenarios for Analysis and Planning* 7–8 (Dec.
2013), http://www.mass.gov/eea/docs/czm/stormsmart/slr-guidance-2013.pdf.......................8

Nat'l Hurricane Ctr., NOAA, National Storm Surge Hazard Maps,
http://www.nhc.noaa.gov/nationalsurge ................................................................................23

*NPDES Permit Writers' Manual* (Sept. 2010),
https://www.epa.gov/sites/production/files/2015-
09/documents/pwm_2010.pdf.......................................................................................29, 30

U.S. Global Change Research Program, *Climate Change Impacts in the United
States: The Third National Climate Assessment* 60 (Oct. 2014),
http://s3.amazonaws.com/nca2014/low/NCA3_Climate
__Change_Impacts_in_the_United%20States_LowRes.pdf?download=1 ..............................8

Defendants Exxon Mobil Corporation, ExxonMobil Oil Corporation, and ExxonMobil Pipeline Company (collectively, "Defendants" or "ExxonMobil") respectfully submit this memorandum of law in support of their motion to dismiss the Amended Complaint of Plaintiff Conservation Law Foundation, Inc. ("Plaintiff" or "CLF").

## PRELIMINARY STATEMENT

Rather than cure the defects that plagued its initial pleading, CLF's Amended Complaint doubles down on its improper effort to usurp EPA's permitting authority.  In defiance of this Court's prior ruling, CLF continues to assert climate change claims premised on distant and speculative impacts, which are substantively identical to those the Court dismissed previously. As before, CLF frequently concedes that its alleged impacts will not occur (if at all) for several decades or more.  And CLF does not even attempt to tie the alleged impacts to any purported defect at Everett Terminal (the "Terminal").  CLF's insistence on repeating the same claims the Court already rejected disregards the law of this case—under which CLF lacks standing to assert claims that are not even alleged to impact the Terminal "until after the Permit has expired, or if the Permit remains in effect indefinitely, in the near future."  (ECF No. 29 at 2.)

CLF also fails to identify any violations of the actual conditions of the Terminal's operative National Pollutant Discharge Elimination System Permit (the "Permit").  As CLF acknowledges, the Terminal operates pursuant to a valid Permit that was issued jointly by the Environmental Protection Agency ("EPA") and the Massachusetts Department of Environmental Protection ("Mass. DEP") following extensive agency review, as well as public notice and comment.  Despite CLF's representation that it merely seeks to enforce compliance with the Permit, CLF actually seeks to rewrite the Permit to create new obligations, and further demands that the Terminal radically redesign its facilities in some unspecified manner.  The timing of this

suit reveals that CLF's real objective is to circumvent the permitting regime and override EPA's authority.  Rather tham participate appropriately in the permitting process and provide comments at the prescribed time, CLF instead decided to sue several years after the Permit had issued and when a new permit is already under consideration.

In order to manufacture violations that do not exist, CLF repeatedly mischaracterizes the terms of the Permit.  *First*, CLF invents a new design flow requirement based on daily discharge volumes.  But the flow volume CLF envisions is untethered to any condition in the Permit and at odds with the facility upgrades performed under the supervision and with the approval of EPA.  *Second*, while CLF does not allege a single violation of the Permit's actual numeric effluent limits for Polycyclic Aromatic Hydrocarbons ("PAHs"), it manufactures effluent violations based on (i) a PAH limit that EPA states cannot be reliably measured and CLF concedes the agent cannot enforce, and (ii) State Water Quality Standards ("WQS") that apply only to receiving waters.  *Third*, CLF asserts nine claims under the Clean Water Act ("CWA") premised on ExxonMobil's supposed failure to consider distant climate change impacts.  But nowhere does the Permit or any applicable statute or regulation demand consideration of the speculative climate change risks on which CLF predicates its claims.  To the contrary, the Permit specifies the precise level of precipitation that the Terminal must address, and the Terminal was upgraded to meet those exact specifications just before the Permit went into effect.

For these reasons and those set forth below, CLF's Amended Complaint should be dismissed in its entirety and with prejudice, and Defendants respectfully request the Court grant them any additional relief it deems proper.

## STATEMENT OF FACTS[1]

**The Terminal's Treatment System Was Tailor Made to EPA's Specifications**

The Terminal operates pursuant to a NPDES permit issued and approved by EPA and the Mass. DEP.   (Am. Compl. ¶ 48.)[2]   EPA issued the current Permit, No. MA0000833, to ExxonMobil Oil Corporation on October 12, 2011, and it became effective on January 1, 2012.[3] The Permit was due to expire on January 1, 2014, but has been administratively continued pending EPA's decision on ExxonMobil's renewal application.  (*Id.* ¶ 49.)

The Permit authorizes the Terminal to discharge wastewater into the Island End River through three point sources:  Outfalls 01A, 01B, and 01C.  (*Id.* ¶ 69.)  Under the Permit, the Terminal may discharge stormwater, ground water, and other effluents, subject to specific numeric limits on pollutants in the discharges from each outfall.  (*Id.*)  For instance, the Permit imposes separate numeric effluent limitations for PAHs discharged through Outfalls 01A and 01C.  (*Id.* ¶ 70.)  It also dictates when effluent may be discharged through each outfall, establishing the design capacities for Outfalls 01A and 01C.  (*Id.* ¶ 97.)  The Permit further dictates the extreme weather events that the Terminal must have the capacity to handle.  It provides that "[t]he collection, storage and treatment systems" that discharge through Outfalls 01A and 01C shall be "designed, constructed, maintained and operated to treat the total equivalent volume of [water] which would result from a 10-year 24 hour precipitation event." (*Id.*)  The Permit specifies the volume of water resulting from such a precipitation event as 4.6

---

[1]   Defendants adopt the facts as alleged in the Amended Complaint for purposes of this motion only.  *See New Comm Wireless* v. *Sprintcom, Inc.*, 213 F. Supp. 2d 61, 64 n.2 (D.P.R. 2002).  On a motion to dismiss, a court may consider the pleadings as augmented by "documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice."  *Haley* v. *City of Boston,* 657 F.3d 39, 46 (1st Cir. 2011) (citation omitted).

[2]   Am. Compl. Ex. A at 1. "Am. Comp. Ex. __" refers to exhibits appended to CLF's Amended Complaint. "Toal Ex. __" refers to exhibits to the Declaration of Daniel Toal in support of ExxonMobil's Motion to Dismiss the Amended Complaint.

[3]   *Id.* at 1.

inches of rainfall.[4]  If an extreme weather event exceeds that threshold, and thus the "capacity of the facility to collect, store, treat, and discharge wastewater through outfalls 01A and 01C," the Permit authorizes ExxonMobil to discharge untreated effluents through Outfall 01B.[5]

The terms of the Permit were subject to extensive review by EPA, Mass. DEP, and the public.  In October 2008, ExxonMobil petitioned the U.S. Environmental Appeals Board for review of a prior version of the permit that EPA had issued.[6]  EPA and ExxonMobil then entered into a formal agreement, pursuant to which EPA agreed to make specified modifications to the 2008 permit and to issue the Permit now in effect provided that ExxonMobil would make certain "material and substantial alterations or additions to the permitted facility"[7] to upgrade its effluent treatment system.  (Am. Compl. ¶ 96.)  Specifically, the Permit, as modified, "established separate effluent limitations and monitoring requirements to address wet weather discharges (dominated by storm water) and dry weather discharges (comprised of infiltrated groundwater, some of which exhibits contamination from historic refinery and bulk petroleum operations)."[8]  ExxonMobil would, in turn, "extensively redesign its effluent treatment system in order to improve effluent quality under all flow conditions, including through the use of [i] a continuously operated advanced treatment system . . . capable of treating dry weather flow from the site, as well as storm water flow" and [ii] a "tank to store stormwater volume during periods of peak stormwater flow."[9]  These upgrades equipped the facilities with over 2 million gallons of

---

[4]   *Id.* at 2 (defining a "10-year 24-hour precipitation event" as a rainfall event with a probable recurrence interval of once in ten years," which "in Boston is estimated at 4.6 inches").

[5]   *Id.* at 11.

[6]   *Id.*, Response to Comments at 1.

[7]   Toal Ex. 2, Memorandum of Understanding at 2-4.

[8]   Am. Compl. Ex. A, Response to Comments at 1.

