UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CONSERVATION LAW FOUNDATION, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 16-11950-MLW |
| | ) | |
| EXXONMOBIL CORP., EXXONMOBIL OIL CORP., EXXONMOBIL PIPELINE CO., | ) | |
| Defendants. | ) | |

MEMORANDUM AND ORDER

WOLF, D.J.                                    March 21, 2020

I.   INTRODUCTION

Defendants ExxonMobil Corp., ExxonMobil Oil Corp., and ExxonMobil Pipeline Co. (together, "Exxon") operate a petroleum storage and distribution terminal in Everett, Massachusetts (the "Terminal"). The Terminal receives petroleum-based products at a marine dock, transfers the products to storage tanks through above-ground pipes, and then distributes the products at truck-loading racks. In the course of normal operations, the Terminal discharges pollutants into the Island End River pursuant to a permit (the "Permit") issued by the Environmental Protection Agency (the "EPA"). The Permit expired in January 2014. Exxon has filed an application for renewal. The EPA has administratively continued the Permit, meaning that its terms remain in effect.

Plaintiff Conservation Law Foundation ("CLF") alleges that Exxon is violating the Permit, the Clean Water Act ("CWA"), and the Resource Conservation and Recovery Act ("RCRA"). Among other things, it asserts that the Permit requires Exxon to consider predictable weather patterns--including flooding and severe storms caused by climate change--in maintaining the Terminal, and that Exxon has failed to do so, creating a risk of imminent harm from the inadvertent discharge of pollutants. CLF seeks statutory damages and injunctive relief.

Exxon moved to dismiss the Amended Complaint for lack of standing and failure to state a claim upon which relief can be granted.[1] In March 2019, the court denied in part Exxon's Motion to Dismiss. It found that CLF plausibly alleges both standing and entitlement to relief with respect to potential harms from flooding and severe storms in the near future.

Exxon now moves to stay this case until the EPA renews the Permit. It relies on the doctrine of primary jurisdiction, under which a court may stay claims involving issues within an executive agency's authority and expertise. Exxon argues that how it must consider predictable weather patterns implicates scientific and policy issues that the EPA, not the court, should decide. In

---

[1] As explained _infra_, in September 2017, the court found that CLF lacked standing for some of its claims and allowed it to file an Amended Complaint.

2

opposition, CLF argues that a stay would prejudice CLF and undermine the citizen suit provisions of the CWA and RCRA. It also asserts that the EPA's eventual action on the Permit will not resolve the underlying issues in this case.

On May 14, 2019, the court heard oral argument and took Exxon's Motion to Stay under advisement. At the hearing, the court also heard from Carl Dierker, Regional Counsel for EPA Region 1. In essence, Dierker stated that Region 1 is working in good faith to renew the Permit by 2022.

The court recognizes that the doctrine of primary jurisdiction must be applied sparingly, especially in citizen suits authorized by Congress. However, this case involves a rare set circumstances in which deferring to the primary jurisdiction of the EPA is justified and appropriate. First, determining permit conditions are at the heart of the EPA's authority under the CWA. Second, how Exxon must consider predictable weather patterns-- including flooding and severe storms caused by climate change-- raises scientific and policy issues that the EPA is better equipped to decide than the court. Third, the EPA's renewal of the Permit may render CLF's request for injunctive relief moot. Finally, resolving this case on the merits would take at least as long as the EPA predicts it will take to renew the Permit on terms that are now most appropriate. Accordingly, the court is allowing Exxon's Motion to Stay.

3

II.  LEGAL STANDARDS

   A. The Clean Water Act ("CWA")

   The CWA aims to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. §1251(a). To do so, it prohibits "the discharge of any pollutant by any person" into "navigable waters from any point source." Id. §§1311(a), 1362(12). A "point source" is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, [or] container . . . from which pollutants are or may be discharged." Id. §1362(14). A "navigable water" is any body of water with a "'significant nexus' to any waters that are or were navigable in fact or that could be reasonably be so made." Rapanos v. United States, 547 U.S. 715, 759 (2006) (Kennedy, J., concurring).

   Generally, in order to discharge a pollutant into a navigable water from a point source, a person must obtain a permit from the EPA under the National Pollutant Discharges Elimination System ("NPDES").[2] See 33 U.S.C. §§1311(a), 1342. "Congress has vested in the Administrator [of the EPA] broad discretion to establish conditions for NPDES permits." Arkansas v. Oklahoma, 503 U.S. 91,

_____

   [2]  Most states directly administer NPDES permits. In Massachusetts, the EPA administers NPDES permits. See Conservation Law Found. v. EPA, 964 F. Supp. 2d 175, 180 (D. Mass. 2013).

4

105 (1992). In doing so, the EPA "analyzes the environmental risk posed by the discharge, and places limits on those pollutants that . . . it reasonably anticipates could damage the environmental integrity of the affected waterway." Piney Run Preservation Ass'n v. Cty. Comm'rs of Carrol Cty., Md., 268 F.3d 255, 268 (4th Cir. 2001).

An NPDES permit also gives a permittee immunity from certain CWA liability. Under the permit shield doctrine, "a discharger in compliance with the terms and conditions of an NPDES permit is deemed to be in compliance with those sections of the [CWA] on which the permit conditions are based." EPA v. California, 426 U.S. 200, 205 (1976) (citing 33 U.S.C. §1342(k)). This immunity also encompasses discharges of pollutants not listed in a permit, if such discharges were "adequately disclosed to the permitting authority." Piney Run Preservation Ass'n, 268 F.3d at 268.

In interpreting an NPDES permit, "if the language of the permit, considered in light of the structure of the permit as a whole, 'is plain and capable of legal construction, the language alone must determine the permit's meaning.'" Nat. Res. Def. Council v. Cty. of Los Angeles, 725 F.3d 1194, 1204-05 (9th Cir. 2013) (quoting Piney Run Preservation Ass'n, 268 F.3d at 270). However, if "the permit's language is ambiguous," the court "may turn to extrinsic evidence to interpret [the permit's] terms." Id. at 1205.

