# United States Court of Appeals
## For the First Circuit

No. 20-1456

CONSERVATION LAW FOUNDATION, INC.,

Plaintiff, Appellant,

v.

EXXON MOBIL CORPORATION, EXXONMOBIL OIL CORPORATION, EXXONMOBIL
PIPELINE COMPANY,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Howard, Chief Judge,
Thompson, Circuit Judge,
and Katzmann,[*] Judge.

Ian David Coghill, with whom Christopher M. Kilian,
Conservation Law Foundation, Allan Kanner, and Kanner & Whiteley,
LLC were on brief, for appellant.
    William Thomas Marks, with whom Theodore V. Wells, Jr., Daniel
J. Toal, Jamie D. Brooks, Kannon K. Shanmugam, William T. Marks,
Paul, Weiss, Rifkind, Wharton & Garrison LLP, Deborah E. Barnard,
Jessica R. Early, and Holland & Knight LLP were on brief, for
appellees.

---

[*] Of the United States Court of International Trade, sitting by
designation.

_____

July 1, 2021

_____

THOMPSON, **Circuit Judge**.  Conservation Law Foundation, a not-for-profit organization focusing on the conservation and protection of New England's environment, has filed suit against ExxonMobil Corporation, ExxonMobil Oil Corporation, and ExxonMobil Pipeline Company (collectively, "ExxonMobil").  The Foundation's complaint alleges violations of the Clean Water Act ("CWA"), 33 U.S.C. § 1251 et seq., and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq., at ExxonMobil's petroleum storage and distribution terminal in Everett, Massachusetts.  After denying in part ExxonMobil's motion to dismiss, the district court granted ExxonMobil's motion to stay proceedings under the so-called doctrine of primary jurisdiction, a doctrine "concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties," so that the U.S. Environmental Protection Agency ("EPA") could weigh in.  United States v. W. Pac. R.R., 352 U.S. 59, 63 (1956).  The case has remained stayed ever since.  The Foundation appealed the stay order, maintaining that the district court erred because, in the context of this case, the doctrine of primary jurisdiction is inapt.  ExxonMobil, on the other hand, argues that the district court correctly applied the doctrine, but that even if it did not we lack appellate jurisdiction to review the stay

order.[1]   For the following reasons, we find that we do have appellate jurisdiction to review the order and, upon that review, that the district court improperly stayed the case.

## I.   Background

### A.   The Permit

Pursuant to a permit issued by EPA under the National Pollutant Discharge Elimination System program, see 33 U.S.C. § 1342(a), ExxonMobil may discharge stormwater, groundwater, and certain other waters (such as potable water used to wash trucks or garage floors) from its Everett terminal into the Island End River, a small tributary of Boston's Mystic River.   See City of Taunton v. EPA, 895 F.3d 120, 124 (1st Cir. 2018) (explaining the permit process more).   ExxonMobil's permit originally became effective on

---

[1]   It is often remarked that jurisdiction is "a word of many, too many, meanings." Fort Bend Cty. v. Davis, 139 S. Ct. 1843, 1848 (2019) (quoting Kontrick v. Ryan, 540 U.S. 443, 454 (2004)).   This case requires us to discuss two of the word's uses.   The first, the doctrine of primary jurisdiction, is a bit of a misnomer. "Properly understood, the doctrine is not jurisdictional per se, but rather is a means of procuring 'harmony, efficiency, and prudence' in areas of overlapping judicial and administrative concern." Nat'l Tank Truck Carriers, Inc. v. Burke, 608 F.2d 819, 821 (1st Cir. 1979) (quoting Mashpee Tribe v. New Seabury Corp., 592 F.2d 575, 580 n.1 (1st Cir. 1979)); see also United States v. Lahey Clinic Hosp., Inc., 399 F.3d 1, 18 (1st Cir. 2005) (explaining that the primary jurisdiction doctrine "does not implicate the subject matter jurisdiction of the federal court" (quoting P.R. Mar. Shipping Auth. v. Fed. Mar. Comm'n, 75 F.3d 63, 67 (1st Cir. 1996))).   By contrast, when it comes to appellate jurisdiction, a court of appeals "must verify [that] it has that jurisdiction before addressing the merits of any appeal." Conille v. Council 93, Am. Fed'n of State, Cty. & Mun. Emps., 935 F.3d 1, 5 (1st Cir. 2019).

January 1, 2009 and superseded a prior permit issued in March 2000. EPA later modified the permit. Permits issued under the National Pollutant Discharge Elimination System program may not exceed five years, so ExxonMobil's permit for the Everett terminal expired on January 1, 2014. See 33 U.S.C. § 1342(a)(3), (b)(1)(B). By regulation, however, the conditions of an EPA-issued permit "continue in force" until the effective date of a new permit if, as here, the permittee has submitted a timely application and through no fault of its own a new permit has not yet issued. 40 C.F.R. § 122.6(a); 5 U.S.C. § 558 ("When the licensee has made timely and sufficient application for a renewal or a new license in accordance with agency rules, a license with reference to an activity of a continuing nature does not expire until the application has been finally determined by the agency."). EPA has yet to act on ExxonMobil's application, so the conditions of the prior permit remain in effect.