[9]   *Id.* at 1-2.

storage capacity, and ensured that the Terminal would be able to treat effluents in any weather within the parameters of a 10-year, 24-hour storm event, as defined in the Permit.[10]

Over the next two years, ExxonMobil made significant investments in order to redesign and upgrade the Terminal according to designs that EPA reviewed and approved.  In 2011, ExxonMobil completed installation of the "continuous flow treatment system (CFTS) component to the NPDES treatment process," which provides state-of-the-art treatment to discharges through Outfall 01C.[11]  As intended, Outfall 01C's CFTS "treats non-storm event wastewater"— including historically contaminated groundwater—and any stormwater "up to its design capacity of 280 [gallons per minute ("gpm")]."[12]  ExxonMobil also upgraded its corrugated plate separator ("CPS"), which treats stormwater flows lacking this historical contamination.[13] ExxonMobil further repurposed Tank 140, which stores stormwater exceeding Outfall 01A's 4,000 gpm design capacity.[14]

**CLF Did Not Timely Object to EPA's Decision to Issue the Current NPDES Permit**

On December 10, 2009, before ExxonMobil completed the improvements that EPA had specified, EPA subjected the Permit—including the provisions detailing the planned upgrades to the Terminal's effluent treatment system—to public notice and comment.[15]  This process afforded interested parties the opportunity to object to the Permit and the proposed system upgrades.  CLF had the opportunity to voice any objections during that public comment period,

---

[10]   Am. Compl. Ex. A at 2 & Response to Comments at 3; Toal Ex. 2 at 4.
[11]   Toal, Ex. 1 at 6.
[12]   *Id.*; Am. Comp. Ex. A at 2, 6, 11.
[13]   Toal Ex. 1 at 5; Timely Ex. 2 at 7-8; Am. Compl. Ex. A at 3.
[14]   Toal Ex. 2 at 7; Am. Compl. Ex. A, at 3.
[15]   Am. Compl. Ex. A, Response to Comments at 1.

before ExxonMobil spent two years working to upgrade the system.  But during the month-long comment period, CLF stood silent.[16]

**The Terminal Treats and Discharges Water in Accordance with Its NPDES Permit**

ExxonMobil has complied with the terms of its Permit.  For example, EPA's Enforcement and Compliance History Online ("ECHO") Database, from which the Amended Complaint constructs its list of purported PAH violations, does not report a single exceedance of the Permit-specified limits for PAHs since the Permit became effective in 2012.[17]

The Terminal has also demonstrated that its design is adequate to treat and store current volumes of stormwater in Boston.  In fact, since the upgraded system went online, the Terminal has never discharged any effluent through Outfall 01B, which ExxonMobil is authorized to use "in extreme weather events."  (Am. Compl. ¶ 98.)[18]  That is consistent with the observed precipitation in Boston: during the past decade, rainfall has reached or exceeded the 4.6 inches defining a 10-year 24-hour precipitation event just once.[19]

Nor is there any indication of noncompliance in the rivers near the Terminal.  The Terminal discharges into the Island End River, which feeds into the Mystic River.  (*See* Am. Compl. ¶¶ 51-52.)  The lower reach of the Mystic River, which incorporates the Island End River, has long been impaired by numerous pollutants, including the human pathogen "Fecal Coliform."  (*Id.* ¶ 59.)  But the Mystic River is not impaired by any of the pollutants that the

---

[16]   *Id.* at 1 ("The Region received timely comments from one party: Michael Fager of Mystic River Watershed Association.").

[17]   *See* Toal Ex. 3 at 1-4.  Where, as here, "plaintiff has actual notice . . .  and has relied upon these documents in framing the complaint," they may properly be considered on a Rule 12(b)(6) motion to dismiss.  *See Watterson* v. *Page*, 987 F.2d 1, 3–4 (1st Cir. 1993) (quoting *Cortec Indus., Inc.* v. *Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991)).  Moreover, the Court may take judicial notice of "public record[s]" published on the website of a government agency.  *See In re Fruit Juice Prods. Mktg. & Sales Practices Litig.*, 831 F. Supp. 2d 507, 509 (D. Mass. 2011) (taking judicial notice of reported lead levels posted on FDA's website).

[18]   *See* Toal Ex. 3 at 8-11; Am. Compl. Ex. A, Response to Comments at 3.

[19]   *See* Boston Water & Sewage Comm'n, *Daily Rainfall*, http://www.bwsc.org/COMMUNITY/rainfall/telog_rainfall/rf_daily.asp (reporting rainfall measured in Union Park exceeded 4.6 inches on March 14, 2010).

Terminal allegedly discharges.  Specifically, CLF alleges that the Terminal discharged PAHs and Total Suspended Solids ("TSS") in excess of permit levels, (*id.* ¶ 245), but CLF acknowledges that neither of these pollutants has caused the Mystic or Island End Rivers to be designated as "impaired" water bodies since 2010, prior to the Permit becoming effective.  (*Id.* ¶¶ 56-59.)[20]

**CLF Admits that the Distant Scenarios It Contrives Are Exaggerated and Uncertain**

Ten of CLF's fifteen claims target ExxonMobil's alleged failure to expressly consider alleged climate change impacts, such as storm surge, sea level rise, increased precipitation, and increased sea surface temperatures.  As before, CLF either fails entirely to specify a time frame for these impacts (*see, e.g.*, *id.* ¶¶ 140, 145), relies on historic information known to EPA at the time it issued the Permit (*see, e.g.*, *id.* ¶¶ 143-46, 158), or acknowledges that these impacts will not occur (if at all) for several decades or more.  For instance, CLF alleges:

- "[G]lobal mean sea level rise will continue beyond 2100" and "cumulative emissions through 2050 . . . commit Boston to sea level rise of 2.8 meters." (*Id.* ¶¶ 183, 185.)

- "By mid-century, sea surface temperatures could increase by 1.7º C (3º F) and by the end of this century it could increase 2.2º to 2.8ºC (4º to 5º F)." (*Id.* ¶ 202.)

- Boston is "projected to see more than 70 tidal floods annually by 2045." (*Id.* ¶ 153.)

- "By midcentury, [superstorms] will be the new normal."  (*Id.* ¶ 208.)

Furthermore, the Amended Complaint's own source materials underscore that the rate and extent of alleged climate change are shrouded in uncertainty:

---

[20]   *See* Mass. DEP, *Massachusetts Year 2016 Integrated List of Waters* 149–50 (June 2017), http://www.mass.gov/eea/docs/dep/water/resources/07v5/16ilwplist.pdf; Mass. DEP, *Massachusetts Year 2014 Integrated List of Waters* 135 (Dec. 2015), http://www.mass.gov/eea/docs/dep/water/resources/07v5/14list2.pdf; Mass. DEP, *Massachusetts Year 2010 Integrated List of Waters* 189 (Nov. 2011), http://www.mass.gov/eea/docs/dep/water/resources/07v5/10list6.pdf (cited in Am. Compl. ¶¶ 57–59).

- "As with other climate predictions (such as precipitation and storm events), future sea level rise projections are uncertain because they attempt to predict inherently complex forces and processes, including human response and actions."[21]

- "Key remaining uncertainties relate to the precise magnitude and nature of changes at global, and particularly regional, scales, and especially for extreme events and our ability to simulate and attribute such changes using climate models."[22]

The Amended Complaint not only repeats such distant and speculative allegations from its prior pleading (*compare* Compl. ¶ 93(g), *with* Am. Compl. ¶ 180), but also supplements them with new allegations regarding purported impacts CLF does not project to occur until mid-century or later, (*see id.* ¶¶ 153, 183, 185, 190, 202).

## APPLICABLE LEGAL STANDARD

To survive a motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).   "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  Nor do allegations that are "so general and conclusory as to amount merely to an assertion that unspecified facts exist."  *CLF* v. *Am. Recycled Materials, Inc.*, No.16-12451-RGS, 2017 WL 2622737 (D. Mass. June 16, 2017) (quoting *Menard* v. *CSX Transp., Inc.*, 698 F.3d 40, 45 (1st Cir. 2012)).

A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction is subject to the same standard of review as a motion to dismiss under Rule 12(b)(6).  *Muller* v. *Bedford VA*

---

[21]   Mass. Office of Coastal Zone Mgmt., *Sea Level Rise: Understanding and Applying Trends and Future Scenarios for Analysis and Planning* 7–8 (Dec. 2013), http://www.mass.gov/eea/docs/czm/stormsmart/slr-guidance-2013.pdf (cited in Am. Compl. ¶ 181).

[22]   *See* U.S. Global Change Research Program, *Climate Change Impacts in the United States: The Third National Climate Assessment* 60 (Oct. 2014), http://s3.amazonaws.com/nca2014/low/NCA3_Climate _Change_Impacts_in_the_United%20States_LowRes.pdf?download=1 (cited in Am. Compl. ¶ 125); *id.* at 73 (noting the "critical uncertainty in projecting the impacts of climate change on regional water cycles").

*Admin. Hosp.*, No. 11–10510–DJC, 2013 WL 702766, at *2 (D. Mass. Feb. 25, 2013) (citing *Rogan* v. *Menino*, 175 F.3d 75, 77 (1st Cir. 1999)).

## ARGUMENT

### I.     CLF's Non-Climate Change Claims Fail as a Matter of Law (Counts 1–5)

CLF's non-climate change claims should be dismissed because they fail to plausibly allege an ongoing violation of the CWA.  Each of these claims is pleaded in conclusory fashion to conceal the lack of any connection to the Permit's conditions or the necessary elements of a CWA citizen suit.  Counts 1–3 are plainly barred by the NPDES permit shield defense and the prohibition on collateral attacks.  Although styled as permit violations, they actually seek to impose more stringent obligations than the Permit itself imposes.  Counts 2 and 4 require dismissal because they fail to allege an ongoing violation, which is a jurisdictional prerequisite for CWA citizen suits.  And Count 5 fails because CLF does not, and cannot, allege that the Terminal discharges pollutants from a point source into the half-moon shaped pond.

### A.     The Permit Shield and Collateral Attack Doctrine Bar Counts 1–3

The CWA "prohibits the discharge of any pollutant into navigable waters, unless authorized by a valid National Pollutant Discharge Elimination System (NPDES) permit." *Paolino* v. *JF Realty, LLC*, 710 F.3d 31, 34 (1st Cir. 2013) (internal citations omitted).  The "permit shield" insulates NPDES permit holders from liability when they comply with the terms of their permits.  *See* 33 U.S.C. § 1342(k).  Indeed, for NPDES permit holders, "[c]ompliance with [the] permit . . . shall be deemed compliance" with the CWA.  *See id*.  The purpose of the permit shield is to "prevent permit holders from being forced to change their procedures due to changes in regulations, or to face enforcement actions over 'whether their permits are sufficiently strict.'"  *S. Appalachian Mountain Stewards* v. *A & G Coal Corp.*, 758 F.3d 560, 564 (4th Cir. 2014)  (quoting *E.I. du Pont de Nemours & Co.* v. *Train*, 430 U.S. 112, 138 n. 28 (1977)).