"[P]rimary responsibility for enforcement [of the CWA] rests with state and federal governments . . . ." Piney Run Preservation Ass'n v. Cty. Comm'rs of Carrol Cty., Md., 523 F.3d 453, 456 (4th Cir. 2008). However, when the EPA fails or refuses to do so, private citizens may bring suit against "any person who is alleged to be in violation of . . . an effluent standard or limitation," including an NPDES permit. 33 U.S.C. §§1365(a)(1), (f)(6); see also Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 57 (1987).

B. Resource Conservation and Recovery Act ("RCRA")

RCRA aims to "reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.'" Meghrig v. KFC W., Inc., 516 U.S. 479, 483 (1996) (quoting 42 U.S.C. §6902(b)). To do so, RCRA imposes restrictions on the handling of hazardous waste. "Hazardous" waste is that which may "cause, or significantly contribute to an increase in mortality or an increase in serious . . . illness," or which may "pose a substantial present or potential hazard to human health or the environment when improperly . . . managed." 42 U.S.C. §6903(5).

Like the CWA, "the principal responsibility for implementing and enforcing RCRA resides with EPA . . . ." Me. People's All. & Nat. Res. Def. Council v. Mallinckrodt, 471 F.3d 277, 292 (1st

Cir. 2006). However, RCRA also authorizes citizen suits against "any person . . . who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. §6972(a)(1).

## C. Primary Jurisdiction

The Supreme Court "recognized early in the development of administrative agencies that coordination between traditional judicial machinery and these agencies was necessary if consistent and coherent policy were to emerge." Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatl., 400 U.S. 62, 68 (1970) (citing Tex. & Pac. Ry. Co. v. Abilene Cotton Oil Co., 204 U.S. 426 (1907)). "The doctrine of primary jurisdiction has become one of the key judicial switches through which this current has passed." Id.

Under the doctrine of primary jurisdiction, a court may stay "claims properly cognizable in court that contain some issue within the special competence of an administrative agency." Reiter v. Cooper, 507 U.S. 258, 268 (1993). The doctrine recognizes that "in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over." Far E. Conference v.

7

United States, 342 U.S. 570, 574 (1952). It "serves as a means [to] coordinat[e] administrative and judicial machinery" and "promote uniformity and take advantage of agencies' special expertise." Mashpee Tribe v. New Seabury Corp., 592 F.2d 575, 580 (1st Cir. 1979).

Generally, "a court invokes the doctrine of primary jurisdiction by staying its proceedings to allow one of the parties to file an administrative complaint seeking resolution of a particular issue." Palmer Foundry, Inc. v. Delta-HA, Inc., 319 F. Supp. 2d. 110, 113 (D. Mass. 2004). However, "[n]o fixed formula exists for applying the doctrine of primary jurisdiction." United States v. W. Pac. R.R. Co., 352 U.S. 59, 64 (1956).

In Massachusetts v. Blackstone Valley Electric Co., 67 F.3d 981 (1st Cir. 1995), the First Circuit identified several factors to be considered in deciding whether the primary jurisdiction doctrine justifies a stay. They are whether: (a) "the agency determination l[ies] at the heart of the task assigned the agency by Congress"; (b) "agency expertise [i]s required to unravel intricate, technical facts"; (c) "the agency determination would materially aid the court"; and (d) deference to the agency would "serve the interest of national uniformity in regulation." Id. at 992. The First Circuit has also instructed that if these Blackstone factors weigh in favor of a stay they "must be balanced against the potential for delay inherent in the decision to refer an issue

to an administrative agency." Am. Auto. Mfrs. Ass'n v. Mass. Dep't of Envtl. Prot., 163 F.3d 74, 81 (1st Cir. 1998).

III.  FACTUAL BACKGROUND

A. The Terminal and the Permit

Exxon operates the Terminal, a 110-acre petroleum storage and distribution facility in Everett, Massachusetts. See Am. Compl. ¶¶37-38 (Dkt. No. 34). The Terminal receives petroleum products, such as "gasoline, low sulfur diesel, jet fuel, heavy oil, and fuel additives," at a marine dock, transfers the products to storage tanks through above-ground piping, and then distributes the products at truck-loading racks. Id. ¶40. Exxon also collects storm water from all areas of the Terminal, and treats and discharges the water into the Island End River through three outfalls. See id. ¶¶45, 69.

The Permit authorizes Exxon to discharge pollutants, including treated storm water, into the Island End River subject to several requirements. See id. ¶48; Am. Compl., Ex. A ("Permit & Fact Sheet") (Dkt. No. 34-1). First, the Permit imposes numeric limitations on the volume of discharges from each outfall. See Permit & Fact Sheet §§I(A)(2)-(4), at 4-7 of 80 (Dkt. No. 34-1).

Second, the Permit requires Exxon to ensure that its discharges do not cause violations of Massachusetts' Water Quality Standards ("WQS") for the Island End River. See id. §I.A.5, at 10 of 80.

Third, the Permit prohibits Exxon from causing "a visible oil sheen, foam, or floating solids" in the Island End River. See id. §I(A)(8), at 10 of 80.

Fourth, the Permit requires that Exxon "develop, implement, and maintain a [Storm Water Pollution Prevention Plan ('SWPPP')] designed to reduce, or prevent, the discharge of pollutants . . . ." Id. §I(B), at 14 of 80. The SWPPP must:

> be prepared in accordance with good engineering practices, identify potential sources of pollution that may reasonably be expected to affect the quality of the storm water discharges, and describe and ensure implementation of practices which will be used to reduce the pollutants and assure compliance with this permit.

Id. §I(B)(4), at 14 of 80 (emphasis added). It "must also include . . . spill prevention and response procedures . . . ." Id. §I(B)(4)(e), at 14 of 80. Furthermore, Exxon must "amend and update the SWPPP within 30 days of any changes at the facility affecting the SWPPP"--including "a determination by the permittee or EPA that the SWPPP appears to be ineffective in . . . controlling pollutants"--and periodically certify that the SWPPP "meets the requirements of the [P]ermit." Id. §§I(B)(2), (7), at 14-15 of 80.

The EPA last modified the Permit in October 2011, and the Permit expired in January 2014. See Am. Compl. ¶49 (Dkt. No. 34); Permit & Fact Sheet at 2 of 80 (Dkt. No. 34-1). However, the EPA has administratively continued the Permit pending its decision on

Exxon's application for renewal. See Am. Compl. ¶49 (Dkt. No. 34). This means that the Permit is still in effect.