## B.  Procedural History

In September 2016, the Foundation filed this action under the citizen suit provisions of the CWA, 33 U.S.C. § 1365, and RCRA, 42 U.S.C. § 6972. The operative complaint contains principally two sets of allegations:  first, that ExxonMobil has failed to comply with its discharge permit and thus violated the CWA; and second, that ExxonMobil "has contributed and is contributing to past and present handling, storage, treatment,

transportation, or disposal of solid and hazardous wastes which may present an imminent and substantial endangerment to health or the environment in violation of RCRA."

In March 2019, after hearing argument on ExxonMobil's motion to dismiss, the district court granted the motion as to three of the fifteen counts in the complaint but denied the motion as to the others.  All but one of the surviving counts allege violations of the CWA.  Some of those counts allege ExxonMobil violated the CWA by discharging pollutants from the Everett terminal in excess of the limits set out in the permit or in violation of Massachusetts Surface Water Quality Standards, which itself violates the permit.  Another count alleges that ExxonMobil violated the CWA by failing to develop, implement, and maintain a Storm Water Pollution Prevention Plan ("stormwater plan") that is designed to reduce or prevent the discharge of pollutants in stormwater while accounting for harsher precipitation events and increased flooding generally attributable to climate change ("climate change factors").  Other counts allege that ExxonMobil violated the CWA by failing to prepare the stormwater plan "in accordance with good engineering practices" as required by the permit since it did not account for the climate change factors, or because the stormwater plan failed to "identify potential sources of pollution that may reasonably be expected to affect the quality" of the stormwater discharges, as required by the permit,

since the stormwater plan did not account for the climate change factors. Still more counts allege ExxonMobil violated the CWA because, in violation of the permit, the stormwater plan failed to "describe and ensure implementation of practices which will be used to reduce the pollutants and assure compliance with this permit" and also fails to identify "all pollutant sources" including "all areas where spills . . . could occur" and the "expected drainage" for each of those pollutants, since the stormwater plan did not account for the climate change factors. Another count alleges that ExxonMobil violated the CWA because, among other reasons, the stormwater plan did not contain "spill prevention and response procedures," as required by the permit, which accounted for the climate change factors. Another count alleges a CWA violation because the permit required ExxonMobil to report any relevant facts it either did not previously submit or that it submitted incorrectly, and that ExxonMobil failed to do so as to facts relating to the climate change factors. Another count describes a similar obligation as to the stormwater plan and alleges that ExxonMobil failed to amend or update the stormwater plan with information relating to the climate change factors. It also alleges that ExxonMobil failed to "properly operate and maintain" the Everett terminal or to "take all reasonable steps to minimize" certain discharges having "a reasonable likelihood of adversely affecting human health or the environment" (in violation

of the permit) since it did not account for the climate change factors.  The complaint also alleges that ExxonMobil made certain certifications that were improper for many of the reasons already discussed, in violation of the permit.

The final count relates to RCRA.  It alleges that ExxonMobil violated -- and continues to violate -- RCRA at its Everett terminal because it "has contributed or . . . is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment" largely because it has failed to account for the climate change factors.  42 U.S.C. § 6972(a)(1)(B).

The Foundation seeks injunctive relief to prevent further violations of the CWA and RCRA as well as declaratory relief under the CWA.  It also seeks civil penalties amounting to tens of thousands of dollars per day per violation for each day starting in 2009.  Finally, it seeks costs of the litigation, including attorney and expert witness fees, and all other relief permitted by law.

After the district court ruled on the motion to dismiss, ExxonMobil moved to stay the case under the doctrine of primary jurisdiction until EPA issued a decision on ExxonMobil's pending permit renewal application for the Everett terminal.  ExxonMobil maintained that EPA's decision would likely resolve "most, if not

all, of the disputed issues" in the case.  The district court
granted ExxonMobil's motion.  Conservation Law Found., Inc. v.
ExxonMobil Corp., 448 F. Supp. 3d 7, 12 (D. Mass. 2020).  While
recognizing that the doctrine of primary jurisdiction "must be
applied sparingly, especially in citizen suits authorized by
Congress," it reasoned that this case involved "a rare set
circumstances" justifying application of the doctrine.  Id.  We
will detail its reasoning as it pertains to our analysis later.

The Foundation timely appealed the stay order.