While government agencies have broad authority to bring CWA enforcement actions, *see* 33 U.S.C. § 1319, "private citizens are given a more limited enforcement role," *Paolino*, 710 F.3d at 35. Their role is confined to holding NPDES permit holders liable for ongoing failures to comply with the enforceable conditions of the permit. *Gwaltney of Smithfield, Ltd.* v. *Chesapeake Bay Found., Inc.*, 484 U.S. 49, 59 (1987). As a result, a CWA citizen suit may target only a permittee that "discharges pollutants in excess of the levels specified in the permit," or otherwise fails to comply with the permit's conditions. *Nat. Res. Def. Council, Inc.* v. *Cty. of Los Angeles*, 725 F.3d 1194, 1204 (9th Cir. 2013). This limited role comports with the Supreme Court's admonition that "the citizen suit is meant to supplement rather than to supplant governmental action." *Gwaltney*, 484 U.S. at 60–61. Because, as explained below, ExxonMobil is in compliance with the actual terms of its Permit, it is shielded from CLF's CWA claims.

Although CLF styles its claims as an enforcement action, its attempt to reinterpret the Permit to impose more stringent conditions is also an impermissible collateral attack on the Permit. The time for any review of the Permit has long passed. In order to challenge the EPA Administrator's actions, CLF was required to comment on the draft Permit during the public notice period. *See* 40 C.F.R. § 124.19(a); *Chesapeake Bay Found.* v. *Bethlehem Steel Corp.*, 608 F. Supp. 440, 443 (D. Md. 1985) ("The obligations and limitations of NPDES permits are binding unless timely challenged, and may not be reexamined in an enforcement proceeding."). Because CLF failed to do so,[23] it is jurisdictionally barred from challenging the terms of the Permit in court. *See* 33 U.S.C. § 1369(b); 40 C.F.R. § 124.19(a).

Courts have found that *styling* claims as enforcement actions, as CLF has done here, is insufficient to evade the statutory prohibition on time-barred review of an Administrator's actions. In *Conewango*, for example, a complaint purported to challenge a NPDES permittee's

---

[23]   *See* Am. Compl. Ex. A, Response to Comments at 1.

compliance with the CWA when, in actuality, it was merely using this framework as a "veneer on the counts," which at bottom challenged the state agency's decision to issue the NPDES permit. *Defs. of Conewango Creek* v. *Echo Developers, LLC*, No. CIV.A. 06-242 E, 2007 WL 3023927, at *7–9 (W.D. Pa. Oct. 12, 2007). The court dismissed the complaint for lack of subject matter jurisdiction on the ground that the plaintiff was required to challenge the state administrator's issuance of the permit within the statutory time period. *Id.*[24]

### 1.   Count 1 Mischaracterizes the Permit's Design Flow Conditions

Count 1 is premised on the alleged violation of a requirement found nowhere in the Terminal's Permit. As recounted above, the Terminal made substantial improvements to its wastewater treatment system prior to the effective date of the Permit in 2012, in order to achieve specific EPA reviewed and approved parameters. One such improvement was the installation of a CFTS that treats discharges through Outfall 01C "up to its design capacity of 280 gallons per minute ('gpm')." (Am. Compl. ¶ 97.)[25]

CLF contends that "discharges from Outfall 01A frequently occur even when Outfall 01C has not reached its 280 gpm capacity." (Am. Compl. ¶ 236.) But the only factual matter pleaded to support CLF's claim is a list of "*Daily* Discharge Volume[s]," none of which allege any violation of the Permit's 280 gallons per *minute* requirement.[26] To the contrary, CLF alleges that the Terminal violated a gallons *per day* requirement that appears nowhere in the Permit. According to CLF, on any given day, the Terminal must discharge 403,200 gallons of water (280

---

[24]   In *United States* v. *S. Union Co.*, the First Circuit similarly held that a defendant could not collaterally attack the EPA Administrator's actions in a criminal enforcement action well after the period for such judicial review had expired. *See* 630 F.3d 17, 27 (1st Cir. 2010), *overruled on other grounds*, 567 U.S. 343 (2012). The Fourth Circuit reached a similar conclusion when applying an analogous judicial review provision in the RCRA statute. In *Palumbo* v. *Waste Techs. Indus.*, the Fourth Circuit ruled that the district court should have dismissed a complaint for lack of subject matter jurisdiction because plaintiffs merely styled their challenges to the issuance of a RCRA permit as an enforcement action contesting the permit-holder's emissions. *See* 989 F.2d 156, 159 (4th Cir. 1993) (applying 42 U.S.C. § 6976).

[25]   *See* Toal Ex. 1 at 6; Toal Ex. 2 at 6.

[26]   *Compare* Am. Compl. Ex. E (emphasis added), *with* Am. Compl. Ex. A. at 2, 6, 11.

gpm x 1,440 minutes in a day) through Outfall 01C *before* it may discharge any water through Outfall 01A.[27]   Under this theory, the Terminal may not discharge one drop of water from Outfall 01A unless Outfall 01C discharges at its maximum 280 gpm capacity for every minute of every hour, all day long.   CLF's nonsensical interpretation would require the Terminal to store any water that cannot be immediately discharged through Outfall 01C until the end of day when Outfall 01C's daily discharge volume may be determined (and the process presumably begins again).   This means that, as a practical matter, Outfall 01A could never be used.

No such requirement can be found in the Permit.   As CLF recognizes, the Permit contains only a gallons per *minute* requirement.   (Am. Compl. ¶ 97.)   The Terminal therefore may discharge water through Outfall 01A whenever flows to Outfall 01C require it to treat and process water at a rate higher than 280 gallons per *minute*.   CLF pleads no facts suggesting that the Terminal failed to comply with this gallons *per minute* requirement.   Pursuant to the permit shield, ExxonMobil cannot be liable for discharges in compliance with the Permit.   *See Coon* v. *Willet Dairy, LP,* 536 F. 3d 171, 173 (2d Cir. 2008).   And the collateral attack doctrine bars CLF from maintaining an action to challenge terms of a permit on which it failed to comment during the public notice period.

### 2.     Count 2 Misinterprets the Permit's Numeric Effluent Limits

Count 2 alleges that the Terminal violated the CWA 184 times since 2010 by discharging pollutants in concentrations exceeding the Permit's numeric effluent limits.   This claim must be dismissed on the basis of one fatal defect:  it uses the wrong effluent limit.

---

[27]   *See* Am. Compl. Ex. E (calculating "[u]nused [d]aily [c]apacity at Outfall 01C" as the difference between the amount discharged and 403,200 gallons per day).

Practically all of the alleged effluent violations in Count 2 concern the discharge of PAHs through Outfall 01A.[28]   The limit CLF purports to enforce for Outfall 01A is 0.031 μg/L.[29] According to CLF, this is the same limit that governs Group II PAH discharges through Outfall 01C.[30]  But the Permit unambiguously sets a different limit for discharges through Outfall 01A, unequivocally establishing that: "*Compliance*/non-compliance . . . for discharges at outfall 01A shall be 10 μg/L for individual PAHs."[31]   In setting 10 μg/L as the "compliance" limit, EPA could not have been more clear about which limit may be used in an enforcement action.   After all, the plain language of the CWA dictates that "[c]ompliance with [the] permit . . . shall be deemed compliance" with the CWA.   *See* 33 U.S.C. § 1342(k).   This reading of the Permit is also confirmed by the Terminal's current compliance status.   EPA's ECHO Database—which supplies the data underlying many of CLF's 184 alleged violations—lists the 10 μg/L compliance limit as the governing limit for Outfall 01A and reports no PAH exceedances by the Terminal.[32]

CLF's contends, without a shred of support, that EPA's establishment of "a compliance threshold for its own purposes does not in any way bar CLF's citizen suit enforcing" a different—and more stringent—effluent limit.[33]   CLF is mistaken.   As an initial matter, CLF's position would grant private citizens broader enforcement powers than EPA—which is precisely what the Supreme Court has held the CWA does not allow.   In *Gwaltney*, the Court explained that citizen suits cannot curtail the agency's enforcement discretion, but instead merely fill a limited role where "the Federal, State, and local agencies fail to exercise their enforcement

---

[28]   Am. Compl. Exs. F & G.   Two exceptions for TSS exceedances are discussed *infra* in Part I.B.   The remaining four alleged violations concern discharges of PAHs through Outfall 01C, all of which are below the enforceable limits the Permit establishes for that Outfall.   *Compare* CLF Ex. A at 8 n.9, 10 n.20, *with* CLF Ex. F at 2-3.

[29]   Am. Compl. Ex. F.

[30]   *Id.* at 2.

[31]   Am. Compl. Ex. A at 4 n.7 (emphasis added).

[32]   *See* Toal Ex. 3 at 5.