In a December 17, 2018 letter from the EPA to the parties, the EPA stated that it might take two-and-a-half years to issue a new Permit. See Dkt. No. 86-1 at 24-25 of 28. More specifically, the EPA wrote that it was "highly unlikely" that it would release the Terminal's draft permit for public notice and comment in the fiscal year ending September 30, 2019, but that EPA is "committed to" eliminating its backlog of NPDES permit applications by 2022. Id. at 25. In an April 18, 2019 letter EPA stated that its "assessment of the timeframe concerning permit reissuance has not materially changed since [its December 17, 2018 letter] and [it] anticipates commencement of public notice and comment on the draft permit within the next two fiscal years." Docket No. 86-1.

B. Climate Change

CLF alleges that weather patterns in the Boston area are changing compared to averages over the last century. See Am. Compl. ¶136 (Dkt. No. 34) (citing Exec. Office of Energy & Envtl. Affairs, Massachusetts Climate Change Adaptation Report 1 (Sept. 2011), available at http://www.mass.gov/eea/docs/eea/energy/cca/eeaclimate-adaptation-report.pdf). According to CLF, the consequences of climate change in Massachusetts include an increase in sea level and sea temperature, and an increase in the frequency and severity of storms and precipitation, all of which

11

can lead to flooding. See id. ¶¶141, 144-45, 151-56, 175-78, 200, 202.

CLF further alleges that to avoid the harmful consequences of climate change, "[e]ngineers customarily take [climate change] into account throughout their facility planning, decision-making, construction and design, engineering certification, and operation processes in order to assure adequate control and treatment of pollutant discharges and/or releases." Id. ¶218. For example, the Army Corps of Engineers incorporates the impact of sea level change when developing civil works programs. See id. ¶220 (citing Army Corps of Eng'rs, Reg. No. 1100-2-8162, at Appendix B, B-1 (Dec. 31, 2013), available at http://www.publications.usace.army.mil/ Portals/76/Publications/EngineerRegulations/ER_1100-2-8162.pdf). Also, "the Deer Island sewage treatment plant in Boston, Massachusetts was designed and built taking future sea level rise into consideration." Id. ¶224.

Exxon acknowledges the existence of climate change. See May 14, 2019 Hr'g Tr. at 56:15-17 (Dkt. No. 102). It also "recognize[s] that the risk of climate change and its potential impacts on society and ecosystems may prove to be significant." Am. Compl. ¶121 (Dkt. No. 34) (quoting Exxon, Corporate Citizenship in a Changing World 10 (2002), available at https://www.sec.gov/ Archives/edgar/vprr/0301/03019682.pdf).    Accordingly,    Exxon generally "engineers its facilities and operations robustly with

extreme weather conditions in mind . . . both with regard to risk

management and extreme event response" Id. ¶¶226-27 (quoting

Exxon, Energy and Carbon--Managing the Risks 14, 20-21, available

at    https://cdn.exxonmobil.com/~/media/global/files/energy-and-

environment/report---energy-and-carbon---managing-the-

risks.pdf). However, CLF contends that Exxon has failed to do so

with respect to the Terminal.

IV.   PROCEDURAL HISTORY

      A. Complaint and September 12, 2017 Hearing

      On September 29, 2016, CLF filed its initial Complaint. See

Dkt. No. 1. It alleged that Exxon violated the Permit and the CWA

by discharging pollutants in excess of the Permit's allowances and

failing to consider climate change in maintaining the Terminal. It

also alleged that Exxon violated the RCRA.

      Exxon moved to dismiss the Complaint for lack of standing,

arguing that CLF did not plausibly allege a risk of imminent harm

to CLF's members. See Mem. Supp. Mot. Dismiss at 11-16 (Dkt. No.

17). On September 12, 2017, the court held a hearing, and denied

in part and allowed in part Exxon's Motion to Dismiss. See Sept.

12, 2017 Hr'g Tr. (Dkt. No. 30); Sept. 13, 2017 Mem. & Order (Dkt.

No. 29). More specifically, the court found that CLF had standing

with respect to "severe weather events" that created a "substantial

risk" of causing the Terminal to discharge pollutants in the "near

future." Id. ¶1(a) (citing Clapper v. Amnesty Int'l USA, 568 U.S.

13

398, 409, 414 n.5 (2013)). However, the court found that CLF did not have standing "with respect to alleged injuries . . . unlikely to occur . . . in the near future," including "injuries that allegedly will result from rises in sea level, or increases in the severity and frequency of storms and flooding, that will occur in the far future, such as in 2050 or 2100." Id. ¶1(b). The court allowed CLF to amend the Complaint. See id. ¶3.

### B. Amended Complaint and November 30, 2018 and March 13, 2019 Hearings

On October 20, 2017, CLF filed the 15-count Amended Complaint. See Dkt. No. 34. Exxon again moved to dismiss for lack of standing, lack of jurisdiction, and failure to state a claim upon which relief can be granted. See Dkt. No. 36. After hearings on November 30, 2018 and March 13, 2019, the court allowed in part and denied in part Exxon's Motion to Dismiss. See Nov. 30, 2018 Hr'g Tr. (Dkt. No. 58); Mar. 13, 2019 Hr'g Tr. (Dkt. No. 73); Mar. 14, 2019 Mem. & Order (Dkt. No. 71). Twelve counts survive.

Counts Two and Three allege, in essence, that the Terminal discharges more pollutants than the Permit allows. More specifically, Count Two alleges that Exxon discharges certain pollutants through Outfall 01A in excess of 0.031 µg/L. See Am. Compl. ¶¶241-48. Count Three alleges that Exxon's discharges of

pollutants are contributing to violations of Massachusetts' WQS.[3] See id. ¶¶249-54.