## II.  Discussion

### A.  Appellate Jurisdiction

The parties dispute whether we even have jurisdiction to
hear this case.  Generally speaking, we only have appellate
jurisdiction to review "final decisions of the district courts."
28 U.S.C. § 1291; see Commonwealth Sch., Inc. v. Commonwealth Acad.
Holdings LLC, 994 F.3d 77, 82 (1st Cir. 2021).  A district court's
order is final if it "ends the litigation on the merits and leaves
nothing for the court to do but execute the judgment." Caribbean
Mgmt. Grp., Inc. v. Erikon LLC, 966 F.3d 35, 40 (1st Cir. 2020)
(quoting Whitfield v. Municipality of Fajardo, 564 F.3d 40, 45
(1st Cir. 2009)).  That might seem like an uneasy match for an
order granting a stay -- the decision we are asked to review --
since a stay is the "postponement or halting of a proceeding."
Stay, Black's Law Dictionary (11th ed. 2019).  Indeed, "most stay

orders do not constitute final appealable decisions within the meaning of 28 U.S.C. § 1291." Nat'l R.R. Passenger Corp. v. Providence & Worcester R.R. Corp., 798 F.2d 8, 9 (1st Cir. 1986).

Sometimes, however, a stay bears "special features . . . that make the district court's action something other than what it seems," not just "an ordinary postponement of court action." Hartford Fin. Sys., Inc. v. Fla. Software Servs., Inc., 712 F.2d 724, 726 (1st Cir. 1983) (Breyer, J.). The Foundation argues that this case entails such a stay, because the stay order has rendered the Foundation "effectively-out-of-court." See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 10 (1983). The Foundation focuses on the length of the stay, emphasizing that the case has been pending since 2016, that the district court granted the stay on March 21, 2020, and that the district court's order stayed the case indefinitely pending issuance of a new permit by EPA (though the district court set a check-in date for over a year-and-a-half after its order (November 1, 2021)).

ExxonMobil tells us that the key consideration for determining whether a stay order renders a party "effectively out of court" is not the indefiniteness of the stay but whether the stay "require[s] all or an essential part of the federal suit to be litigated in a state forum" or some other forum. Moses H. Cone, 460 U.S. at 10 n.11. Several "effectively-out-of-court" cases have focused on situations where the federal court stayed

proceedings while a state court was resolving an identical issue and where the state court's judgment would have bound the parties in the federal litigation.  See In re Urohealth Sys., Inc., 252 F.3d 504, 507 (1st Cir. 2001) (citing Moses H. Cone, 460 U.S. at 10 & n.11); Quackenbush v. Allstate Ins., 517 U.S. 706, 713 (1996) (explaining that the stay order in Moses H. Cone was appealable because the stay "put the litigants 'effectively out of court,' and because its effect was 'precisely to surrender jurisdiction of a federal suit to a state court'" (quoting Moses H. Cone, 460 U.S. at 10 n.11)).  In those situations, a party would lose the opportunity to litigate that same issue in federal court.

As ExxonMobil acknowledges, however, that is not the only circumstance our circuit has recognized as rendering a party "effectively out of court."  See Rojas-Hernandez v. P.R. Elec. Power Auth., 925 F.2d 492, 495 (1st Cir. 1991) ("[W]e note that this Court has not interpreted the appealability rule in Moses H. Cone to turn solely on the preclusive effects of the state court judgment.").  Indeed, the approach we have taken -- treating stay orders that impose lengthy or indefinite delays as appealable as final orders under § 1291, even absent any risk that another proceeding will have res judicata effect on the federal case, id.

-- is the approach adopted by several courts of appeals to have considered the issue.[2]

In Rojas-Hernandez, for example, which is binding precedent in our circuit, there was ambiguity about whether the appellant was a party to state-court proceedings which concerned an issue identical to one he had initiated litigation on in federal court. 925 F.2d at 494-95. Accordingly, there was ambiguity about whether the state-court judgment there would have had preclusive effect in the federal-court proceedings. Id. And if the state-court judgment were not binding in federal court, then the appellant would not be "effectively out of court" in the way ExxonMobil suggests is necessary, because the appellant would get

---

[2] The Second, Fifth, Ninth, Eleventh, and Federal Circuits agree that stay orders imposing lengthy or indefinite delays are appealable as final orders under § 1291. See King v. Cessna Aircraft Co., 505 F.3d 1160, 1165 (11th Cir. 2007) (holding that "a stay order that is immoderate and involves a protracted and indefinite period of delay is final and appealable under 28 U.S.C. § 1291"); see also XPO Logistics, Inc. v. Elliott Cap. Advisors, LP, 673 F. App'x 85, 86 (2d Cir. 2016) (unpublished); Occidental Chem. Corp. v. La. Pub. Serv. Comm'n, 810 F.3d 299, 307-09 (5th Cir. 2016); Stanley v. Chappell, 764 F.3d 990, 995 (9th Cir. 2014); Spread Spectrum Screening LLC v. Eastman Kodak Co., 657 F.3d 1349, 1354 (Fed. Cir. 2011). But see Crystal Clear Commc'ns v. Sw. Bell Tel. Co., 415 F.3d 1171, 1176 (10th Cir. 2005) (explaining that, "[i]f a stay merely delays litigation and does not effectively terminate proceedings, it is not considered a final decision"); see also Strausser v. Twp. of Forks, 460 F. App'x 115, 119 (3d Cir. 2012). Other circuits have not yet articulated a clear position on this query. See, e.g., Clark v. Adams, 300 F. App'x 344, 351 (6th Cir. 2008) (unpublished); Phyllis Schlafly Revocable Tr. v. Cori, 924 F.3d 1004, 1010 (8th Cir. 2019); Belize Soc. Dev. Ltd. v. Gov't of Belize, 668 F.3d 724, 730 (D.C. Cir. 2012).