[33]   *See* CLF Opp., ECF No. 20 at 18 & n.12; Am. Compl. Ex. C at 15.

authority." 484 U.S. at 60. For instance, if an agency issues a "compliance order" and "agree[s] not to . . . seek civil penalties on the condition that the violator take some extreme corrective action, such as to install particularly effective but expensive machinery," a citizen cannot then "seek the civil penalties that the Administrator chose to forgo." *Id.* at 60-61. Were it otherwise, and permit holders were still "exposed to a citizen suit whenever the EPA grants a concession," the permit holders would "have little incentive to negotiate" with EPA. *Karr* v. *Hefner*, 475 F.3d 1192, 1197 (10th Cir. 2007).

Usurping EPA's considered discretion is precisely what CLF improperly seeks to accomplish here. When drafting the Permit, EPA agreed that, if ExxonMobil made specified improvements, EPA would issue a permit that carried over the 10 µg/L PAH limit for discharges through Outfall 01A.[34] EPA set different conditions for each outfall to reflect the distinct purpose of each. Outfall 01C—which was intended to treat "dry weather discharges" (which may exhibit historic contamination)—would be treated by a new state-of-the-art continuous treatment system, and would be required to meet the lowest limits for PAHs that EPA determined can be reliably quantified using approved analytical methods.[35] By contrast, Outfall 01A—which was intended to treat excess "wet weather discharges (dominated [and diluted] by storm water)" unaffected by historic site contamination[36]—would retain the same numeric effluent limit that applied under the Terminal's previous permit. The different limits EPA set for each outfall are reflected in the very structure of the recently redesigned facility. Yet, CLF contends it may enforce the same PAH limits for both outfalls and thereby ignore the significant distinctions between the outfalls that EPA expressly recognized.

---

[34] Toal Ex. 2 at 11-12; *id.*, Memorandum of Understanding at 2; *id.*, Draft Permit Modification at 4 n.7.
[35] Am. Compl. Ex. A, Response to Comments at 1; Toal Ex. 2, Statement of Basis at 6, 10.
[36] Am. Compl. Ex. A, Response to Comments at 1; Toal Ex. 2, Statement of Basis at 10.

Significantly, while CLF styles Count 2 as a supposed enforcement of the Permit's effluent limits, CLF actually seeks to overwrite the Permit's established limits and to replace them with limits that EPA deems below the concentrations which can be reliably measured.[37] Indeed, CLF has solicited and received EPA emails concerning these precise allegations, which confirm that CLF's interpretation of the Permit is both inaccurate and impossible to implement.[38] Because Count 2 boils down to an "enforcement action[ ] over 'whether [the Terminal's] permit[ ] [is] sufficiently strict," and fails to allege a single exceedance of the actual PAH effluent limits, it is barred by the permit shield defense. *A & G Coal Corp.*, 758 F.3d at 564.

CLF's attempt to challenge the PAH compliance limit is also barred as an untimely collateral attack on the Permit. As CLF has acknowledged in a prior proceeding before this Court, "EPA NPDES permit appeal regulations include an express waiver requirement, putting the public on fair notice of its obligation to raise issues directly with the agency or forego judicial review."[39] CLF could have challenged the enforceable limit during the public comment process, when EPA expressly informed the public that "[n]umeric effluent limits, compliance levels and reporting requirements derived for stormwater and uncontaminated groundwater in the 2000 permit have been carried forward and applied to outfall 0lA in the draft permit modification."[40] Having failed to do so, CLF cannot now seek to alter these limits.

### 3.    Count 3 Misapplies the State Water Quality Standards

In an attempt to create a third set of effluent limits, CLF alleges that the Terminal's discharges violate the WQS. However, those allegations are premised on a misapplication of the WQS in disregard of settled case law, the Permit's numeric limits, and direct guidance from EPA

---

[37]    Am. Compl. Ex. A at 2, 10 (defining "Minimum Level" of quantification); *see also id.*, Fact Sheet at 17.

[38]    Toal Ex. 4, at 6 ("CLF alleged a number of PAH violations – the limits table in the NPDES permit showed a limit of 0.031 µg/l, but since there are no approved test methods that can measure to that level a footnote established a compliance level of 10 µg/l. Exxon did not exceed the compliance level in any test.").

[39]    Mem, *CLF* v. *EPA*, No. 10–11455–MLW,  2012 WL 12077183 (D. Mass. Nov. 30, 2012), ECF No. 56 at 21.

[40]    Toal Ex. 2 at 11.

to the contrary.  In Count 3, CLF contends that the Terminal has violated the WQS because 30 discharges from the Terminal exceeded the "allowable receiving water concentrations" for PAHs under the Massachusetts WQS.  (Am. Compl. ¶¶ 251-53.)  This allegation is meritless for at least three reasons.

*First*, as CLF concedes, the WQS regulate pollutant concentrations in the *receiving water*—which in this case is the Island End River.  (Am. Compl. ¶¶ 51, 109, 252.)  WQS prohibit discharges, once released and diluted by the receiving water, from causing the "surface water quality standards of the *receiving waters*" to be polluted at levels above specified concentrations deemed harmful to human or aquatic life.  *See* 314 C.M.R. § 4.03(1)(a) (emphasis added); 40 C.F.R. § 122.44(d).   WQS do *not* prohibit end-of-pipe discharges from exceeding WQS concentrations.   This distinction is well settled.   *See Upper Blackstone Water Pollution Abatement Dist.* v. *EPA*, 690 F.3d 9, 14 (1st Cir. 2012) (distinguishing state water quality standards, which "specify the amounts of pollutants that may be present in these water bodies" from "federal, technology-based effluent limitations on individual discharges of pollution into navigable waters").  Indeed, in discussing this very facility, EPA disabused CLF of precisely the same misconception advanced here, explaining "WQSs apply to the receiving water and not directly to the outfall."[41]  The "Amended Complaint's misstatements" regarding application of the WQS is "inexcusable," given that "defendants highlighted" this very "disconnect" in the "initial motion to dismiss," and EPA has done the same.  *Divot Golf Corp.* v. *Citizens Bank of Mass.*, No. Civ.A 02-CV-10654-PB, 2003 WL 61287, *2 (D. Mass. Jan. 8, 2003).

*Second*, Count 3 must be dismissed because it ignores the express numeric limits established in the Permit.  Indeed, crediting CLF's WQS argument would result in yet another conflicting effluent limit for a single discharge.  Under the permit shield, however, the only

---

[41]   Toal Ex. 5 at 69.

legally enforceable effluent limits for PAHs are the numeric limits established by EPA in the Permit. As CLF recognizes, EPA is required by statute to ensure that the Permit's conditions will not cause or contribute to a violation of the WQS. (Am. Compl. ¶ 60.) *See* 40 C.F.R. § 122.44(d)(1)(vii). In issuing the Permit, EPA did precisely that confirming that the effluent limits established in the Permit are "sufficient to ensure compliance with . . . water-quality based standards established pursuant to any State law or regulation."[42] There is no requirement that the numeric effluent limits governing discharges out of a particular point source be the same as those governing the quality of wide swaths of receiving waters. *See* 314 C.M.R. § 4.05(e). Moreover, the WQS limits CLF seeks to impose here are unenforceable because they too are below the minimum level at which EPA has determined reliable quantitative measurement can be made. *See supra* Part I.A.2.

    *Third*, even if—contrary to fact and law—Count 3 were not barred by the permit shield and collateral attack doctrine, CLF still could not establish a WQS violation, given that the receiving water is not impaired for PAHs. Indeed, the Massachusetts Integrated Lists of Waters, which CLF repeatedly cites in the Amended Complaint, confirm that neither the Island End River nor the relevant segment of the Mystic River have been impaired by PAHs since before the Permit went into effect. (Am. Compl. ¶¶ 56-59.) CLF thus cannot establish that the Terminal's discharges cause or contribute to pollutant concentrations above WQS for the receiving water.[43]

## B. This Court Lacks Jurisdiction Over Wholly Past Violations

    Counts 2 and 4 must be dismissed for the additional and independent reason that CLF has not satisfied the jurisdictional requirement of alleging ongoing violations of the CWA. *See*

---

[42] Toal Ex. 2 at 6.

[43] Counts 1–5 also must be dismissed as to all alleged violations that occurred prior to July 31, 2011. Any such violations are barred by the CWA's five-year statute of limitations. *See, e.g., Catskill Mountains Chapter of Trout Unlimited, Inc.* v. *City of New York*, 451 F.3d 77, 88 n.14 (2d Cir. 2006).

*Gwaltney*, 484 U.S. at 60–61.   In contrast to governmental enforcement actions, citizen suits under the CWA may be brought only for violations that are *ongoing* at the time of suit.   *See U.S. Pub. Interest Research Grp.* v. *Atl. Salmon of Me., LLC*, 339 F.3d 23, 33 (1st Cir. 2003).   CLF therefore must plead sufficient factual matter to plausibly allege an ongoing violation.   *See Twombly*, 550 U.S. at 557.   It has failed to do so.

Count 2 pleads CWA violations based on alleged discharges of PAHs and TSS in excess of the Permit's purported effluent limits.   (Am. Compl. ¶¶ 105-06, 244-45.)   As discussed above, however, the overwhelming majority of these violations are premised on a deliberate misinterpretation of the Permit's effluent limits for PAHs.[44]   When these spurious "violations" are set aside, only two alleged discharges of TSS remain.   The first occurred in 2010—*before* EPA issued the Terminal's current Permit and the Terminal's current wastewater treatment system went online.[45]   This time-barred exceedance does not suffice to allege an ongoing violation, particularly since the limits in question were established by a permit no longer in effect for a wastewater treatment system that has since been replaced.   "A ceased improper discharge does not 'continue.'"   *Pawtuxet Cove Marina, Inc.* v. *Ciba-Geigy Corp.*, 807 F.2d 1089, 1092-94 (1st Cir. 1986) (barring citizen suit where defendant had ceased operating under the permit).