Counts Six through 14 allege that Exxon is violating the Permit by not considering predictable weather patterns, including flooding and severe storms caused by climate change. More specifically, CLF alleges that Exxon is violating the Permit's conditions to: develop a SWPPP "designed to reduce, or prevent, the discharge of pollutants" (Count Six); develop a SWPPP using "good engineering practices" (Count Seven); identify in the SWPPP "potential sources of pollution reasonably expected to affect the quality of discharges" (Count Eight); describe and ensure implementation in the SWPPP of "practices . . . to reduce . . . pollutants" (Count Nine); identify in the SWPPP sources of spills of pollutants and expected drainage routes (Count Ten); implement in the SWPPP "spill prevention and response procedures" (Count 11); submit relevant facts to the Regional Administrator of the EPA (Count 12); update the SWPPP for any changes at the Terminal that affect the SWPPP (Count 13); and certify that the SWPPP "meets the requirements of the [P]ermit" and EPA regulations (Count 14).[4]

---

[3] Neither count Two nor Three turn on CLF's allegations that Boston-area weather patterns are changing.

[4] With respect to Counts Six through 14, the court found that CLF "adequately alleges facts establishing standing" because the Amended Complaint "contains new allegations of foreseeable severe weather events allegedly induced by climate change that are allegedly already occurring or will occur in Massachusetts in the near future." Mar. 13, 2019 Hr'g Tr. at 127-28 (Dkt. No. 73). The

Count 15 alleges that the foregoing violations of the Permit pose a substantial and imminent risk to human health and the environment and, therefore, constitute a violation of RCRA.[5]

C. May 14, 2019 Hearing

After the court allowed in part and denied in part Exxon's Motion to Dismiss, Exxon indicated that it would file a motion to stay pursuant to the doctrine of primary jurisdiction and seek testimony from the EPA. See Mar. 13, 2019 Hr'g Tr. at 142:6-9 (Dkt. No. 73). Accordingly, the court set a schedule for briefing and another hearing. See id. at 142-43. It also emphasized that any EPA testimony would "be limited to matters relevant to whether the court should stay this case under the doctrine of primary

---

court also held that the Permit "requires Exxon to consider foreseeable severe weather events, including any climate change-induced weather events." Id. at 132:19-21 (Dkt. No. 73). After determining that the phrase "good engineering practices" is ambiguous, the court considered extrinsic evidence to determine its meaning, considered and found that EPA guidance and practices of engineers demonstrate that "good engineering practices" include "consideration of foreseeable severe weather events, including any caused by . . . climate change." Id. at 132-33, 138:4-6. Finally, the court found that CLF plausibly alleges that Exxon has not considered predictable weather patterns--including those caused by climate change--because "there have been no changes in the [Terminal] after the [P]ermit issued." Id. at 134:18-19.

[5] The court noted that "industrial discharges from point sources subject to NPDES permits are expressly exempted from RCRA[.]" Mar. 13, 2019 Hr'g Tr. at 140:20-21 (Dkt. No. 73) (citing 42 U.S.C. §6903(27)). Accordingly, the court dismissed Count 15 "to the extent it relies on allegations of discharges from the three point sources covered by the [P]ermit, outfalls 01A, 01B, and 01C." Id. at 141:17-19.

jurisdiction," and "not include EPA's views on the meaning of the [NPDES] Permit for the Everett Terminal or the merits of this case." Mar. 14, 2019 Mem. & Order ¶5(b) (Dkt. No. 71).

On April 4, 2019, Exxon subpoenaed Thelma Murphy, Chief of the Water Permits Branch of EPA Region 1, to testify at the hearing on Exxon's Motion to Stay. See Dkt. No. 86-1 at 7-8 of 28. It sought her testimony regarding:

> (1) the likely timeframe for renewing or reissuing the Permit, in light of Region 1's past experience with permit renewal applications and its current competing obligations, and (2) why EPA has determined it is appropriate to assign higher priority to other permit applications while allowing the Terminal's Permit to be administratively continued.

Opp'n Mot. Quash at 11 of 26 (Dkt. No. 91). On April 18, 2019, the EPA moved to quash the subpoena. See Dkt. No. 85.

On May 14, 2019, the court held a hearing on EPA's Motion to Quash and Exxon's Motion to Stay. At the outset, the court explained that if it denied the EPA's Motion to Quash and ordered Murphy to testify, the EPA could only appeal such an order if the court held Regional Counsel Dierker, her superior, in criminal contempt. See May 14, 2019 Hr'g Tr. at 14-16 (Dkt. No. 102); United States v. Salemme, 978 F. Supp. 364, 371 (D. Mass. 1997); 9A Wright & Miller, Federal Practice & Procedure §2466 (3d ed. 2019). In lieu of Murphy testifying, Dierker then agreed to answer questions from the court and from the parties. See May 14, 2019 Hr'g Tr. at 27-28 (Dkt. No. 102).

17

Dierker stated that, pursuant to a directive from the Deputy Administrator of the EPA, one of the "highest policy objectives" of EPA Region 1 is to clear its backlog of 216 pending NPDES permit applications by September 30, 2022. Id. at 45-47. He represented that Region 1 "devised a plan to meet th[is] fiscal year 2022 deadline." Id. at 37:13-14. More specifically, Dierker stated that Region 1 plans to issue approximately 72 permits each fiscal year for the next three years. Id. at 49:2-4. To do so, the EPA employs technical experts, such as hydrologists, chemists, and biologists. See id. at 46:13-15.

However, Dierker could not guarantee that the EPA would meet any deadline. See id. at 38:9-18. He also noted that it was "fuzzy" whether the goal to eliminate the permit backlog includes resolving any judicial appeals of permits.[6] Id. at 22:17-23. Finally, Dierker explained that in determining the order in which the EPA renews permits, the EPA considers grouping similarly situated permits. The Terminal is one of six or seven oil terminals, which the EPA intends to address at the same time "to put more or less the same conditions on them so they are all covered with the same level of protection . . . ." Id. at 49:20-22.

---

[6] Dierker explained that if Exxon appeals any conditions in the renewed Permit, "the uncontested conditions . . . [would] go into effect." May 14, 2019 Hr'g Tr. at 39:23-25 (Dkt. No. 102).

V.   DISCUSSION

As explained earlier, the doctrine of primary jurisdiction allows a court to stay claims "that contain some issue within the special competence of an administrative agency." Reiter, 507 U.S. at 268. The First Circuit has identified several factors for courts to consider in determining whether to apply the doctrine, see Blackstone, 67 F.3d at 992, and the court must balance those factors "against the potential for delay inherent in the decision to refer an issue to an administrative agency," Am. Auto. Mfrs. Ass'n, 163 F.3d at 81. In this case, all of the Blackstone factors weigh in favor of a stay and they are not outweighed by the risk of delay in the EPA's renewal of the Permit.