to litigate his entire case in federal court after all. Nevertheless, we found we had jurisdiction in Rojas-Hernandez because the appellant was "effectively out of court" for a different reason: "the indefinite unnecessary delay inherent in the stay order." Id. at 495 (quoting Nat'l R.R. Passenger Corp., 798 F.2d at 10). Even though the state court had set a trial date, we determined that the appellant was subject to an indefinite delay:

> The stay in this case . . . [creates] a delay tied not into the usual considerations of the federal court's calendar but rather to those arising in the state proceeding. . . . Whether or not the trial in the commonwealth court takes place in the near future, [as scheduled,] plaintiff's trial has already been delayed almost a year since the entry of the district court order . . . , and further delays may arise while an opinion is awaited and an appeal taken.

Id. We also recognized that if the state-court proceedings turned out not to be binding (as we had assumed), then the stay would not even have preserved any judicial resources. Id.

We think the situation here mirrors that in Rojas-Hernandez. See, e.g., Occidental Chem. Corp. v. La. Pub. Serv. Comm'n, 810 F.3d 299, 307 (5th Cir. 2016) (finding that a decision to stay a case under the primary jurisdiction doctrine rendered the plaintiff "effectively out of court" where the agency had taken no action since the entrance of the stay and, after nearly two years, there was "no indication" of when it might take action);

<u>Johnson & Johnson, Inc.</u> v. <u>Wallace A. Erickson & Co.</u>, 627 F.2d 57, 62 (7th Cir. 1980) (taking a similar approach in a case where the court ordered plaintiff to initiate patent reissue proceedings with the PTO and stayed patent infringement case pending resolution of those proceedings, resulting in delay that was for an "indefinite period, and possibly forever"). ExxonMobil tries to distinguish this case on the facts, pointing out that EPA has represented that the agency is trying to issue a new permit by October 2021. Even if EPA can deliver by its proposed issuance date (over eight years since ExxonMobil submitted its application), the Foundation will have endured the stay for over a year and a half. This is so even though the district court is requiring the parties in November 2021 to report their views on whether the stay should be lifted if EPA has not by that point issued the permit. ExxonMobil contends that this check-in date makes the delay not so "indefinite," but the mere fact that the district court may reconsider its stay order after over a year and a half does not mean that the stay's duration is definite for purposes of our appellate jurisdiction. <u>But see</u> <u>Cheyney State Coll. Faculty</u> v. <u>Hufstedler</u>, 703 F.2d 732, 735–36 (3d Cir. 1983) (concluding a stay order was not indefinite where the district court asked for an update on administrative proceedings within ninety days and where the district court agreed to reconsider its order on that date).

ExxonMobil maintains that we should render a party "effectively out of court" due to "indefinite" delay in more limited circumstances, such as where there is not even the possibility of an eventual return to federal court. See, e.g., Crystal Clear Commc'ns, Inc. v. Sw. Bell Tel. Co., 415 F.3d 1171, 1177 (10th Cir. 2005) (explaining that a party was not "effectively out of court" since the "referral of a discrete issue to a federal agency under the doctrine of primary jurisdiction leaves open the possibility of an eventual return to federal court"). Our caselaw, however, espouses a broader view -- in Rojas-Hernandez, for example, we contemplated that the appellant would eventually return to federal court, 925 F.2d at 495 -- and, subject to only rare exceptions, we are bound by our circuit's prior decisions, see United States v. Barbosa, 896 F.3d 60, 74 (1st Cir. 2018).

For an indefinite stay to confer appellate jurisdiction under § 1291, the stay must also be unnecessary. See Miccosukee Tribe of Indians of Fla. v. S. Fla. Water Mgmt. Dist., 559 F.3d 1191, 1197 (11th Cir. 2009) (explaining that suspended-animation stays are appealable when they are "pending the outcome of proceedings that [are] unlikely to control or to narrow substantially the claims or unresolved issues in the stayed lawsuit"); Rojas-Hernandez, 925 F.2d at 495 (describing the appellant as effectively-out-of-court because of the "indefinite unnecessary delay inherent in the stay order" (quoting Nat'l R.R.