This leaves only one alleged violation during the term of the Permit.   As an initial matter, a single, past violation is insufficient to state an ongoing violation under the CWA.   *See Hamker* v. *Diamond Shamrock Chem. Co.*, 756 F.2d 392, 398 (5th Cir. 1985).   And, in all events, the remaining alleged TSS exceedance, on May 17, 2014, involves no violation at all.   The Discharge Monitoring Report—which CLF used to craft its list of purported "Violations of Permitted Effluent Limits"—reflects two TSS samples tested on May 17, 2014.   While the first

---

[44]   *See supra* Part I.A.2.
[45]   *See* Amend. Compl. Ex. F at 6.

sample recorded a TSS concentration of 127 mg/L (above the daily limit of 100 mg/L), the second sample was 49.2 mg/L, well below that limit.[46]  CLF's list of exceedances reports only the 127 mg/L sample, but neglects to mention the 49.2 mg/L sample.[47]  This is significant because 40 C.F.R. § 122.2 requires that these samples be averaged.  And the average of the TSS samples for May 17, 2014, 88.1 mg/L, was plainly below the Permit's limit.  Thus, CLF does not plausibly allege any TSS exceedance since the current Permit went into effect.

Count 4 fares no better.  In conclusory fashion, CLF alleges ExxonMobil violated the Permit's prohibition on visible oil sheens in 2011, 2014, and 2015 based on "four instances in which discharges *associated with* the ExxonMobil Everett Terminal *and/or the Sprague Energy facility* were reported to the National Response Center."  (Am. Compl. ¶ 257 (emphasis added).)  The sole factual basis CLF offers to support its vague contention is a list of incident reports, which identifies ExxonMobil as the source of only one of these four discharges.  Sprague Energy, an entirely separate corporate entity, is identified as the source of the two incidents in 2014.  The source of the remaining incident—which occurred before the current Permit went into effect in 2011—is listed as "unknown."[48]  This leaves only one incident in October 2015 attributed to ExxonMobil.  But one isolated incident cannot plausibly make out an ongoing violation of the CWA.  *See U.S. Pub. Interest Research Grp.*, 339 F.3d at 33.

### C.    CLF Fails to Plausibly Allege Point Sources Discharges into the Half-Moon Shaped Pond (Count 5)

Without any factual allegations to support its claim, Count 5 half-heartedly alleges unpermitted discharges occur into the half-moon shaped pond located on the facility.  (Am.

---

[46]    *See* Toal Ex. 7 at 1 (cited in Am. Compl. Ex. C at 16); Am. Compl. Ex. A at 2 (listing "100" mg/L TSS limit).
[47]    *See* Am. Compl. Ex. F at 2.
[48]    Am. Compl. Ex. K.

Compl. ¶¶ 260-63.)  While the pond in question was used to hold excess effluent prior to 1988,[49] EPA has recognized that this practice ceased long ago and the pond "currently serves no purpose."[50]  CLF fails to plead when, where, or how the Terminal supposedly discharges water into the pond—much less that the discharges are contaminated by excess pollutants.  Because CLF merely "camouflage[s] conclusory statements" as factual allegations, *A.G. ex rel. Maddox* v. *Elsevier, Inc.*, 732 F.3d 77, 81 (1st Cir. 2013), Count 5 should be dismissed.

Count 5 also fails because CLF does not—and cannot—plead facts to support a necessary element under the CWA: namely, the discharge was conveyed to the half-moon pond through a "point source."  33 U.S.C. § 1362(14).  The CWA does not regulate all discharges, but only the discharge of pollutants from a point source into a navigable water.  *See Hamker*, 756 F.2d at 397.  "Point sources" are "physical structures and instrumentalities that systematically act as a means of conveying pollutants from an industrial source to navigable waterways."  *See United States* v. *Plaza Health Labs., Inc.*, 3 F.3d 643, 646 (2d Cir. 1993).  CLF does not claim that Outfalls 01A, 01B, or 01C, discharge into the pond.  But those outfalls are the only point sources identified in the Permit, which implicitly incorporates and shields all discharges known to the permitting authority.  *See Piney Run Preservation Ass'n* v. *Cty. Comm'rs*, 268 F.3d 255, 268-69 (4th Cir. 2001).  Nor does CLF plausibly allege any other discrete conveyance into the pond.  *See Cordiano* v. *Metacon Gun Club, Inc.*, 575 F.3d 199, 221 (2d Cir. 2009) (no "point source" of pollution when navigable waters are polluted by ordinary surface water runoff); *26 Crown Assocs., LLC* v. *Greater New Haven Reg'l Water Pollution Control Auth.*, No. 3:14-CV-1439, 2017 WL 2960506, at *8 (D. Conn. July 11, 2017) (ground water migration does not qualify as a

---

[49]   Toal Ex. 6 at 4 ¶ 3 ("This permit has been developed for the discharge of wastewater from the oil/water separation system that replaced the original lagoon system . . ."); *see also* Exxon Co. USA, *Closure of Effluent Holding Pond* (Oct. 1988), http://eeaonline.eea.state.ma.us/EEA/FileViewer/Scanned.aspx?id=133192.

[50]   Am. Compl. Ex. A, Fact Sheet at 12.

point source).   Because the Amended Complaint wholly fails to supplement this conclusory

pleading, Count 5 should be dismissed.[51]

## II.     CLF Lacks Standing to Assert its Climate Change Claims (Counts 6–15)

CLF's climate change claims—which are substantively identical to the climate change

claims alleged in the initial Complaint—blatantly disregard this Court's unambiguous holding

that CLF lacks standing to assert claims for injuries "that are unlikely to occur until after the

Permit has expired, or if the Permit remains in effect indefinitely, in the near future."  (ECF No.

29 at 2.)  As shown in the chart attached as Exhibit 8, because Counts 6-15 still expressly rely on

speculative impacts that CLF acknowledges will not occur within this time frame, they violate

the law of this case, and should be stricken.

Contrary to the Court's determination that "Plaintiffs do not have standing . . . for claims

concerning alleged foreseeable rises in sea level and in severity and frequency of storms in the

far future, such as in 2050 or 2100," Sept. 12, 2016 Hr'g Tr. 114:9-12, CLF continues to premise

Claims 6 through 15 on these distant and speculative risks.[52]   Indeed, the Amended Complaint

repeats verbatim allegations this Court has already deemed improper, including the allegation

that "by *2100* sea level rise in Massachusetts could range from 29 to 201 cm."  (*Compare*

Compl. ¶ 93(g) *with* Am. Compl. ¶ 180 (emphasis added).)   CLF's insistence on filing an

Amended Complaint with claims that are "nearly identical" to the claims this Court previously

dismissed violates the law of this case, and "is decidedly against judicial economy."  *Dumont* v.

*Corr. Corp. of Am.*, No. 2:14-cv-209-cr-JMC, 2016 WL 8193639, at *5 (D. Vt. Nov. 21, 2016),

---

[51]   As argued in Defendant's motion to dismiss the initial complaint, this claim also fails because the Terminal's "man-made" pond, (Am. Compl. ¶ 66), is not a navigable water, as defined in 33 U.S.C. §1362(7), and therefore is not within the jurisdiction of the CWA.  *See Vill. of Oconomowoc Lake* v. *Dayton Hudson Corp.*, 24 F.3d 962, 964–65 (7th Cir. 1994) (holding that an "artificial pond" is not a "water[] of the United States").

[52]   *See Amigos Bravos* v. *U.S. Bureau of Land Mgmt.*, 816 F. Supp. 2d 1118, 1130 (D.N.M. 2011) (climate change risks in "years or decades" are not imminent); *Ctr. for Biological Diversity* v. *U.S. Dep't of Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009) (claim that "significant adverse effects of climate change 'may' occur at some point in the future" does not satisfy imminence requirement).

*report and recommendation adopted*, 2017 WL 456463 (D. Vt. Feb. 2, 2017).  In the absence of any newly alleged facts or changed circumstances, the Court should adhere to its prior ruling, and dismiss or strike these claims.  *See Cardoso* v. *City of Brockton*, No. 12–10892–DJC, 2015 WL 1539949, at *3 (D. Mass Jan. 14, 2015).

Any revisions in the Amended Complaint reflect purely superficial changes, without any meaningful narrowing of CLF's claims.  For instance, the Amended Complaint omits CLF's earlier admission that it would take a four-foot rise in sea level to inundate the Terminal— presumably because CLF now recognizes that this substantially exceeds the maximum sea level rise it has conceded is likely to occur during the life of the Permit.  (*Compare* Compl. ¶¶ 81, 93(b), *with* Am. Compl. ¶¶ 175, 185, 189.)  CLF's strategic omission does not, however, cure the attenuated causal link between CLF's claims and its supposed injuries.[53]

As before, CLF either admits that the harms alleged are not likely to occur for decades, if not centuries (*see* Am. Compl. ¶¶ 128, 136, 153, 180, 183, 185, 202, 208), or fails entirely to specify a time frame for its theoretical injuries (*see, e.g., id.* ¶¶ 140, 145).  CLF's allegations concerning the risk of inundation due to hurricanes fall into the latter camp because they neglect to make any representation regarding the likelihood that a Category 1 hurricane will hit Boston in the near future, let alone that any such storm would cause a release of pollutants from the Terminal that might impair the surrounding waters.  (Am. Compl.  ¶¶ 170-72.)  *See Shain* v. *Veneman*, 376 F.3d 815, 818 (8th Cir. 2004) (holding danger of flood was itself remote, but "the possibility the flood will occur while [the plaintiffs] own or occupy the land becomes a matter of sheer speculation").