A. The doctrine of primary jurisdiction applies to citizen suits under the CWA and RCRA.

As a threshold matter, CLF argues that the primary jurisdiction doctrine does not apply to citizen suits under the CWA and RCRA. It characterizes the "precedent disfavoring primary jurisdiction in citizen enforcement actions" as "overwhelming." Opp'n Mot. Stay at 16 of 27 (Dkt. No. 88).

Some district courts have found the doctrine of primary jurisdiction categorically inapplicable to citizen suits under the CWA or RCRA. See e.g., Apalachicola Riverkeeper v. Taylor Energy Co., LLC, 954 F. Supp. 2d 448, 460 (E.D. La. 2013); Stewart-Sterling One LLC v. Tricon Global Rests., Inc., 2002 WL 1837844,

19

*5 (E.D. La. Aug. 9, 2002); Wilson v. Amoco Corp., 989 F. Supp. 1159, 1169-71 (D. Wyo. 1998); Craig Lyle Ltd. P'ship v. Land O'Lakes, Inc., 877 F. Supp. 476, 483-44 (D. Minn. 1995). The court in Apalachicola summarized the rationale for this view:

> The primary jurisdiction doctrine is not listed among the specifically delineated circumstances under which CWA and RCRA may be barred. Where Congress creates specific exceptions to a broadly applicable provision, the proper inference . . . is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth. If Congress had intended for the primary jurisdiction doctrine to bar citizen suits, it would have included the doctrine among the specifically delineated circumstances under which citizen suits are barred. That Congress did not do so means the doctrine is not included among the bars to a citizen suit.

954 F. Supp. 2d at 460 (internal quotation marks and citations omitted).

The First Circuit has not yet addressed whether courts may stay citizen suits under the CWA or RCRA pursuant to the doctrine of primary jurisdiction. However, Chico Service Station, Inc. v. Sol Puerto Rico Ltd., 633 F.3d 20 (1st Cir. 2011), is instructive.

In Chico Service Station, plaintiffs brought a citizen suit under RCRA, and defendants moved to stay under the doctrine of Burford abstention.[7] Like primary jurisdiction, Burford abstention

---

[7] The Seventh Circuit has characterized Burford abstention and primary jurisdiction as "different labels for the same thing." PMC, Inc. v. Sherwin-Williams Co., 151 F.3d 610, 619 (7th Cir. 1998); see generally Burford v. Sun Oil Co., 319 U.S. 315 (1943). In Chico Service Station, the First Circuit described Burford abstention as a federal court's refusal to exercise jurisdiction

is not listed among the specifically delineated circumstances under which a RCRA or CWA citizen suit may be barred. See 33 U.S.C. §1365(b); 42 U.S.C. §6972(b). However, the First Circuit noted that it was "not prepared to rule out categorically the possibility of abstention in a RCRA citizen suit . . . ." Id. at 31-32; see also Me. People's All. v. Holtrachem Mfg., 2001 WL 1704911, *9 (D. Me. Jan. 8, 2001) (noting "split of opinion with regard to whether the primary jurisdiction doctrine should be applied to RCRA citizen suits," but concluding that "the doctrine may be applied against RCRA citizen suits . . . when particularly conducive fact patterns are present").

CLF also argues that courts often refuse to stay pursuant to the primary jurisdiction doctrine in CWA and RCRA citizens suits, even if the doctrine is not categorically inapplicable to such suits. However, this case is unusual in material respects. CWA and RCRA citizen suits typically allege violations of unambiguous, numerical permit conditions. For example, in Student Public Interest Research Group of New Jersey v. Monsanto Co., plaintiffs sued defendant for discharging pollutants at higher levels than allowed under NPDES permits. See 600 F. Supp. 1479, 1481 (D.N.J. 1985). In refusing to defer to the primary jurisdiction of the

---

in order to avoid "bypassing a state administrative scheme and resolving issues of state law and policy that are committed in the first instance to expert administrative resolution." 633 F.3d at 29 (internal quotation marks omitted).

EPA, the court reasoned that it was "not called upon to itself delve into the complex questions of what quantities of pollutants are safe, or what various industries can be expected to accomplish in reducing pollution." Id. at 1483. Rather, the court was only called upon to "compare the allowable quantities of pollution listed in the permits with the available statistics on actual pollution." Id.; see also Ill. Pub. Interest Research Grp. v. PMC, Inc., 835 F. Supp. 1070, 1072 (N.D. Ill. 1993) ("According to plaintiffs . . . defendant's wastewater has contained pollutants in excess of the discharge limits under the Act."); Pennenvironment v. Genon N.E. Mgmt. Co., 2011 WL 1085885, *4-5 (W.D. Pa. Mar. 21, 2011) (characterizing the issue as "whether [defendant] [was] in violation of its NPDES Permit limits," which did "not require the Court to make any determinations involving technical or policy considerations"); La. Envtl. Action Network v. LWS management Co., Inc., 2007 WL 2491360, *6 (W.D. La. Aug. 14, 2007) ("[Plaintiff]'s primary claim is that Defendants are discharging effluents in excess of the amount authorized by their . . . permits. Therefore, in order to adjudicate [plaintiff]'s claims, this Court need only compare the amount of effluent discharge permitted by Defendants' permits with the amount actually discharged by Defendants. No

special knowledge or expertise is necessary to make such a comparison.").[8]

By contrast, CLF's allegations in this case involve ambiguous, narrative permit conditions. Accordingly, this case more closely resembles Sierra Club v. Chesapeake Operating, LLC, 248 F. Supp. 3d 1194 (W.D. Okla. 2017), than those on which CLF relies. In Chesapeake Operating, plaintiff brought a citizen suit under RCRA, alleging that defendants' waste disposal operations caused earthquakes that imminently and substantially endangered public health and the environment. See id. at 1198. Plaintiff argued that "scientific consensus support[ed] its claims and that the court [would] only need to review the scientific evidence and determine which of the defendants have contributed to the increase in seismic activity." Id. at 1206 (internal quotations marks omitted). However, the court observed that plaintiff's claims implicated "highly complex and technical" questions far from a "typical" RCRA citizen suit. Id. In particular, the court reasoned that it would have to discern what "'seismologists' believe to