Passenger Corp., 798 F.2d at 10)). That requires us to review the likely outcome of the stay, an approach that "contrasts with the usual situation in which we first ascertain that jurisdiction exists and only then proceed to the merits." Cheyney State Coll. Faculty, 703 F.2d at 735. We will explain why the stay is unnecessary in the next section.

Accordingly, we find that we have jurisdiction to hear this appeal.[3]

## B. The Stay Order

The district court granted ExxonMobil's motion for a stay under the doctrine of primary jurisdiction. As we mentioned earlier, the doctrine "applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence

---

[3] The Foundation provides two alternative bases for hearing this case. First, it argues that the stay order is final because it falls within the collateral order doctrine laid out in Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541 (1949). Second, it argues that we have jurisdiction under 28 U.S.C. § 1651 to issue a writ of mandamus, a "'drastic and extraordinary' remedy 'reserved for really extraordinary causes.'" Cheney v. U.S. Dist. Ct. for D.C., 542 U.S. 367, 380 (2004) (quoting Ex parte Fahey, 332 U.S. 258, 259–260 (1947)). Because we find appellate jurisdiction over the stay order because the Foundation is "effectively out of court," we need not discuss these alternatives further. See, e.g., Moses H. Cone, 460 U.S. at 8 n.6 ("[A] court of appeals has no occasion to engage in extraordinary review by mandamus 'in aid of [its] jurisdictio[n],' 28 U.S.C. § 1651, when it can exercise the same review by a contemporaneous ordinary appeal." (second and third alterations in original)).

of an administrative body." W. Pac. R.R., 352 U.S. at 64. The
doctrine guides a court in deciding when those issues should be
resolved in the first instance by the agency. See PHC, Inc. v.
Pioneer Healthcare, Inc., 75 F.3d 75, 80 (1st Cir. 1996). The
doctrine exists to promote "national uniformity in the
interpretation and application of a federal regulatory regime" and
"to avoid the possibility that a court's ruling might disturb or
disrupt the regulatory regime of the agency in question." Am.
Auto. Mfrs. Ass'n v. Mass. Dep't of Envtl. Prot., 163 F.3d 74, 81
(1st Cir. 1998).

The district court found a stay appropriate until EPA
renews ExxonMobil's permit for the Everett terminal. It reasoned
that determining permit conditions fell squarely under EPA's
authority, that EPA was better suited than the court to determine
the scientific and policy issues raised by ExxonMobil's need to
consider the climate change factors, that EPA's renewal of the
permit might moot the Foundation's request for injunctive relief,
and that resolving the case on the merits would take at least as
long as EPA's projected timeline for renewing the permit.
Conservation Law Found., Inc., 448 F. Supp. 3d at 12.

### 1. Primary Jurisdiction and Citizen Suits

The Foundation brought this action under the citizen
suit provisions of the CWA and RCRA, and the Foundation argues
that suits brought under those provisions bar courts from applying

the primary jurisdiction doctrine. Citizen suits "function as a form of statutory enforcement in addition to, or in conjunction with, enforcement by an administrative agency or other governmental entity." Chico Serv. Station, Inc. v. Sol P.R. Ltd., 633 F.3d 20, 27 (1st Cir. 2011) (quoting Esso Standard Oil Co. (P.R.) v. Rodríguez-Pérez, 455 F.3d 1, 5 n.2 (1st Cir. 2006)). In other words, citizen suit provisions demonstrate circumstances where Congress wanted to allow individuals to bring lawsuits, even where an agency has some authority. The primary jurisdiction doctrine, on the other hand, is a form of abstention, that is, "a prudential mechanism that allows federal courts to take note of and weigh significant and potentially conflicting interests that were not -- or could not have been -- foreseen by Congress at the time that it granted jurisdiction for a given class of cases to the courts." Id. at 31; see United States v. Culliton, 328 F.3d 1074, 1082 (9th Cir. 2003) ("Whether the doctrine of primary jurisdiction applies in any particular situation depends on 'the extent to which Congress, in enacting a regulatory scheme, intends an administrative body to have the first word on issues arising in juridical proceedings.'" (quoting United States v. Gen. Dynamics Corp., 828 F.2d 1356, 1362 (9th Cir. 1987))). We ourselves have previously recognized some tension between citizen suits and Burford abstention. See generally Chico, 633 F.3d at 30-31.