---

[53]   Additionally, while CLF still explicitly mentions "climate change" throughout the Amended Complaint, *see e.g.*, Am. Compl. ¶¶ 112-13, 117, 130, 138, 140, 201, 217, CLF replaces the term "climate change" in the Amended Complaint's Causes of Action with a cross-reference to the allegedly climate change-induced impacts "discussed in Section III.B."  *Compare id.* ¶ 274, *with* Compl. ¶ 234.

Once again, CLF heavily relies on SLOSH models, which in no way help to establish imminence.  NOAA—the source of these models—reports that only one hurricane has made landfall in Massachusetts in the last 50 years.[54]  NOAA also explains that its SLOSH models represent a "worst-case scenario" generated from a composite and aggregation of 100,000 simulated storms.[55]  In other words, even a worst-case scenario hurricane (whenever it occurs) would not inundate all areas shown on the map.  CLF's alleged injuries are thus premised on a chain of speculative and uncertain events, none of which are supported by factual allegations. CLF posits that (i) a hurricane will hit Boston in the near future; (ii) that hurricane will inundate the Terminal; (iii) the inundation will cause the Terminal to release an unspecified quantity of unidentified contaminants; and (iv) these contaminants will impair CLF's use or enjoyment of the affected water.[56]  "Given the multiple strands of speculation and surmise from which [this] hypothesis is woven," finding standing would stretch the doctrine "past its breaking point."  *See Katz* v. *Pershing, LLC*, 672 F.3d 64, 80 (1st Cir. 2012).  That is especially true here, where CLF fails to identify any defect in the facility to support its hypothesis that inundation of the Terminal would necessarily, or even likely, cause a release of chemicals.  Such vague allegations fail to move CLF's alleged future injuries across the line from "possible" to "certainly impending." *Clapper* v. *Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

---

[54]   *See* Atl. Oceanographic & Meteorological Lab., NOAA, *Continental U.S. Hurricane Impacts/Landfalls: 1851-2016*, http://www.aoml.noaa.gov/hrd/hurdat/All_U.S._Hurricanes.html.

[55]   *See* Nat'l Hurricane Ctr., NOAA, National Storm Surge Hazard Maps, http://www.nhc.noaa.gov/nationalsurge.

[56]   CLF does not cure this defect by citing a 2013 study—based on "historical data from 1944 to 1999"—for its assertion that "the Commonwealth has a six- to 30-percent chance of a tropical storm or hurricane affecting the area each year."  (Am Compl. ¶ 168.)  This statistic (i) does not speak to the probability that a storm will affect Boston, much less the Terminal, (ii) does not distinguish between hurricanes—which feature in CLF's claims—and tropical storms, which do not, and (iii) encompasses storms that may simply "affect" the Commonwealth, without necessarily making landfall.

Accordingly, while the Court should dismiss the entire Amended Complaint with prejudice, at a minimum it should strike Counts 6 through 15 and grant any other relief the Court deems proper.

### III.  CLF's RCRA Claim Fails to Allege "Imminent and Substantial Endangerment" (Count 15)

For much the same reason that the Amended Complaint fails to satisfy the imminence requirement for standing, it likewise fails to allege a RCRA claim—*i.e.*, an "imminent and substantial endangerment to health or the environment" arising out of the treatment, storage, or disposal of solid or hazardous waste.  42 U.S.C. § 6972(a)(1)(B).  RCRA authorizes "citizen suits when there is a reasonable prospect that a serious, *near-term* threat to human health or the environment exists."  *Me. People's All. & Nat. Res. Def. Council* v. *Mallinckrodt, Inc.*, 471 F.3d 277, 279 (1st Cir. 2006) (emphasis added).

"[A]n endangerment can only be 'imminent' if it 'threaten[s] to occur immediately.'"  *Meghrig* v. *KFC W., Inc.*, 516 U.S. 479, 480, 485-86 (1996); *Mallinckrodt*, 471 F.3d at 279 n.1 ("[T]he threat . . . must be close at hand").  Latent risks do not support a finding of "imminent and substantial endangerment" where the endangerment is "'remote in time'" or "'speculative in nature.'"  *Sanchez* v. *Esso Standard Oil de Puerto Rico, Inc.*, No. 08-2151, 2010 WL 3809990, at *6 (D.P.R. Sept. 29, 2010); *see also H & H Holding, L.P.* v. *Chi Choul Lee*, No. 12–5433, 2014 WL 958878, at *5 (E.D. Pa. Mar. 6, 2014).

CLF's RCRA claim is premised on the Terminal's alleged failure to plan for purported climate change-induced risks, such as sea level rise and storm surge, which CLF contends may ultimately impact the Terminal due to its elevation and location.  (Am. Compl. ¶¶ 347-52.)  In pleading imminence, CLF offers only conclusory allegations that "there is a substantial and imminent risk" of the Terminal discharging pollutants "because the Terminal has not been

properly engineered, managed, and fortified or, if necessary, relocated, to protect against" climate change impacts. (*Id.* ¶ 347.) These threadbare allegations are predicated on generalized predictions, forecasts, and projections about alleged climate change impacts—none of which is projected to come to fruition in the near future or relates specifically to the release of solid or hazardous waste at the Terminal.[57]

The purely "theoretical possibility" that the Terminal may not be sufficiently equipped to handle certain extreme weather events that the Amended Complaint predicts may happen decades from now cannot establish a "near-term threat." *Mallinckrodt*, 471 F.3d at 279, 279 n.1. Nor has CLF even suggested that the Terminal is incapable of adequately preparing for these remote threats absent immediate action. *Cf. Price* v. *U.S. Navy*, 39 F.3d 1011, 1019 (9th Cir. 1994) (holding imminent endangerment requires "action is needed now" to address a "threat which is present *now*"). The defects that negate CLF's standing to assert climate change claims therefore similarly foreclose its RCRA claim on the merits.

## IV.    CLF's CWA Climate Change Claims Must Be Dismissed (Counts 6–14)

Although recast in various formulations, Claims 6–14 fundamentally assert a single claim:  that the Terminal violated the Permit's mandate to use "good engineering practices" and "identify sources of pollution" by failing to account for certain climate change-induced weather events in developing and administering the Terminal's Storm Water Pollution Prevention Plan ("SWPPP") and Spill Prevention, Control, and Countermeasures plan ("SPCC").  (Am. Compl. ¶¶ 264-342.)  No authority supports CLF's efforts to style this grievance as a violation of the CWA, and CLF's present attempt is not only untimely collateral attack, but also impermissible under the Permit shield.

---

[57]    CLF's RCRA claim appears to be based, at least in part, on the purported failure to address climate change in the Permit and SPCC, and thus fail for the same reasons.  *See infra* Part IV.

**A.      The Permit Shield and Collateral Attack Doctrine Bar CLF's CWA Climate Change Claims**

The Permit expressly specifies the severe weather event for which the Terminal must prepare.  According to the Permit, the Terminal must be equipped to handle a "10-year 24-hour precipitation event," which the Permit explicitly defines as "4.6 inches" of rainfall.[58]  Despite the Permit's express terms, CLF insists that the Terminal must continuously update its facilities to increase its stormwater collection, storage, and treatment capacity.  That suggestion contravenes the permit shield, which protects the Terminal against the burden of "fac[ing] enforcement actions over 'whether [its] permit[ ] [is] sufficiently strict.'"  *A & G Coal Corp.*, 758 F.3d at 564.  But that is precisely what CLF seeks to do here.  Instead of alleging that the Terminal "discharges pollutants in excess of the levels specified in the permit," *Nat. Res. Def. Council*, 725 F.3d at 1204, or violates any other permit condition, CLF relies on strained readings of unambiguous Permit text to impose wholly new obligations, which would require ExxonMobil to completely reengineer its facilities.  Having failed to comment on the now shielded Permit when afforded the opportunity, the CWA bars CLF's untimely collateral attack.

CLF attempts to ground the supposed obligation of the Terminal to update its facilities so as to guard against distant climate change impacts in the Permit's requirement that the Terminal prepare a SWPPP[59] that uses "good engineering practices."[60]  But that too is a misrepresentation of the Permit's conditions.  The Permit gives substance to the phrase "good engineering practices" in the five subparagraphs that follow it, each of which establishes concrete elements a SWPP must include, such as (i) "[a] site description," with a "site map showing drainage areas,"

---

[58]   Am. Compl. Ex. A at 2, 11.

[59]   The SWPPP, which is required by the Permit, is "designed to reduce, or prevent, the discharge of pollutants in storm water to the receiving waters."  Am. Comp. Ex. A at 13; Am. Compl. ¶ 71.

[60]   *See* Am. Compl. Ex. A at 13.  There is no private cause of action for challenging the adequacy of SWPPPs; actions involving SWPPPs may be brought only to the extent that they challenge compliance with conditions of a permit.  *See  EPA* v. *California ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 223 (1976) (holding that a CWA suit must "necessarily be brought" for a violation of "the conditions of an NPDES permit").

and (ii) "[a] summary of all pollutant sources" that "identif[ies] the expected drainage and corresponding pollutant."[61]   The CWA does not authorize citizen suits to challenge SWPPPs except where they violate a permit condition, and the few CWA suits that have successfully challenged SWPPPs have alleged violations of the discrete requirements for a SWPPP clearly mandated by the permit.  *See, e.g.*, *Puget Soundkeeper All.* v. *Rainier Petroleum Corp.*, 138 F. Supp. 3d 1170, 1180 (W.D. Wash. 2015) (holding permit holder failed to satisfy permit's SWPPP obligations by neglecting to prepare site map required in permit).  The SWPPP does not give plaintiffs license to substitute their judgment for the professional judgment of the permittee or to impose new permit obligations, which is a role reserved to EPA.