---

[8] On September 27, 2019, CLF filed a Notice of Supplemental Authority (Dkt. No. 104), informing the court of the recent Memorandum and Order in Sierra Club v. Granite Shore Power LLC, 1:19-cv-00216-JL (D.N.H. Sept. 13, 2019). The court has considered this decision and concludes that it is also distinguishable. In Sierra Club at *37-38, the EPA's review process had been ongoing for 27 years, with no end date anticipated. In contrast, in the instant case the EPA has stated that it is striving to issue a new permit.

determine the amount of wastewater that can be injected in defendants' disposal wells so as not to increase earthquake frequency and severity." Id. Therefore, the court stayed the case based on the doctrine of primary jurisdiction.

Similarly, this case is not a typical CWA or RCRA citizen suit. To decide whether to grant CLF's requested injunctive relief, the court must determine whether, how, and to what extent climatologists believe weather patterns in Boston are changing, and how prudent industrial engineers would respond to such changes. This undertaking implicates scientific and policy issues absent from a typical citizen suit in which the court compares the level of pollutants discharged to the level of pollutants allowed by the permit. Therefore, contrary to CLF's argument, the precedent against applying primary jurisdiction is not overwhelming, and the question in this case is whether the Blackstone factors favor deferring to EPA's primary jurisdiction.

B. The Blackstone factors weigh in favor of applying primary jurisdiction.

1. The EPA's determination is at the heart of the EPA's task under the CWA.

The first Blackstone factor is "whether the agency determination l[ies] at the heart of the task assigned the agency by Congress." 67 F.3d at 992. This factor weighs in favor of allowing Exxon's Motion to Stay.

24

Here, Exxon asks the court to defer until the EPA acts on the Permit renewal application. As noted earlier, "Congress has vested in the Administrator [of the EPA] broad discretion to establish conditions for NPDES permits." Arkansas, 503 U.S. at 105. The CWA provides that "[t]he Administrator shall prescribe conditions for . . . permits to assure compliance with the requirements of [§1342(1)], including conditions on data and information collection, reporting, and such other requirements as he deems appropriate." 33 U.S.C. §1342(2). In doing so, the EPA "analyzes the environmental risk posed by the discharge, and places limits on those pollutants that . . . it reasonably anticipates could damage the environmental integrity of the affected waterway." Piney Run Preservation Ass'n, 268 F.3d at 268. Accordingly, the decisions concerning whether to renew the Permit and what conditions to impose are at the heart of the EPA's role in the CWA.

In opposition, CLF argues that there is a distinction between "permitting" and "judicial enforcement" functions under the CWA. See Opp'n Mot. Stay at 19 of 27 (Dkt. No. 88). It acknowledges the EPA's prime role in drafting and granting NPDES permits. See id. However, CLF argues that interpreting and enforcing those permits is "the sole responsibility of the courts" and, therefore, not at the heart of the EPA's tasks under the CWA. Id. at 20, 22 of 27 (Dkt. No. 88).

CLF's argument is not meritorious. The first Blackstone factor does not ask whether the ultimate issue in the case--here, Exxon's compliance with the Permit--is at the heart of the EPA's tasks. Rather, it asks whether the agency determination--here, what terms to include in a new Permit--is at the heart of the agency's tasks. Again, drafting NPDES permit terms is at the heart of the EPA's role under the CWA.

CLF also reasons that "it makes no sense to defer to EPA because courts do not defer to EPA interpretation in matters of enforcement, even where EPA has expressly opined on the issue before the court." In support, CLF cites San Francisco Baykeeper v. Cargill, 481 F.3d 700 (9th Cir. 2007). However, that case actually undermines CLF's argument.

In San Francisco Baykeeper, plaintiffs sued defendant for discharging pollutants into a pond without a permit, in violation of the CWA. See id. at 701. Plaintiffs argued that the pond was a "navigable water" into which discharges required a NPDES permit. See id. In reversing the district court's grant of summary judgment to plaintiff, the Ninth Circuit observed that "in entertaining a citizen suit," it could "decide whether a discharge of particular matter into navigable waters violates the CWA even though [the EPA] determined that the discharge was not subject to the requirement of a permit." Id. at 706. However, the Ninth Circuit also explained it is generally "heavily guided by the EPA's

definition[s] . . . in order not to undermine the agency's interpretation of the [CWA]." Id. (internal quotation marks omitted). Indeed, the Ninth Circuit reasoned that such deference is particularly appropriate when a question involves "conflicting policies" and requires "expert factual considerations for which the agencies are especially well suited." Id.

CLF also argues that "[n]o law places interpretation of the terms of a [CWA] permit specially outside of the Court's purview." Opp'n Mot. Stay at 21-22 of 27 (Dkt. No. 88). This is true, but immaterial. Primary jurisdiction only applies to claims "properly cognizable in court." Reiter, 507 U.S. at 268. Therefore, the question is not whether the court must stay litigation, but rather whether the court should stay litigation.

> 2. The EPA's expertise is required to unravel intricate, technical facts.

The second Blackstone factor is "whether agency expertise [i]s required to unravel intricate, technical facts." 67 F.3d at 992. This factor also weighs in favor of allowing Exxon's Motion to Stay.

As described earlier, in order to decide whether to grant CLF's requested injunctive relief, the court would have to determine whether and to what extent climatologists believe weather patterns in Boston are changing, and how prudent industrial engineers would respond to such changes. As part of this task, the

court would have to determine, for example, which climate models best predict weather events in the near future. However, as the First Circuit has noted, that "the choice of statistical methods is a matter best left to the sound discretion of the Administrator [of the EPA]." BASF Wyandotte Corp. v. Costle, 598 F.2d 637, 655 (1st Cir. 1979).