In Chico, we examined whether Burford abstention, a type
of abstention related to the doctrine of primary jurisdiction, was
applicable to a suit brought under RCRA's citizen suit provision.
633 F.3d at 30.  We began our abstention discussion by taking note
of a bedrock principle:

> Abstention occupies an uneasy position in the
> jurisprudence of federal court jurisdiction.
> As the common refrain goes, "federal courts
> have a 'virtually unflagging obligation . . .
> to exercise the jurisdiction given them.'"
> Ankenbrandt v. Richards, 504 U.S. 689, 705
> (1992) (quoting Colo. River Water Conservation
> Dist. v. United States, 424 U.S. 800, 817
> (1976)); United States v. Fairway Capital
> Corp., 483 F.3d 34, 44 (1st Cir. 2007) (same).
> This all but unyielding duty to exercise
> jurisdiction rests on the "the undisputed
> constitutional principle that Congress, and
> not the Judiciary, defines the scope of
> federal jurisdiction within the
> constitutionally permissible bounds." New
> Orleans Pub. Serv., Inc. v. Council of New
> Orleans (NOPSI), 491 U.S. 350, 359 (1989); see
> also Cohens v. Virginia, 19 U.S. 264, 404
> (1821) (federal courts "have no more right to
> decline the exercise of jurisdiction which is
> given, than to usurp that which is not").

Chico, 633 F.3d at 28-29.  In our consideration of the abstention
issue before the court, we observed that most courts to consider
the issue, under either Burford abstention or the doctrine of
primary jurisdiction, had found abstention improper.  Id. at 30.
We then explained that Congress had recognized in RCRA's citizen
suit provision "the specific clash of interests" we were
considering with respect to abstention, and we thought abstention

might "threaten[] an 'end run around RCRA,' and would substitute our judgment for that of Congress about the correct balance between respect for state administrative processes and the need for consistent and timely enforcement of RCRA." Id. at 31 (quoting PMC, Inc. v. Sherwin-Williams Co., 151 F.3d 610, 619 (7th Cir. 1998)). Nevertheless, we declined to categorically rule out the possibility of abstention in RCRA in citizen suits. Id. Instead, we expressed our view that the "circumstances justifying abstention will be exceedingly rare." Id. at 32.

Reasoning by analogy, the Foundation argues that the circumstances justifying the doctrine of primary jurisdiction should be exceedingly rare -- and, in fact, nonexistent -- when a suit is brought under the citizen suit provisions of the CWA and RCRA. Because we find abstention improper in the circumstances of this particular case, however, we need not determine whether the doctrine of primary jurisdiction doctrine is, as the Foundation urges, inapplicable to every case brought under the citizen suit provisions of the CWA and RCRA. See Baykeeper v. NL Indus., Inc., 660 F.3d 686, 695 (3d Cir. 2011) (finding abstention improper while declining to impose a general rule as to the applicability of the primary jurisdiction doctrine to cases brought under citizen suit provisions). We now explain why we find abstention improper here.

### 2. Review

To start, we must decide what standard we ought to apply

in reviewing the stay order, but the parties have hardly discussed this issue. Our caselaw does not readily provide an answer. Compare U.S. Pub. Interest Research Grp. v. Atl. Salmon of Me., LLC, 339 F.3d 23, 34 (1st Cir. 2003) (suggesting that a district court has some discretion over whether to stay a case under the primary jurisdiction doctrine), with Newspaper Guild of Salem, Local 105 of Newspaper Guild v. Ottaway Newspapers, Inc., 79 F.3d 1273, 1283 (1st Cir. 1996) ("We review de novo the district court's implicit jurisdictional finding that the Guild's claims fall within the primary jurisdiction of the NLRB."); see also U.S. Pub. Interest Research Grp., 339 F.3d at 34 ("[A] refusal in this case to make a primary jurisdiction reference prior to the state's issuance of the permit was neither a mistake of law nor an abuse of discretion."). And other circuit courts are split over whether to review decisions about the application of the doctrine of primary jurisdiction for abuse of discretion or without any deference to the district court. See Chlorine Inst., Inc. v. Soo Line R.R., 792 F.3d 903, 908 (8th Cir. 2015) (collecting cases); see generally Nicholas A. Lucchetti, One Hundred Years of the Doctrine of Primary Jurisdiction: But What Standard of Review Is Appropriate for It?, 59 Admin. L. Rev. 849 (2007). For present purposes, we assume -- favorably to ExxonMobil -- that our review is for abuse of discretion. "Abuse occurs when a material factor deserving significant weight is ignored, when an improper factor

is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them." Indep. Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co., 864 F.2d 927, 929 (1st Cir. 1988).

Although there is "[n]o fixed formula" for applying the primary jurisdiction doctrine, W. Pac. R.R., 352 U.S. at 64, we have recognized three principal factors that guide whether to defer a matter to an agency:

> (1) whether the agency determination l[ies] at the heart of the task assigned the agency by Congress; (2) whether agency expertise [i]s required to unravel intricate, technical facts; and (3) whether, though perhaps not determinative, the agency determination would materially aid the court.