But even if the permit shield allowed the phrase "good engineering practices" to be interpreted as the evolving standard CLF proposes (and it does not), CLF still fails to plausibly justify the amendments and fundamental re-design of the facility that it demands.  Crucially, CLF has not alleged that the Permit's current definition of a 10-year 24-hour rainfall event is inaccurate.  To the contrary, official rainfall data for the City of Boston—which are subject to judicial notice[62]—reveal that, in the past decade, daily rainfall has exceeded 4.6 inches only once—on March 14, 2010, prior to the Permit becoming effective.[63]  That is precisely what the Permit anticipates.  Moreover, the adequacy of the Permit's present definition of "extreme weather" is underscored by the fact that there has not been a single discharge from Outfall 01B since the Permit and current wastewater treatment system went into effect.[64]

CLF alleges that ExxonMobil improperly certified the SWPPP (Am. Compl. ¶ 337), failed to submit relevant facts to the Regional Administrator (*id.* ¶ 317), and failed to amend or

---

[61]   *See* Am. Compl. Ex. A at 13.
[62]   *See In re Fruit Juice*, 831 F. Supp. 2d at 509; *see also Nat. Res. Def. Council* v. *McCarthy*, 231 F. Supp. 3d 491, 497 n.6 (N.D. Cal. 2017) (taking judicial notice of rainfall data in CWA suit).
[63]   *See supra* note 19.
[64]   *See* Toal Ex. 3 at 8-11.

update the SWPPP (*id.* ¶ 323) to reflect climatic developments.  But the Amended Complaint fails to allege any *changes* since the Permit issued in October 2011 that would warrant reevaluating the conditions established by EPA.  To the contrary, many of the historical materials on which CLF relies predate the issuance of the Permit.  For instance, CLF relies on increases in precipitation from 1949 to 2002, from 1958 to 2010, and from 1895 to 2011.  (*Id.* ¶¶ 143-46.) As CLF acknowledges, however, the "potential consequences" associated with climate change were "well recognized" by 2007, when the Supreme Court decided *Massachusetts* v. *EPA*.  (*Id.* ¶ 114.)  These allegations thus only highlight that the climatic changes that CLF asserts the Terminal currently must contend with occurred gradually and well before the issuance of the current Permit.  CLF fails to allege that these risks were unknown to EPA when it issued the Permit, or that EPA did not adequately address any immediate impacts on the Terminal in the Permit it issued.

Accepting CLF's position would not only contravene the CWA, but also violate fundamental "fair warning" limits on the retroactive application of new interpretations of agency regulations.  *See United States* v. *Hoyts Cinemas Corp.*, 380 F.3d 558, 573 (1st Cir. 2004).  Due process demands some modicum of fair notice in enforcement actions such that "regulated parties should know what is required of them."  *FCC* v. *Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  These principles apply with full force in the context of a CWA enforcement action brought under a NPDES permit.  *See*, *e.g.*, *Wis. Res. Prot. Council* v. *Flambeau Mining Co.*, 727 F.3d 700, 708–09 (7th Cir. 2013).

Critically, phrases such as "good engineering practices" and "identify sources of pollution" are not unique to the Terminal's Permit.  These phrases appear in near-identical form

in other publicly available permits,[65] as well as in EPA's NPDES Permit Writers' Manual and SPCC guidance.[66]   Through this lawsuit, CLF therefore seeks not merely a ruling that the Terminal's Permit imposes obligations to consider distant and speculative climate change impacts, but also that all NPDES permits and SPCCs impose this requirement, notwithstanding that neither Congress nor EPA ever intended such a result.

### B.    The Court Should Defer to EPA's View that the CWA Does Not Require SWPPPs or SPCCs to Consider Speculative Climate Change Impacts

CLF does not cite any authority to support its view that the CWA obligates the Terminal to expressly consider distant risks associated with alleged climate change impacts.  As EPA told this Court in 2012 (the same year the Permit went into effect), it cannot "be faulted for refraining from guess[work]" about how to incorporate alleged climate change effects into pollutant limits, nor is it required to address hypothetical effects or to "assign a numerical value to the uncertainty associated with climate change."[67]   To the contrary, administrative interpretations of the CWA confirm that EPA does not require such speculative considerations to form part of a SWPPP or SPCC.

Congress has entrusted EPA with the responsibility to make policy determinations concerning enforcement of the CWA, and EPA has refrained from requiring consideration of purported climate change impacts in NPDES permits, SWPPPs or SPCCs, as CLF would have it. SWPPPs are governed by EPA's SWPPP Manual and the Multi-Sector General Permit for

---

[65]  *See, e.g.*, PJ Keating Co. NPDES Permit No. MA0029297 at 9, https://www3.epa.gov/region1/npdes/ permits/2007/finalma0029297permit.pdf; CSX Transportation, Inc. NPDES Permit No. MA0025704 at 6-7, https://www3.epa.gov/region1/npdes/permits/2014/finalma0025704permit.pdf.

[66]  *See NPDES Permit Writers' Manual*, Ex. 9-1(Sept. 2010), https://www.epa.gov/sites/production/files/2015-09/documents/pwm_2010.pdf; EPA, Office of Emergency Mgmt., *SPCC Guidance for Regional Inspectors* (Dec. 16, 2013), https://www.epa.gov/sites/production/files/2014-04/documents/spcc_guidance_fulltext_2014.pdf.

[67]  Mem., *CLF* v. *EPA*, No. 10–11455–MLW, 2012 WL 1207719 (D. Mass. Sept. 21, 2012), ECF No. 37 at 28.

Stormwater Discharges Manual.[68]  Neither source of guidance mentions climate change even in passing.  Nor is climate change mentioned in the regulation governing SPCCs, *see* 40 C.F.R. § 112, or any agency rule or guidance interpreting SPCC obligations.[69]

Notably, where EPA seeks to require consideration of climate change, it does so explicitly.  In its NPDES Permit Writers' Manual, for example, EPA requires consideration of climate change only in connection with requests for thermal effluent variances and patterning upstream flow of a discharge—neither of which is alleged to apply to the Terminal or to bear any relationship to the Terminal's SWPPP or SPCC.[70]  EPA's decision not to require consideration of climate change in the context of SWPPPs and SPCCs, particularly when it has done so in other contexts, is entitled to deference.  *See Molosky* v. *Wash. Mut., Inc.*, 664 F.3d 109, 118 (6th Cir. 2011).

EPA does not require permittees to account for the potential climate change impacts advocated by CLF because the agency has not yet determined a method by which this could, or should, be done.[71]  Because permits are reevaluated at "regular intervals" when they are issued, EPA need only consider reasonably and currently available scientific information.  *See Upper Blackstone*, 690 F.3d at 22-24 (rejecting claim that EPA should have delayed permit authorization to consider more advanced scientific data that was in progress because the Act "requires reevaluation of the relevant factors, and allows for the tightening of . . . conditions" at "regular intervals").  Reading into the Permit or regulations a tacit obligation to consider climate change would amount to requiring Defendants to analyze speculative climate change risks for

---

[68]   *See* EPA, *Developing Your Stormwater Pollution Prevention Plan* (Feb. 2009), https://www3.epa.gov/npdes/pubs/sw_swppp_guide.pdf; EPA, *Multi-Sector General Permit for Stormwater Discharges* (June 4, 2015), https://www.epa.gov/sites/production/files/2015-0/documents/msgp2015_finalpermit.pdf.

[69]   *See supra* note 57 (making no mention of climate change in the 921-page SPCC manual published by EPA to "facilitate nationally consistent implementation of the SPCC rule").

[70]   *NPDES Permit Writers' Manual* §§ 5.2.2.7, 6.2.4.2 (Sept. 2010).

[71]   *See* Mem., *CLF* v. *EPA*, 2012 WL 1207719, ECF No. 37 at 27-28.

which even EPA lacks tools.  This would contravene the basic purpose and structure of the CWA, which grants the agency authority to interpret the Act's requirements, *see* 33 U.S.C. §§ 1312, 1319(a)(1), 1342(a)(2), and guards against the use of citizen suits in a manner that is "potentially intrusive" on the agency's authority, *see Gwaltney*, 484 U.S. at 60–61.

### C.   CLF Has Not Alleged a Failure to Exercise "Good Engineering Practices" Based on Purported Violations of Actual Permit Conditions

Having failed to identify any defect at the Terminal that renders it unequipped to handle the weather events likely to impact the Terminal during the Permit's term, CLF advances a new theory: the Terminal must have failed to use good engineering practices given the frequency of its supposed unpermitted discharges.  (*See* Sept. 12, 2017 Hr'g Tr. 82:7-23, 89:3-17; Am. Compl. ¶¶ 87-89.)  However, as established above, at best, CLF alleges one violation of the Permit since it went into effect in 2012—although even that singular oil sheen incident is not alleged to have any connection to the Terminal's wastewater treatment or any other ongoing process or practice at the Terminal.[72]  Having disposed of CLF's non-climate change claims, the climate change claims should likewise be dismissed.