Clark v. Time Warner Cable, 523 F.3d 1110 (9th Cir. 2008), is instructive. In Clark, plaintiff alleged that defendant violated a federal law against "slamming"--"the practice in which a telecommunications carrier switches a consumer's telephone service without the consumer's consent." Id. at 1112. Defendant provided a new technology -- Voice over Internet Protocol ("VoIP"). See id. The federal statute only applied to "telecommunications carriers," and the Federal Communications Commission ("FCC") had not yet determined whether defendant, which provided Voice over Internet Protocol ("VoIP") services, was a "telecommunications carrier." Id. at 1113-14. "[R]ecognizing that its own decision [regarding whether defendant was a telecommunications carrier] could jeopardize the uniform administration of the FCC's regulatory scheme," the district court applied primary jurisdiction. Id. at 1114.

In affirming the district court's application of primary jurisdiction, the Ninth Circuit observed that "Congress has specifically delegated responsibility to the FCC to define

28

'slamming' violations . . . ." Id. at 1115. Therefore, it found that "whether a VoIP provider qualifies as a 'telecommunications carrier' . . . fits squarely within that delegation, particularly because the FCC has already developed a detailed and comprehensive regulatory scheme in response to the statute's instructions." Id. In essence, the court held that FCC was better suited to address the implications of an emerging technology.

This case does not involve a new technology like VoIP. However, it does involve responses to the alleged emerging and evolving threat of climate-change induced weather patterns. Like the FCC with respect to telecommunications statutes, the EPA has developed a comprehensive regulatory scheme to administer the CWA and RCRA. As discussed earlier, a central part of that scheme is NPDES permits, which the EPA drafts by considering many factors. See Nat'l Wildlife Fed'n v. Gorsuch, 693 F.2d 156, 178 (D.C. Cir. 1982) ("Read as a whole, the [CWA] shows not only Congress's determined effort to clean up our polluted lakes and rivers, but also its practical recognition of the economic, technological, and political limits on total elimination of all pollution from all sources.").

CLF argues that the EPA's expertise is unnecessary in this case because "many of the facts are not in dispute." Opp'n Mot. Stay at 22 of 27 (Dkt. No. 88). For example, CLF asserts that Exxon "admitted that it has not considered impacts related to climate

change in [maintaining] the Terminal[.]" Id. However, this contention is incorrect. As Exxon correctly states, it "presumed that CLF's allegations were true for the purposes of the motion to dismiss," but otherwise maintains that it engineered the Terminal "robustly with extreme weather considerations in mind." Exxon Reply CLF at 12 of 20 (Dkt. No. 92).

   3. The EPA's determination would materially aid the court.

   The third Blackstone factor is "whether . . . agency determination would materially aid the court." 57 F.3d at 992. This factor too weighs in favor of allowing Exxon's Motion to Stay because the EPA's action on the Permit will aid the court in two ways.

   First, even if the renewed Permit does not directly address climate change, it will generate a fuller administrative record to which this court can refer to discern the meaning of particular terms in the Permit. More specifically, the EPA must publish a draft permit and provide a detailed explanation for permit conditions. See 40 C.F.R. §§124.7, 124.8. It must also respond to public comments, which may seek clarification, object to the permit, or request more stringent conditions. See id. §§124.11, 124.13, 124.17. This information will be helpful to the court.

   Second, the EPA's determination on Exxon's Permit application could render most of this case moot. As this court has previously stated, "it would be unfortunate . . . to have . . . two years of

litigation and then have the EPA come out with a new permit that moots the request for injunctive relief, which is the heart of the case." Mar. 13, 2019 Hr'g Tr. at 117:4-8 (Dkt. No. 73); see also Nov. 30, 2018 Hr'g Tr. at 149:22-25 (Dkt. No. 58).

For example, if the EPA renews the Permit with express conditions to consider climate change-induced weather patterns, then CLF's request for injunctive relief would be moot. See Nat. Resources Council Me., 424 F. Supp. 2d at 256 ("[T]he conduct that [plaintiff] complained about--namely the unpermitted discharge of pollutants into the Androscoggin River--was fully rectified upon [the agency's] issuance of a final . . . permit. To enjoin [defendant] from discharging until it obtains a permit it has already obtained would be simply nonsensical.").

Montgomery Environmental Coalition v. Washington Suburban Sanitary Commission, 607 F.2d 378 (D.C. Cir. 1979), is instructive. In that case, an environmental group sued a municipal agency for discharging sewage in violation of WQS. During the pendency of the case, the EPA issued a NPDES permit for the discharges and scheduled a hearing to address objections to the permit. See id. at 380. The court reasoned that "the resolution of the [NPDES] proceeding may make unnecessary any decision in this case" and, accordingly, "with[e]ld jurisdiction until EPA complete[d] the pending administrative proceeding." Id. at 382.

31

Similarly, if CLF prevails on the merits and obtains injunctive relief, and the EPA later renews the Permit without requiring that Exxon consider climate-change induced weather patterns, the injunction would be invalidated. As explained earlier, under the permit shield doctrine, "a discharger in compliance with the terms and conditions of an NPDES permit is deemed to be in compliance with those sections of the [CWA] on which the permit conditions are based." EPA v. California, 426 U.S. at 205 (citing 33 U.S.C. §1342(k)). This immunity extends to discharges of pollutants not listed in the permit, as long as such discharges were "adequately disclosed to the permitting authority." Piney Run Preservation Ass'n, 268 F.3d at 268.

Nevertheless, CLF argues that any hypothetical injunctive relief would not be invalidated by the EPA's renewal of the Permit. It relies on U.S. Public Interest Research Group v. Atlantic Salmon of Maine, 339 F.3d 23 (1st Cir. 2003). In that case, plaintiffs sued operators of salmon farms, alleging that they discharged pollutants in violation of the CWA. The district court issued an injunction, after which the state environmental agency issued a permit with conditions for salmon farming. See id. at 27. The injunction, however, "required compliance with federal and state requirements as well as the more specific requirements of the injunction." Id. at 30. On appeal, defendants argued that under the permit shield doctrine, the injunction was invalid to the

extent it imposed more stringent conditions than the new permit. See id. at 29.