Massachusetts v. Blackstone Valley Elec. Co., 67 F.3d 981, 992 (1st Cir. 1995) (quoting Mashpee Tribe, 592 F.2d at 581). We may also consider whether referral to the agency promotes "national uniformity in the interpretation and application of a federal regulatory regime." Am. Auto. Mfrs. Ass'n, 163 F.3d at 81; see also Blackstone, 67 F.3d at 992.

As a reminder, the district court stayed the case until EPA issues its new permit for ExxonMobil's Everett terminal. As to the first Blackstone factor, the district court sensibly determined that issuing a permit and determining its terms lie at the heart of EPA's assigned task. See 33 U.S.C. § 1342; Arkansas v. Oklahoma, 503 U.S. 91, 105 (1992) ("Congress has vested in the

[EPA] Administrator broad discretion to establish conditions for NPDES permits.").

As to the second Blackstone factor, the district court explained that -- because the complaint focuses heavily on ExxonMobil's alleged failure to account for the climate change factors -- it would have to determine "whether and to what extent climatologists believe weather patterns in Boston are changing, and how prudent industrial engineers would respond to such changes" in order to grant the requested relief. Conservation Law Found., Inc., 448 F. Supp. 3d at 22. We assume for the sake of argument that agency expertise would be helpful to unravel which climate models most accurately capture the effects of the climate change factors. Cf. BASF Wyandotte Corp. v. Costle, 598 F.2d 637, 655 (1st Cir. 1979) ("[T]he choice of statistical methods is a matter best left to the sound discretion of the [EPA] Administrator." (quoting FMC Corp. v. Train, 539 F.2d 973, 986 (4th Cir. 1976))); but see Me. People's All. v. Mallinckrodt, Inc., 471 F.3d 277, 293 (1st Cir. 2006) ("[F]ederal courts have proven, over time, that they are equipped to adjudicate individual cases, regardless of the complexity of the issues involved. Federal courts are often called upon to make evaluative judgments in highly technical areas (patent litigation is an excellent example).").

We now turn to the third Blackstone factor -- whether the agency determination would materially help the court. Of

course, were we to weigh each of the Blackstone factors equally, the first two factors might outweigh the third even if the agency determination underlying the stay were completely unrelated to an issue before the court. But that is obviously not what is meant. "[T]he doctrine of primary jurisdiction is not a doctrine of futility; it does not require resort to 'an expensive and merely delaying administrative proceeding when the case must eventually be decided on a controlling legal issue wholly unrelated to determinations for the ascertainment of which the proceeding was sent to the agency.'" Local Union No. 189, Amalgamated Meat Cutters & Butcher Workmen of N. Am., AFL-CIO v. Jewel Tea Co., 381 U.S. 676, 686 (1965) (quoting Fed. Mar. Bd. v. Isbrandtsen Co., 356 U.S. 481, 521 (1958) (Frankfurter, J., dissenting)). So, the third factor can outweigh the other factors, and sometimes greatly so. See U.S. Pub. Interest Research Grp., 339 F.3d at 34 (explaining that whether to apply the doctrine of primary jurisdiction "usually depends on whether a reference will advance the sound disposition of the court case and whether failure to refer will impair the statutory scheme or undermine the agency to which the reference might be made").

The third Blackstone factor is especially salient in this case. Whether and on what terms EPA issues the permit for the Everett terminal seems to us largely irrelevant to whether ExxonMobil has violated the conditions of the permit currently in

effect.[4]  And it is wholly speculative whether the issuance of the permit will illuminate EPA's beliefs as to the best climate change models or how good engineers would respond to them, even if it must publish a draft permit, provide detailed explanations for the permit's conditions, and respond to public comments.  See 40 C.F.R. §§ 124.7, 124.8, 124.11, 124.13, 124.17.  The stay also seems unlikely to aid in the national uniformity of the meaning of terms at issue in ExxonMobil's permit or the appropriate scope of climate change regulations since EPA is not tasked with interpreting them. See Astiana v. Hain Celestial Grp., Inc., 783 F.3d 753, 761 (9th Cir. 2015) ("Common sense tells us that even when agency expertise

---

[4]  See, e.g., Sierra Club, Inc. v. Granite Shore Power LLC, No. 19-CV-216-JL, 2019 WL 8407255, at *13 (D.N.H. Sept. 13, 2019) ("At its core, the EPA's current permit adjudication concerns the content and scope of [the facility's] future permit conditions. This is a very different determination than whether [the facility] is operating in compliance with its current permit conditions." (citation omitted)) (denying motion to stay citizen suit alleging violations of existing NPDES permit under primary jurisdiction doctrine notwithstanding pending permit renewal proceeding); Student Pub. Interest Research Grp. of N.J., Inc. v. Fritzsche, Dodge & Olcott, Inc., 579 F. Supp. 1528, 1537-38 (D. N.J. 1984), aff'd, 759 F.2d 1131 (3d Cir. 1985) ("Defendant's argument confuses two events:  the present citizen's suit, to enforce an existing NPDES permit; and a renewal application") (rejecting argument that citizen suit alleging violation of NPDES permit should be stayed pending permit reissuance); Ill. Pub. Interest Research Grp., 835 F. Supp. at 1076 (finding primary jurisdiction inapplicable where citizen suit seeks enforcement of existing permit terms); cf. Student Pub. Interest Research Grp. of N.J., Inc. v. Monsanto Co., 600 F. Supp. 1479, 1483 (D.N.J. 1985) ("The pendency of a [permit] modification proceeding does not excuse violations of a permit prior to actual modification:  a modification request does not stay existing permit limitations.").