CLF fails otherwise to plausibly allege any concrete defect in the Terminal's infrastructure that amounts to a failure to exercise good engineering practices.  While CLF invokes comparisons to "other large-scale engineering projects" that consider climate change, CLF does not identify a single engineering practice—short of relocation[73]—that the Terminal should adopt from such projects.  (*Id.* ¶¶ 220–24.)  Moreover, the agencies that have opted to consider such distant potential impacts have done so in the context of civil and municipal works

---

[72]  *See supra* Part I.B.

[73]  CLF's suggestion that the Terminal must relocate its facilities relies on a 1978 record-setting flood, which would have been well known to EPA when it issued the Permit more than three decades later.  (Am. Compl. ¶ 158.)  CLF does not allege that repetition of such historic flooding is certainly impending, nor does it allege any factual basis for inferring the Terminal cannot withstand such flooding.

projects with intended lifespans of 50 years or more—far in excess of the five-year term applicable to NPDES permits, SWPPPs, and SPCCs.[74]

CLF's sole conclusory allegation of "undersized pipes and storage facilities" fares no better (*id.* ¶ 90), given EPA's involvement in developing the current infrastructure.    The Terminal's facilities were re-designed only a few years ago to meet precise specifications developed with EPA as a condition for issuing the Permit.[75]   After ExxonMobil completed these upgrades, EPA and the Mystic River Watershed Association lauded ExxonMobil's "substantial improvements" and "significant investment."[76]   Moreover, throughout the period of these upgrades, a Court Appointed Observer filed quarterly status reports on ExxonMobil's progress with Judge Saris.   The Observer's final report, in April 2012, similarly concluded that ExxonMobil had shown dedication to its environmental compliance.[77]   CLF pleads no facts to undermine the judgment of these authorities, nor does it even propose an alternative design.   As CLF well knows, allegations, such as these, which are "so general and conclusory as to amount merely to an assertion that unspecified facts exist," do "not carry the Complaint over the plausibility threshold."   *Am. Recycled Materials*, 2017 WL 2622737, at *5 (quoting *Menard* v. *CSX Transp., Inc.*, 698 F.3d 40, 45 (1st Cir. 2012)).

## V.    This Court Lacks Subject Matter Jurisdiction Over CLF's SPCC Claim (Count 11)

Separate and apart from the defects discussed above, Count 11—which alleges that the Terminal's SPCC fails adequately to consider potential climate change impacts (Am. Compl. ¶¶ 293-314)—must be dismissed for lack of subject matter jurisdiction.

---

[74]   The planned life of the Deer Island Sewage Treatment Plant in Boston, Massachusetts concededly extends until 2050.  (Am. Compl. ¶ 224.)

[75]   Am. Compl. Ex. A, Response to Comments at 3; Toal Ex. 2, Memorandum of Understanding at 3.

[76]   EPA News Release, *ExxonMobil Addresses Stormwater at Everett Terminal – Better Water Quality in Mystic and Island End Rivers Will Result* (Oct. 14, 2011), https://yosemite.epa.gov/opa/admpress.nsf /0/7228CB43D6712FCA85257929005936EA.

[77]   *U.S.* v. *ExxonMobil Pipeline Co.*, No. 1:08-cr-10404-PBS (D. Mass. May 1, 2012), ECF No. 69 at 3.

As an initial matter, SPCCs, which address oil spill prevention measures, are not incorporated into, or governed by, NPDES permits. Since a "suit against a permit holder" brought under the CWA must "necessarily be brought" for violations of "the conditions of an NPDES permit," claims concerning SPCCs, which bear no relation to NPDES permits, fall outside the province of the CWA's citizen suit provision. *See California ex rel. State Water Res. Control Bd.*, 426 U.S. at 223 (analyzing 33 U.S.C. § 1365(f)(6)).

Citizen suits under the CWA are limited, and a private citizen can only bring an action "against any person . . . who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator . . . with respect to such a standard or limitation." 33 U.S.C. § 1365(a); *see EPA ex rel. McKeown* v. *Port Auth. of N.Y. & N.J.*, 162 F. Supp. 2d 173, 188 (S.D.N.Y. 2001). The statute enumerates the "specific and limited types of violations" that qualify as an "effluent standard or limitation." *See Atchafalaya Basinkeeper* v. *Chustz*, 682 F.3d 356, 358 (5th Cir. 2012); *Askins* v. *Ohio Dep't of Agric.*, 809 F.3d 868, 875 (6th Cir. 2016). None of the violations listed in the citizen suit provision relate to SPCCs, which address oil spill prevention measures, not effluent limits or standards on discharges. *See* 33 U.S.C. § 1365(f). In fact, the only section of the CWA that governs oil spills is 33 U.S.C. § 1321. But that section does not authorize citizen suits. *See Chesapeake Bay Found., Inc.* v. *Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 619 (D. Md. 2011) (granting motion to dismiss CWA claim based on § 1321). The Court therefore lacks subject matter jurisdiction to adjudicate CLF's SPCC claim.

## VI.    The Amended Complaint Should Be Dismissed With Prejudice

The Amended Complaint should be dismissed with prejudice because granting CLF yet another opportunity to amend would be futile. *See Rife* v. *One W. Bank, F.S.B.*, 873 F.3d 17, 20 (1st Cir. 2017). Despite instruction and opportunity to do so, CLF has not cured the standing

deficiencies that prompted the Court to partially allow ExxonMobil's first motion to dismiss. Plainly, CLF cannot state a SWPPP-related CWA claim or a RCRA claim for injuries likely to occur within the term of the Permit. "Having afforded [CLF] an ample opportunity to put [its] best foot forward," the Court is "not obliged to grant [it] yet another opportunity." *Aponte-Torres* v. *Univ. of Puerto Rico*, 445 F.3d 50, 58 (1st Cir. 2006).

Nor would additional pleadings remedy the fundamental defects in CLF's non-climate change CWA claims—which are all premised on deliberate mischaracterizations of the Permit's terms and the governing EPA regulations. CLF has benefitted from extensive productions by EPA concerning the subject of its allegations following CLF's request under the Freedom of Information Act. Those materials did not allow CLF to plausibly state a viable claim because they tell a very different story about the Terminal's compliance with the CWA than CLF depicts. Indeed, CLF received internal EPA emails concerning this very suit, where EPA confirmed that, for PAHs discharged through Outfall 01A, "compliance is to be judged against the 10 μg/l compliance limit" because CLF's purported "limit of 0.031 μg/l is well below the detection limit of available test methods."[78] Similarly, the EPA discharge monitoring data that CLF used to manufacture its alleged effluent limit violations report no violations of the Permit's effluent limits for PAHs.[79] EPA has also directly informed CLF, when discussing the Terminal, that "[t]he Massachusetts WQSs apply to the receiving water and not directly to the outfall."[80] Given CLF's deliberate efforts to suppress material in its possession revealing that the permitting authority deems its claims to be without merit—in violation of the duty of candor it owes this tribunal, *see, e.g.*, *In re Stallworth*, No. 11-19919-WCH 2012 WL 404952, *6 (D. Mass. Bankr.

---

[78]  *See* Toal Ex. 4 at 9.
[79]  *See* Toal Ex. 3 at 1-4.  In fact, EPA's databases show a single exceedance since the Permit went into effect, and that was for TSS.
[80]  *See* Toal Ex. 5 at 69.

Feb. 8, 2012)—CLF cannot show that it would be able to plead additional facts that would cure the many deficiencies in the Amended Complaint.

## CONCLUSION

CLF is not seeking to enforce the terms of the Terminal's EPA-issued Permit, but rather to impose new obligations under the guise of a CWA and RCRA enforcement action. Despite CLF's efforts to manufacture violations of the Permit by misrepresenting its terms, the law is clear that both the permit shield and the collateral attack doctrine bar CLF's claims. To hold otherwise would deprive EPA of its regulatory authority, and vest citizens with power to effectively rewrite the terms of NPDES permits.

CLF's climate change claims are equally untethered to the Permit, and no more plausibly alleged.[81] These claims should be dismissed or struck—together with the RCRA claim—for the independent reason that CLF has utterly disregarded this Court's prior ruling on standing.

---

[81] Defendants reserve their right to move to strike CLF's jury demand. The jury demand is improper because CLF's civil penalty claims are inextricably intertwined with its requests for injunctive and declaratory relief, and therefore those claims are primarily equitable in nature. *See Sanchez* v. *Esso Standard Oil De Puerto Rico, Inc.*, No. 08-2151 (JAF), 2010 WL 3087485, at *2 n.2, *4 (D.P.R. Aug. 5, 2010) (granting motion to strike jury demand on these grounds in a RCRA lawsuit).

Dated:  December 20, 2017


By:  /s/ *Daniel J. Toal*
Theodore V. Wells, Jr.
*pro hac vice*
twells@paulweiss.com
Daniel J. Toal
*pro hac vice*
dtoal@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
Fax: (212) 757-3990


By:  /s/ *Deborah E. Barndard*
Deborah E. Barnard  (BBO #550654)
deborah.barnard@hklaw.com
Jessica R. Early (BBO# 672878)
jessica.early@hklaw.com
HOLLAND & KNIGHT LLP
10 St. James Avenue, 11th Floor
Boston, MA 02116
(617) 523-2700
Fax: (617) 523-6850

*Counsel for Exxon Mobil Corporation,*
*ExxonMobil Oil Corporation, and*
*ExxonMobil Pipeline Company*