The First Circuit upheld the injunction. It explained that a "court may grant additional injunctive relief governing the post-permit operations of [defendants] insofar as the court is remedying harm caused by [defendants'] past violations." Id. at 31. Here, however, Counts Six through 14 allege only a risk of future harm, not now ongoing harm. Therefore, any injunctive relief ordered by the court would be invalidated by a renewed Permit under the permit shield doctrine if the injunction imposed more stringent requirements than the Permit.   See Piney Run Preservation Ass'n, 268 F.3d at 268.

> ### 4. The EPA's determination would further regulatory uniformity.

The fourth Blackstone factor is whether agency determination "will . . . serve the interest of national uniformity in regulation." Blackstone, 67 F.3d at 981; see also Am. Auto Mfrs., 163 F.3d at 81 ("[T]he goal of national uniformity in the interpretation and application of a federal regulatory regime is furthered by permitting the agency that has primary jurisdiction over the matter in question to have a first look at the problem."). This factor also weighs in favor of Exxon's Motion to Stay.

As a threshold matter, this case is different than some other cases in which courts have invoked the primary jurisdiction

doctrine to defer to agencies interpreting federal statutes or regulations. In Blackstone, for example, the court deferred to the EPA's determination of whether something was a "hazardous substance" under CERCLA - a definition would have applied nationwide. See 67 F.3d at 991-93.

In contrast, this case does not involve a statutory or regulatory term under the CWA or RCRA. It involves terms in one permit for one facility. However, the language used in the Permit is also used in permits across Massachusetts, and in 17 other states and territories where the EPA issues NPDES permits. See Exxon Reply CLF at 15 of 20 (Dkt. No. 92); Dierker Decl. at 21 of 28 (Dkt. No. 86-1) (listing states and territories where EPA issues NPDES permits). Therefore, the EPA's determination will have broad implications for permits and facilities in addition to the Terminal.

Indeed, EPA Regional Counsel Dierker stated that the EPA is concerned about uniformity across NPDES permits addressing similar facilities. He noted that one of the factors in determining the sequencing for addressing the permit backlog is "trying to group permits in a watershed or similar types of permits," including one group of six or seven oil terminals, including the Terminal involved in this case. See May 14, 2019 Hr'g Tr. at 49:6-24 (Dkt. No. 102). Dierker explained that the EPA would "try to put more or less the same conditions on [the six or seven oil terminals] so

they are all covered with the same level of protection, which right now . . . they're not." Id. at 49:20-24. A ruling by this court might be inconsistent with decisions EPA may make concerning similarly situated facilities and, if so, disrupt the EPA's attempt to achieve uniformity in dealing with such facilities.

      C. The potential for delay does not outweigh the Blackstone factors.

As the First Circuit has instructed, the Blackstone factors "must be balanced against the potential for delay inherent in the decision to refer an issue to an administrative agency." Am. Auto. Mfrs. Ass'n 163 F.3d at 81. To the extent, if any, that this consideration favors denying Exxon's Motion to Stay, it does not outweigh the foregoing Blackstone factors.

As explained earlier, in 2019, the EPA stated, in effect, that it was striving to issue a new Permit before October 2021. See Dierker Decl. at 28 of 28 (Dkt. No. 86-1). The First Circuit has not held that any particular length of time would always constitute an unreasonable delay, which is consistent with the Supreme Court's statement that "[n]o fixed formula exists for applying the doctrine of primary jurisdiction." W. Pac. R.R. Co., 352 U.S. at 64. In National Association of the Deaf v. Harvard University, 2016 WL 3561622 (D. Mass. Feb. 9, 2016), Report and Recommendation adopted 2016 WL 6540446 (D. Mass. Nov. 3, 2016), the court found that two years was too long to wait for the

Department of Justice to issue new regulations before resolving plaintiffs' claims. See id. at *19. This suggests that the foreseeable delay in this case would be too long.[9] However, National Association of the Deaf is distinguishable.

First, National Association of the Deaf involved ongoing harm. Deaf students sued Harvard University for failing to provide captioned educational video content, in violation of Title III of the Americans with Disabilities Act. See id. at *1-2. Accordingly, the court reasoned that "[i]f Harvard is in violation of Title III as Plaintiffs allege, then Plaintiffs will continue to be unlawfully harmed until this case is resolved." Id. at *20. In contrast, in the instant case Counts Six through 14 do not allege actual, ongoing harm, but rather the risk of future harm.

Second, in National Association of the Deaf, the court found that the Blackstone factors mostly weighed against applying primary jurisdiction. See 2016 WL 3561622 at *15-17. Here, in contrast, all of those factors weigh in favor of deferring to the primary jurisdiction of the EPA.

Moreover, deferring to the EPA until at least October 2021 should not delay the resolution of the issues involved in this case.   Even under CLF's ambitious, and perhaps unrealistic,

---

[9] In American Auto Manufacturers, the court stated that "if no agency ruling is forthcoming within 180 days," it would "decide the issues . . . without the EPA's guidance." 163 F.3d at 86-87.

schedule, it would take more than a year to complete discovery and brief motions for summary judgment. See Dkt. 90. Additional time would be needed for the court to prepare, conduct a hearing, and decide any motions for summary judgment. It appears likely that there will be disputed material facts and, therefore, that any motions for summary judgment will not resolve this case in the District Court. Therefore, more time will be needed to prepare for and conduct a lengthy trial. In addition, it is foreseeable that the decision in the District Court will be then subject to a lengthy appeal. This process will not be completed by October 2021.

As explained earlier, it is also foreseeable that the issuance of a new Permit will moot many of the issues now being litigated. Therefore, particularly because plaintiffs allege only the risk of future harm rather than current, continuing injury, the delay in litigation resulting from a stay does not outweigh the compelling reasons to grant a stay.

VI. ORDER

In view of the foregoing, it is hereby ORDERED that:

1.   Exxon's Motion to Stay (Dkt. No. 80) is ALLOWED.

2.   Within 30 days of EPA issuing a new permit for the Terminal, the parties shall confer and report, jointly if possible, concerning whether the stay should be lifted and, if so, how this case should proceed.

37

3.    If a new permit for the Terminal has not been issued by November 1, 2021, the parties shall confer and report, jointly if possible, on the status of the permitting process and their views on whether the stay should be lifted.   See, e.g., American Auto Manufacturers, 163 F.3d at 86-97.


                                        UNITED STATES DISTRICT JUDGE

38