would be helpful, a court should not invoke primary jurisdiction when the agency is aware of but has expressed no interest in the subject matter of the litigation."); see also Student Pub. Interest Research Grp. of N.J., Inc. v. Monsanto Co., 600 F. Supp. 1479, 1483 (D.N.J. 1985) ("[W]hatever uniformity the EPA hoped to achieve presumably was expressed through the issuance of permits.").[5] After all, ExxonMobil has represented that its permit application seeks the issuance of a permit that is similar "in all material aspects" to the one currently in effect.

For these reasons, we find unconvincing the district court's rationale that EPA's determination on the permit could render "most of th[e] case moot" since the Foundation has sought injunctive relief and since the new permit might cover some or all of the behavior the Foundation seeks to enjoin. Conservation Law Found., Inc., 448 F. Supp. 3d at 24. The district court also reasoned that even if the new permit did "not directly address climate change," it would "generate a fuller administrative record to which [it could] refer to discern the meaning of particular terms" in the permit. Id. at 23. That may be so, but we are not

---

[5] EPA is well aware of this litigation. In fact, EPA's statements in this case have expressly discounted concerns with any regulatory interference (indicating in a letter filed in this matter that the threat that "rulings in this case could be contrary to EPA's programs" is no greater than that "present in most private environmental litigation"). Further, EPA was invited to comment on this lawsuit and expressly declined to do so.

satisfied that a stay awaiting EPA's decision on ExxonMobil's permit for this reason would "materially" help the district court.[6]

After considering the Blackstone factors, we balance them "against the potential for delay inherent in the decision to refer an issue to an administrative agency." Am. Auto. Mfrs. Ass'n, 163 F.3d at 81.[7] Since the Blackstone factors do not weigh in favor of the stay envisioned by the district court, any potential delay only furthers our view that the stay was unjustified. We add that, despite the district court ruling on ExxonMobil's motion to dismiss in March 2019, the parties have not even begun discovery. The district court explained that, in its view, even under an "ambitious, and perhaps unrealistic, schedule," discovery and briefing on summary judgment would take

_____

[6] We can imagine much more salient agency determinations, though we do not suggest that a stay to refer such determinations to EPA would satisfy the Blackstone factors or that it would be proper for the district court on remand to refer such determinations to the agency at this stage of the litigation. EPA's determination would much more likely aid the district court if, for example, it were to consider the meaning of the terms as used in ExxonMobil's permit whose terms are currently in effect.

[7] In American Automobile Manufacturers, we advised that where delay would potentially be too great to justify a referral, a district could, for example, "refer a matter to an administrative agency, explicitly providing, however, that if the agency fails to rule within a reasonable amount of time, the court would either vacate the referral order and decide the matter itself, or issue an order under 5 U.S.C. § 706(1), which authorizes courts to 'compel agency action . . . unreasonably delayed.'" 163 F.3d at 82. There, we stayed proceedings to afford one of the parties the opportunity to obtain a ruling from EPA, but we warned that if no agency ruling was forthcoming in 180 days, we would decide the issues in the case without EPA's guidance. Id. at 86–87.

over a year.  Conservation Law Found., Inc., 448 F. Supp. 3d at
26.  Although the district court foresaw the issuance of the new
permit as mooting many of the issues in the case, it is unclear
how, as it believed, "deferring to the EPA until at least October
2021 [w]ould not delay the resolution of the issues involved in
this case."  Id.  Even if EPA issues ExxonMobil's permit by EPA's
proposed deadline and even if the permit moots the Foundation's
request for injunctive relief, the parties would still have to
begin discovery on the counts alleging past violations.  Indeed,
the district court held that the Foundation's complaint adequately
alleged that ExxonMobil was or is contributing to an "imminent and
substantial endangerment to health or the environment" in
violation of RCRA.  42 U.S.C. § 6972(a)(1)(B).  And that count
does not even involve consideration of the permit's terms.

In conclusion, we think the district court erred in
granting a stay under the doctrine of primary jurisdiction until
EPA issues a new permit for ExxonMobil's Everett terminal.

### III.  Conclusion

For the foregoing reasons, we vacate the stay order and
remand for proceedings not inconsistent with this opinion.  Costs
to the appellant.